IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:19-CR-218-TAV-DCP |
| | ) | |
| GLENN FRED GLATZ, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or recommendation as appropriate. This case is before the undersigned on Defendant Glenn Glatz's motion to suppress evidence gained from the warrantless seizure of his cellphone and SD card and his unwarned statements made to law enforcement officers and challenging the lawfulness of the subsequent search of his person and of his arrest. [Docs. 19, 96, & 112].[1] The events leading to the seizure and subsequent searches of Defendant's cellphone and SD card began on May 2, 2018, when Defendant reported to the Jefferson County Sheriff's Office ("JCSO") for a meeting on his sex offender registration. During this interview, JCSO Detectives Richard Collins and Pamela Taylor seized Defendant's cellular telephone and SD card, frisked Defendant, and later advised him of his rights, which he waived in writing, approximately twenty-nine minutes into the interview. The following day, the officers obtained a search warrant for the contents of Defendant's cellphone and "sim card" based, in part, on Defendant's unwarned statements during the May 2 interview. The Federal Bureau of Investigation ("FBI") subsequently

---

[1]    *See infra* n.6.

1

obtained search warrants on June 6, 2018, and again on November 19, 2019, for later searches of the contents of Defendant's cellphone and SD card.

Defendant contends that the seizure of his cellphone and SD card and the repeated searches of their contents violated his rights under the Fourth Amendment and asks the Court to suppress all evidence flowing from the seizure and searches of his cellphone and SD card. Defendant also asks the Court to suppress his unwarned statements on May 2, 2018, which he argues occurred in custody and were the product of police coercion, thereby tainting any statements given after he received the *Miranda* warnings and signed a rights waiver. Finally, Defendant contends that he was unlawfully searched on May 2, 2018, and unlawfully arrested on May 3, 2018.

For the reasons discussed herein and after reviewing the parties' arguments and exhibits and the relevant legal authorities, the Court finds that law enforcement properly seized Defendant's cellphone and SD card, which the Court finds was contained within the cellphone, because the officers had probable cause to believe Defendant's cellphone contained evidence of Defendant's violations of the sex offender registry and a reasonable belief that he would destroy any evidence on the phone and card.[2] The Court finds that Defendant's statements to law enforcement on May 2, 2018, cannot be used in the Government's case-in-chief at trial, because they were obtained in violation of his rights under the Fifth Amendment. The Court also finds the search of Defendant's person during the May 2, 2018 interview was reasonable and that no evidence was seized. Finally, the Court finds that law enforcement had probable cause to arrest Defendant on May 3, 2018, for a violation of the sex offender registration law. Accordingly, the

---

[2] Whether probable cause existed to issue the three search warrants to search the contents of Defendant's cellphone and SD card is the subject of Defendant's Motion to Suppress All Evidence Obtained [in Three Search Warrants] [Doc. 20] and his Motion for a "Franks" Hearing [Doc. 34], which will be addressed by separate Report and Recommendation.

2

Court respectfully recommends that Defendant's motion to suppress evidence from the seizure of his cellphone and SD card [Doc. 19] be granted in part in that his May 2, 2018 statements to JCSO detectives cannot be used in the Government's case-in-chief at trial and that his motion be denied in all other respects.

## I. PROCEDURAL HISTORY

Defendant is charged [Doc. 1] with four counts of inducing a minor to engage in sexually explicit conduct to produce child pornography (Counts 1, 4, 6, & 8), one count of receiving child pornography (Count 2), three counts of transfer of obscene materials to a minor (Counts 3, 5, & 7), and one count of possession of child pornography (Count 9). These charges are alleged to have occurred between December 2015 through May 2, 2018. Count 1 relates to minor A.A., and Counts 3 through 8 relate to minor F.R. Counts 3, 5, and 7 relate to a minor under age sixteen, and Count 9 relates to a minor under age twelve. These charges all arise from the data extracted from Defendant's cellular telephone and SD card, which were seized on May 2, 2018, by the JCSO.

At Defendant's initial appearance on January 28, 2020, the Court appointed Assistant Federal Defender Jonathan A. Moffatt and the Federal Defender Services of Eastern Tennessee ("FDS") to represent him. On June 19, 2020, counsel filed the instant Motion to Suppress All Evidence Resulting from the Warrantless Seizure of Defendant's LG Cellphone and an SD Card [Doc. 19] and a Motion to Suppress All Evidence Obtained by a May 3, 2018 Jefferson County Search Warrant, a June 6, 2018 Federal Search Warrant, and a November 19, 2019 Federal Search Warrant [Doc. 20]. Thereafter, counsel asked to delay the evidentiary hearing on these motions, while counsel reviewed the voluminous discovery and researched legal matters, all while hampered by limitations relating to the Covid-19 pandemic [Docs. 25, 28, & 37]. Counsel also requested and was granted leave [Doc. 32] to file a third dispositive motion, the Motion for a

"Franks" Hearing [Doc. 34].[3]   The Government responded in opposition to Defendant's suppression motions [Docs. 23, 24, & 35].  The Court held an evidentiary and suppression hearing on these motions on April 14, 2021, at the conclusion of which the parties asked to file post-hearing briefs [Doc. 44, Transcript, pp. 110–12].

Defendant subsequently asserted his right to represent himself and asked to file his own post-hearing briefs [Doc. 41].  On June 8, 2021, the undersigned found Defendant knowingly and voluntarily waived his right to counsel, permitted him to represent himself, and appointed Mr. Moffatt to serve as elbow counsel [Doc. 48].  Defendant filed post-hearing briefs [Docs. 96, 97 & 100] and exhibits [Doc. 98] on September 24, 2021.[4]   The Government filed responding post-hearing briefs on October 15, 2021 [Docs. 103–105], and Defendant filed replies on October 25, 2021 [Docs. 112 & 113].

On April 26, 2022, Defendant moved the Court for leave to file a supplemental brief on the location of the micro SD card at the time of seizure [Doc. 139-1].  The Government opposed the untimely filing, arguing the proposed filing realleges issues that have been fully briefed [Doc.

---

[3]    Counsel was also granted leave [Doc. 32] to file a Motion to Suppress Evidence Obtained from a Google Drive Cloud Storage Service [Doc. 33] ("Google Cloud motion").  At the April 14, 2021 evidentiary hearing, Mr. Moffatt moved to withdraw the Google Cloud motion, based upon the Government's representation that it did not access Defendant's Google Cloud accounts [Doc. 44 pp. 5–7].  When Defendant assumed his own representation, the Court held counsel's withdrawal of this motion in abeyance [Doc. 48].  Although Defendant stated that he wanted to pursue this motion [Doc. 87], the Government stipulated that it would not use any evidence from Defendant's Google Cloud storage accounts at trial [Docs. 124 & 134].  Accordingly, the Court found the Google Cloud motion to be moot [Doc. 124].

[4]    Defendant Glatz initially filed post-hearing briefs [Docs. 69 & 80], which together exceeded the page limitation in Local Rule 7.1(b) by nearly seventy-five pages, exclusive of Defendant's forty-five exhibits [Docs. 80-1 through 80-45].  The Court required Defendant to refile his post-hearing briefs, limited to a combined page limit of one hundred pages and to resubmit his exhibits, omitting exhibits 43 and 44 [Doc. 87].

4

140].  Most recently, on September 20, 2022, Defendant filed a motion for leave to correct references to exhibit numbers, a citation, and a date in his post-hearing briefs and to add a missing page to two exhibits [Doc. 151].  The Government did not respond to this motion, which the Court subsequently granted [Doc.  157].[5]

## II.  POSITIONS OF THE PARTIES

Defendant asks [Docs. 19, 96, & 112][6] the Court to suppress all evidence gained from the warrantless seizure of his cellphone and SD card.  He contends that JCSO officers violated his rights under the Fourth Amendment by seizing his cellphone and SD card without a search warrant or probable cause.  Defendant also asks the Court to suppress the statements he made to law enforcement on May 2, 2018, arguing that his initial statements were obtained before he was advised of the *Miranda* warnings and that, even after the officers provided the *Miranda* warnings, his statements were the product of police coercion in violation of the Fifth Amendment.  Finally, he argues that law enforcement also violated the Fourth Amendment by searching his person without a warrant or probable cause on May 2, 2018, and illegally arresting him on May 3, 2018.

---

[5]     The Court will address Defendant's Motion to Suppress All Evidence Obtained [from Three Search Warrants] [Doc. 20] and his Motion for a "Franks" Hearing [Doc. 34], along with Defendant's challenge to irregularities with the November 19, 2019 federal search warrant [Doc. 99], in a separate report and recommendation.

[6]     The Court notes that in his Post-hearing Brief on Suppression Hearing, Part I [Doc. 96], Defendant incorporates the arguments he makes in his other post-hearing briefs [Docs. 97 & 100] and the arguments made by former counsel in the Motion to Suppress All Evidence Resulting from the Warrantless Seizure of Defendant's LG Cellphone and an SD Card [Doc. 19].  In his reply brief [Doc. 112], Defendant incorporates his arguments in all preceding motions and post-hearing filings.  This Report and Recommendation focuses on the constitutionality of the seizure of Defendant's cellphone and SD card on May 2, 2018; Defendant's statements and the frisk of his person on that same day; and Defendant's arrest on May 3, 2018.  The Court has examined Defendant's references to other documents in his post-hearing brief and reply.

5

The Government responds [Docs. 23 & 103] that the JCSO properly seized Defendant's cellphone, which contained his SD card, to prevent Defendant from destroying evidence and then applied for a search warrant to search the contents of the cellphone and SD card. It contends that information from a citizen complaint combined with Defendant's admission that he was using his cellphone to have online conversations of a sexual nature with a minor provided probable cause for the officers to believe the cellphone contained evidence of crimes. The Government asserts the fact that the cellphone and the information it contained could be easily destroyed provided exigent circumstances to permit the warrantless seizure of the cellphone. The Government also argues that Defendant was not in custody, nor subject to police coercion, when he voluntarily participated in the May 2, 2018 interview. It contends that law enforcement had probable cause to believe Defendant used the undisclosed account "Tennesseetomcat" on a website known as DeviantArt[7] ("Tennesseetomcat account") when they arrested him on May 3, 2018.[8]

## III. SUMMARY OF THE EVIDENCE

The Court held an evidentiary hearing on Defendant's motions on April 14, 2021.[9] The Government presented the testimony of JCSO Detective Richard Collins, which the Court summarizes as follows:

Detective Collins testified that he has worked for the JCSO for five years [Tr. at 11]. Detective Collins is a special victim investigator, and his duties include investigating cases involving children [*Id.*]. He also maintains the sex offender registry for Jefferson County,

---

[7]     The website for DeviantArt was noted as www.deviantart.com [Doc. 103 p. 2]

[8]     The Government's arguments on the May 3, 2018 arrest are found in its Post-Hearing Brief in Opposition to Motion for a *Franks* Hearing [Doc. 105].

[9]     The transcript of the April 14, 2021 evidentiary hearing [Doc. 44], which was filed on May 7, 2021, will be cited as "Tr." with the referenced page number.

6

Tennessee [Tr. at 12]. Detective Collins stated that sex offenders living or working in Jefferson County must register either quarterly or annually [*Id.*]. He records information received from the sex offenders in the Tennessee Bureau of Investigation ("TBI") computer system, where it can be accessed throughout Tennessee [*Id.*]. Sex offenders reporting quarterly must provide the following information: Address, phone numbers, work locations, email addresses, chat identification, instant message accounts, and all social media accounts [Tr. at 13]. Detective Collins agreed that state law requires sex offenders to update the registry within three days of creating a new email or online account [*Id.*].

Detective Collins stated that Defendant first registered with the JCSO in 2017 and he thought Defendant was on the sex offender registry for convictions for two counts of child rape [Tr. at 14]. Detective Collins identified Defendant's sex offender registration form from March 28, 2018 [Tr. at 15–16, Exh. 1].[10] He said this form does not list "Tennesseetomcat" as Defendant's online identification for the DeviantArt.com website [Tr. at 16].

Detective Collins testified regarding a telephone call on April 24, 2018, from a complainant identified as "S.T." and which was taken by Deputy Blake Cupp [Tr. at 18–19]. S.T. reported that she saw a posting or "journal" on the DeviantArt website [Tr. at 18, Exh. 2 pp. 3–4]. According to S.T., the journal said Glenn Glatz was "role playing" with a thirteen-year-old girl, and the journal contained pictures of Glatz sending photos of "his private area" [Tr. at 18–19; Exh. 2 p. 3]. S.T. reported that she did not know the victim and that based on her investigation, Glatz lived in Dandridge, Tennessee [Tr. at 18; Exh. 2 pp. 3–4]. Detective Collins said after the JCSO received this call, he and former Detective Pam Taylor investigated the allegations by S.T. [Tr. at 19]. At

---

[10]    The Tennessee Sexual Offender Registration Form [Exh. 1], signed on March 28, 2018, lists Defendant's offense of conviction as child molestation, occurring on October 1, 1992, in Hall County, Georgia, and involving a nine-year-old female.

that time, Detective Taylor, who no longer works for the JCSO, assisted with registering sex offenders [Tr. at 22].

Detective Collins said on May 1, 2018, he called Defendant and asked him to come to the JCSO the next day to review his sex offender registration [Tr. at 20; Exh. 2 p. 4]. He said he asked Defendant to come in because the "Tennesseetomcat" username, which S.T. reported Glatz was using, was not listed on Glatz's sex offender registration, as required by state law [*Id.*; Exh. 2 p. 4]. Detective Collins said Detective Taylor conducted some online investigation after receiving the complaint from S.T. but before he called Defendant [*Id.*].

Detective Collins testified that Defendant came to the JCSO on May 2, 2018 [Tr. at 20–21]. He and Detective Taylor spoke to Defendant in a ten-foot-by-fourteen-foot interview room, which had recording equipment [Tr. at 21, 24]. He said during the interview, the door to the interview room was closed but not locked [Tr. at 21]. He said Defendant was not under arrest during this interview, and he did not frisk Defendant at the beginning of the interview [Tr. at 24]. Detective Collins assumed he was armed during the interview [*Id.*]. Detective Collins identified the recording of the interview and explained that the timestamp on the recording is off by one hour, due to the time change [Tr. at 22–23, Exh. 3].[11]

---

[11]    Detective Taylor's May 10, 2018 supplement to the JCSO Preliminary Investigative Report states that when Detective Collins called Defendant on May 2, 2018, he asked Defendant to come to the JCSO at 10:00 a.m. on May 2, 2018 [Exh. 2 p. 3]. Detective Taylor notes that Defendant arrived for the interview around 10:30 a.m. on May 2, 2018 [*Id.*]. The Admonition and Waiver form states that it was signed at 11:00 a.m. on May 2, 2018 [Exh. 5]. Based on this information, the Court finds the timestamp on the video recording is off by two hours. To avoid confusion, however, the Court cites to the timestamps and times as they appear on the recording.

The video recording shows that Defendant entered the interview room shortly before the 8:30 a.m. timestamp [Exh. 3, 8:28:06].[12] Detective Taylor asked Defendant about his dogs, and Defendant said he had two mixed-breed dogs, which were in his car [Exh. 3, 8:28:45–8:29:05]. Defendant said his dogs are like family to him [Exh.3, 8:29:03]. Defendant said he lived in a campground and explained that he called the police the previous week because his neighbors threatened to assault him [Exh. 3, 8:29:07–15]. Defendant explained that he shares a common backyard with other campers and that he was walking his dogs toward the back of the yard on his way to the lake, when some children ran toward him and his dogs [Exh. 3, 8:29:30–56]. Defendant stated that his dogs began barking at the children, and he yelled at his dogs to leave the children alone [Exh. 3, 8:29:58–8:30:02]. Defendant said the children's father became confrontational because Defendant was near his children, so Defendant returned to his camper and called the police [Exh. 3, 8:30:07–35]. Defendant described another incident in which a neighbor claimed that Defendant's dog attacked the neighbor's dog and wanted to fight with Defendant [Exh. 3, 8:30:40–58]. Defendant said although his neighbors' behavior toward him was "getting old," he walks away from fights because he spent sixteen years in prison and does not want to go back [Exh. 3, 8:31:15–35].

Detective Collins testified as to this portion of the recording, that many children live in the same campground as Defendant and that Defendant's neighbors were upset because Defendant is a sex offender and was interacting with their children [Tr. at 25]. He said "some disturbances" had occurred due to that dynamic [*Id.*].

---

[12]    The Court will cite to parts of the video recording [Exh. 3] using the timestamp. The above summary alternates between portions of the video recording played at the hearing and Detective Collins's testimony about the recording.

At 8:33:13 on the video recording, Detective Taylor told Defendant that he was asked to come in to answer questions about reporting the websites he uses [Exh. 3, 8:33:13–25]. She asked if Defendant used the DeviantArt website, and Defendant responded that he previously used it but did not use it anymore [Exh. 3, 8:33:25–32]. Detective Taylor asked Defendant when he last used the DeviantArt website and cautioned him to be honest in answering her questions [Exh. 3, 8:33:35–46]. Detective Taylor told Defendant that his answers could "make or break" him, and Defendant's online activity is a serious matter [Exh. 3, 8:33:46–54]. She said if Defendant was honest, then they would try to work with him [Exh. 3, 8:33:55–58]. Detective Taylor said they had already "done the research" and knew the answers to the questions they were asking [Exh. 3, 8:33:58–8:34:08]. Defendant replied that he did not remember when he last used the DeviantArt website [Exh. 3, 8:34:15–17]. In response to Detective Taylor's question about his electronic devices, Defendant said he had a computer that he used to use when he was on DeviantArt [Exh. 3, 8:34:20–31]. When asked what else he used, Defendant responded "phone" and that was all he had [Exh. 3, 8:34:33–37]. He agreed that these were the only electronic devices he had at this time and that he had his cellphone with him [Exh. 3, 8:34:38–48].

Detective Collins testified that DeviantArt is a website on which users share photographs or pictures and chat [Tr. at 26]. He described DeviantArt as a type of social media [*Id.*]. Detective Collins agreed that Defendant said his cellphone was his only means to access DeviantArt on the internet [*Id.*].

On the video recording, Detective Taylor asked Defendant if he had his cellphone with him, and he replied affirmatively [Exh. 3, 8:34:45–48]. Detective Taylor asked Defendant if he would give consent for the officers to look at his cellphone [Exh. 3, 8:34:50]. Defendant responded, "No," and that his cellphone was private [Exh. 3, 8:34:51–54]. Detective Taylor told

Defendant that if he did not give consent, the officers would seize his cellphone and would get a search warrant for it [Exh. 3, 8:34:55–58]. She said it would "look better" for Defendant to comply and consent to their review if he did not have anything illegal in his cellphone [Exh. 3, 8:34:59–8:35:04]. At that point, Defendant asked what was happening [Exh. 3, 8:35:07]. Detective Taylor said this was her reason for asking him about DeviantArt and asked again when he last used that website [Exh. 3, 8:35:09–14]. Defendant said he last used DeviantArt months ago [Exh.3, 8:35:18–20]. In response to Detective Taylor's question about his usernames on DeviantArt, Defendant said his username was "ManGlenn" and then he changed it to "PeterGriffinIsLove" [Exh. 3, 8:35:31–8:36:07]. Defendant said these were his only two usernames [Exh. 3, 8:36:08–10].

Detective Collins testified that Defendant said he used two accounts on DeviantArt, which were ManGlenn and PeterGriffinIsLove [Tr. at 26]. He agreed that Defendant had previously reported both of those usernames and that they appear on his March 28, 2018 report [Tr. at 27; Exh. 1].

On the video recording, Detective Taylor asked Defendant about the Tennesseetomcat username, reminding Defendant that they had already "done the work" and that if he lied, he would be in trouble that day [Exh. 3, 8:36:11–32]. Defendant responded that the last account he had was the "PeterGriffin" account [Exh. 3, 8:36:33–37]. Detective Taylor asked Defendant about the last time he used the Tennesseetomcat account [Exh. 3, 8:36:38–42]. Defendant responded, "That's not me" [Exh. 3, 8:36:42–44]. Detective Taylor admonished Defendant not to lie to her and told him she would put him in jail today and his dogs would go to the shelter [Exh. 3, 8:36:45–49]. Detective Collins told Defendant, "We've tracked it back, man. You're got, dude" [Exh. 3, 8:36:54–59]. Detective Taylor again told Defendant to be honest [Exh. 3, 8:37:04–05].

On the video recording, Defendant said a female friend of his, Jaycee Corum, started the Tennesseetomcat account [Exh. 3, 8:37:15–23 & 8:38:02]. Defendant said Jaycee Corum and her boyfriend Travis Zanker lived with him in September 2017 and moved out in October 2017 [Exh. 3, 8:37:42–8:38:01 & 8:38:20–36]. Defendant agreed that he knew the user of the Tennesseetomcat account could be tracked back to an IP address [Exh. 3, 8:38:47–56 (Defendant nodding)]. Detective Taylor told Defendant she would give him one more chance to be honest with her, and if he continued to lie to her, she would build a case on him [Exh. 3, 8:38:56–8:39:08]. Defendant then responded that he used the account with Jaycee Corum [Exh. 3, 8:39:08–11]. In response to Detective Taylor's question about how many times he used the account, Defendant said he did not use it much [Exh. 3, 8:39:14–22]. When asked how many people he chatted with on DeviantArt while using the Tennesseetomcat account, Defendant responded that people typically communicate with multiple people, view each other's art, make comments on art, and send private notes [Exh. 3, 8:39:23–51].

On the video recording, Detective Taylor stated that Defendant was given the rules for sex offender compliance and that he knew he had to report every username he uses to them [Exh. 3, 8:39:52–8:40:08]. Defendant said he thought he only had to report his email addresses and that he has three email addresses [Exh. 3, 8:40:09–13]. Detective Taylor observed that Defendant reported he used the DeviantArt website, and Detective Collins stated that Defendant reported the ManGlenn and PeterGriffinIsLove usernames [Exh. 3, 8:40:15–20]. Defendant said he was arrested in 2016 for failing to have the ManGlenn username on his sex offender report, and, at that time, he told the officer his email addresses cover the ManGlenn username [Exh. 3, 8:40:21–39]. When Detective Taylor shook her head, denying this, Defendant said the form asks for either an email address or a username or chat room identification [Exh.3, 8:40:39–49]. At that point,

Detective Taylor tapped on the table and said, "Put your phone right here, Glenn" [Exh. 3, 8:40:49–51]. Once Defendant placed his cellphone on the table, Detective Taylor slid it toward her and said she would get a search warrant to search his cellphone for "anything that you've done that you shouldn't have been doing," any violations of the sex offender rules or regulations or of "the law" [Exh. 3, 8:40:57–8:41:23]. She told Defendant he would be in "big trouble" if the search revealed he was on the Tennesseetomcat account, but they would "try to help [him] out" if he was truthful [Exh. 3, 8:41:25–38]. Defendant again denied "doing anything" on the Tennesseetomcat account [Exh. 3, 8:41:40–42].

In his testimony, Detective Collins agreed that by 8:41:24 a.m. on the recording, Defendant had admitted he used the Tennesseetomcat account to communicate with others on the DeviantArt website [Tr. at 27–28]. He said Defendant reported that someone else had started the Tennesseetomcat account [Tr. at 28]. Detective Collins agreed Defendant did not report the Tennesseetomcat username on his March 2018 quarterly report but stated that Defendant said he had used that account with Jaycee Corum in September and October 2017 [*Id.*]. He agreed that Defendant Taylor took Defendant's cellphone [*Id.*].

On the video recording, after Defendant denied using the Tennesseetomcat account, Detective Taylor instructed Detective Collins to show a printout to Defendant and asked Defendant if he thought it was okay to send a picture of himself in his underwear to thirteen-year-old girls [Exh. 3, 8:41:44–57]. Defendant said, "I didn't," and explained that the photograph "is nothing more than modeling" and that, although he had the photograph posted in his gallery for a short time, he took it down [Exh. 3, 8:42:06–20].

On the video recording, Detective Taylor confronted Defendant with a printout from the website depicting him talking about "your bulge in your pants" with a thirteen-year-old girl and

another printout of Defendant sending a "peekaboo" photograph to thirteen-year-old girls [Exh. 3, 8:42:30–50].

Detective Collins testified that the paper shown to Defendant at 8:41:51 in the recording depicted one of the photographs Defendant had "sent out" and that he considered the photograph to be inappropriate to send to a young person [Tr. at 29]. Detective Collins agreed that at this point in the interview, he and Detective Taylor were confronting Defendant with the details of his use of the Tennesseetomcat account on the DeviantArt website [*Id.*]. Detective Collins stated that the "peek-a-boo" photograph depicted Defendant "pulling his pants out and taking a picture towards his penis area" [*Id.*].

On the video recording, Defendant denied knowing "this girl was thirteen" [Exh. 3, 8:43:10–12]. In response, Detective Taylor said Defendant knew the girl was thirteen because they had chat conversations concerning her being thirteen years old [Exh. 3, 8:43:12–18]. She said the DeviantArt website had "shut [Defendant] down because everybody started giving pedophile warnings" about him [Exh. 3, 8:43:19–22]. Defendant said he deactivated the account [Exh. 3, 8:43:25–26]. Detective Collins stated that Defendant "asked for pictures" on the website [Exh. 3, 8:43:30–33]. Defendant said he may have asked for a photograph of a face [Exh. 3, 8:43:34–36].

Detective Collins agreed that the video shows Defendant said he asked for a photograph of a thirteen-year-old girl on DeviantArt [Tr. at 30].

The Government played another clip of the video recording of the interview, beginning at 8:48:25 a.m. At that point in the recording, in response to a question from Detective Collins about when he knew the female with whom he was communicating was thirteen, Defendant said near the end of the time they were sending notes to each other [Exh. 3, 8:48:58–8:49:06]. Defendant

said at some point, "she said she was thirteen" and he did not recall what they said after that [Exh. 3, 8:49:15–21]. Detective Collins told Defendant he had violated the sex offender registry [Exh. 3, 8:49:28–32]. Detective Taylor returned to the interview room and confronted Defendant with information on Nolifelady's account—the account of the thirteen-year-old female with whom he was communicating on DeviantArt [Exh. 3, 8:49:36–41]. Defendant said that he read Nolifelady's "journal" and knew her boyfriend had broken up with her [Exh. 3, 8:50:17–22]. As to the Tennesseetomcat account, Defendant said Jaycee Corum started that account because people gave him trouble on his account [Exh. 3, 8:50:36–46].

Detective Collins testified that on that portion of the video, Defendant admitted that he sent notes to a thirteen-year-old on DeviantArt [Tr. at 30]. After reviewing another video clip, Detective Collins agreed that Defendant admitted to reviewing journals on the DeviantArt website, to sending sexually suggestive photographs to a minor, to knowing the user Nolifelady was thirteen years old, and that he "looked at her website" [Tr. at 31]. He agreed that by this point, Defendant had corroborated the information from the tipster [*Id.*].

Beginning at 8:55:28 on the video, Detective Taylor brought Defendant a glass of water and Detective Collins asked him to empty his pockets onto the table [Exh. 3, 8:55:28–36]. Detective Collins checked in Defendant's sweatshirt pockets and patted down his pants pockets [Exh. 3, 8:56:50–8:56:20]. Defendant placed his keys and wallet on the table [Exh. 3, 8:55:48–8:56:26]. Detective Taylor stated that they would give Defendant the *Miranda* warnings, before he told his "side of the story," and then it would be up to Defendant whether he wanted to continue to talk to them [Exh. 3, 8:56:25–55]. Detective Taylor advised Defendant of the *Miranda* warnings, and Defendant agreed that he understood his rights [Exh. 3: 8:56:58–8:57:23]. Detective

15

Taylor then read the rights waiver to Defendant, who agreed that he understood the waiver and signed it [Exh. 3, 8:57:24–8:58:11].

Detective Collins testified that he frisked Defendant and asked him to remove items from his pants pockets [Tr. at 32]. He said Detective Taylor reviewed the *Miranda* rights with Defendant and gave Defendant a rights waiver [Tr. at 33]. Detective Collins identified the rights waiver, which was initialed and signed by Defendant and which Collins signed as a witness [*Id.*, Exh. 5]. He said Defendant waived his rights and continued talking with him and Detective Taylor [Tr. at 34].

On the video recording of the interview, Defendant said he had this cellphone for about one year [Exh. 3, 9:02:29–34, 9:04:51]. Defendant agreed to continue talking with the officers [Exh. 3, 9:05:15–16]. He said that he viewed Nolifelady's page because her username sounded interesting [Exh. 3, 9:05:25–28]. Defendant said she had "nudity is awesome" on the top of her page and in her gallery were drawings of a "voluptuous Hispanic lady" [Exh. 3, 9:05:40–9:06:10]. Defendant said Nolifelady's page stated she was from Panama but did not state her age [Exh. 3, 9:06:10–16]. Defendant said he commented on Nolifelady's art, asking if she looked like her drawing [Exh. 3, 9:06:21–27]. He said he thought Nolifelady was nineteen or twenty [Exh. 3, 9:06:35–37]. Defendant said he chatted with Nolifelady using the Tennesseetomcat account over a two-day period about one month ago [Exh. 3, 9:06:41–9:07:40].

Detective Collins testified that Defendant acknowledged chatting with Nolifelady on the DeviantArt website using the Tennesseetomcat account one month before the May 2, 2018 interview [Tr. at 35].

On the video recording of the interview, Defendant said he did not think he could get in trouble for sending photographs of what Detective Taylor described as his "bulging junk" because

he was clothed [Exh. 3, 9:11:18–34]. He also said he did not know that Nolifelady was thirteen at that time [Exh. 3, 9:11:36–38]. Defendant said the sex offender registration forms require him to report his email addresses or usernames and that he had reported his email addresses [Exh. 3, 9:11:50–57]. He denied creating a new username and said Jaycee assisted him by setting up a "website" where he could tell his side of things and that he began using the Tennesseetomcat account with Jaycee "doing it" [Exh. 3, 9:12:05–51]. Defendant denied committing any crimes on DeviantArt and said that he left the website and is no longer on it [Exh. 3, 9:13:10–19].

Detective Collins testified that in the interview, Defendant acknowledged that he was required to report his usernames or email addresses [Tr. at 35].

On the video recording, Detective Collins showed Defendant a printout of a drawing by Nolifelady [Exh. 3, 9:41:34–36]. Defendant said he commented on this drawing and Nolifelady responded [Exh. 3, 9:41:40–42]. Detective Collins remarked that the drawing is "a cartoon" and asked why this picture caused Defendant to believe Nolifelady was over eighteen [Exh. 3, 9:41:43–58]. Defendant responded that the drawing appeared to be of a person who is nineteen or twenty and that Nolifelady's page did not list her age [Exh. 3, 9:42:01–23]. Defendant said Jaycee started the account and, although she moved out in October, he still spends a lot of time with her [Exh. 3 9:42:44–56]. Detective Collins asked if Defendant was still using this account as of two weeks ago, and Defendant responded, "she's assisting me. She's the one typing the stuff" [Exh. 3, 9:43:00–08].

In his testimony, Detective Collins agreed that based on his internet research, Defendant was using the Tennesseetomcat account a few weeks before the interview [Tr. at 36]. He said at the conclusion of the interview, Defendant was released [*Id.*]. Detective Collins stated that Defendant was never told he was under arrest and was not handcuffed or physically restrained

17

during the interview [Tr. at 37]. He said Defendant left at the conclusion of the interview, and he told Defendant that he could return the next day to get a copy of the search warrant that Detective Taylor was seeking for his cellphone [*Id.*].

Detective Collins stated that Detective Taylor obtained a search warrant for Defendant's cellphone [Tr. at 37–38]. Detective Collins testified that in her affidavit in support of the search warrant, Detective Taylor stated that on April 24, 2018, Samantha Taveras, website user, reported that registered sex offender Glenn Glatz was using the website DeviantArt and was chatting and "role-playing" with a thirteen-year-old girl with the username Nolifelady [Tr. at 38–39, Exh. 6 p. 3]. Continuing to read from Detective Taylor's affidavit, Detective Collins said Samantha Tavaras reported Defendant's username was Tennesseetomcat [Tr. at 39, Exh. 6 p. 3]. Detective Collins said this portion of the affidavit was accurate based upon the call taken by Deputy Blake Cupp on April 24, 2018, and consistent with the internet research that he and Detective Taylor conducted [Tr. at 39]. He confirmed that during the interview Defendant admitted that he was using the Tennesseetomcat account [*Id.*].

Detective Collins read the following from Detective Taylor's affidavit:

> Mr. Glatz was sending photographs of himself that were inappropriate and asking for the minor child to send photographs of herself back to him. Mr. Glatz also failed to report using the username on DeviantArt [website], Tennesseetomcat. Mr. Glatz was interviewed on 5/2/18 and did admit to using the username, Tennesseetomcat and also chatting with the minor child and requesting a photograph.

[*Id.*; Exh. 6 p. 3 (addition in original)]. Detective Collins said this statement in Detective Taylor's affidavit is consistent with the video recording of the interview of Defendant [Tr. at 39]. He agreed that Defendant said the account was created by Jaycee Corum [Tr. at 40]. Detective Collins agreed Detective Taylor concluded the affidavit by stating her belief that the cellphone would contain

evidence of illegal activity, including text messages, photographs, and unreported website use and usernames [*Id.*, Exh. 6 p. 4].

Detective Collins testified that he obtained an arrest warrant for Defendant on May 3, 2018, and arrested him on that day [Tr. at 40]. He said the execution of the search warrant for the contents of Defendant's cellular telephone led to the seizure of child pornography [*Id.*].

On cross-examination, Detective Collins stated at the time of the interview, he had not been to the campground where Defendant lived and that Defendant, who was previously registered in Sevier County, had not been on the Jefferson County sex offender registry long [Tr. at 41–42]. He agreed that on May 1, when he called Defendant and asked him to come to the Sheriff's Office to update some paperwork, he did not tell Defendant that he was investigating a potential violation of the sex offender registry law or that he suspected Defendant was engaged in wrongdoing [Tr. at 42, 49]. He and Detective Taylor went to the campground where Defendant lived on May 3 to arrest him [Tr. at 42]. He was aware that other officers had been called to the campground previously due to conflicts between neighbors [Tr. at 42–43]. He did not remember an FBI agent asking him if officers had been to Defendant's residence previously [Tr. at 43].

Detective Collins testified that he did not speak with the caller who made a complaint [Tr. at 43]. He agreed that the report of the call stated the caller read about Defendant in a journal entry and that the report did not indicate the caller had interacted with Defendant or the minor that was the subject of the call [Tr. at 43–44]. Detective Collins testified that the journal entry was attributed to the username Nolifelady [Tr. at 44]. He agreed Deputy Cupp's report of the call did not state whose journal the caller had read [Tr. at 46, Exh. 2 p. 3]. Detective Collins admitted that in investigating the complaint about Defendant, he and Detective Taylor did not subpoena DeviantArt [Tr. at 46]. He said websites do not usually comply with state subpoenas because the

19

websites are located outside of Tennessee [Tr. at 47]. He said while law enforcement attempted to identify Nolifelady, they were not successful [*Id.*]. Detective Collins said Detective Taylor left the room during the interview with Defendant to search the DeviantArt website for the user Tennesseetomcat and returned with a paper [*Id.*].

Detective Collins said Defendant told him that Jaycee Corum created the Tennesseetomcat account and that Defendant used that account [Tr. at 48]. He attempted to verify this information with Ms. Corum after the May 2 interview, but she did not cooperate with the investigation [Tr. at 48–49].

Detective Collins stated the Justice Center in Jefferson County houses the Sheriff's office, the jail, and the courthouse [Tr. at 50]. He said Defendant came to his office and was taken to the interview room, which has video recording equipment [*Id.*]. Defendant sat across the table from him and Detective Taylor with the door behind the two officers [*Id.*]. Detective Collins said both he and Detective Taylor would have been armed [Tr. at 51].

Testifying again about the video recording, Detective Collins agreed that after they entered the interview room with Defendant, they engaged in "chitchat" about Defendant's dogs [Tr. at 51–52]. He said his intent in talking with Defendant was to gather information Defendant failed to report on the sex offender registry and, second, to determine whether Defendant had committed a crime, which is what they suspected [Tr. at 52]. After reviewing the video recording [Exh. 3, 8:33:42–8:34:54], Detective Collins agreed that Defendant said he had no computers in his residence and that he used his cellphone to access DeviantArt [Tr. at 52–53]. He agreed they questioned Defendant about the Tavaras complaint and that Detective Taylor told Defendant he needed to be truthful because she has been researching this matter [Tr. at 53]. He agreed Detective

Taylor asked Defendant to place his cellphone on the table and that Defendant denied consent to search the cellphone [*Id.*].

After reviewing another portion of the video recording [Exh. 3, 8:34:54–8:36:13], Detective Collins agreed that Defendant said he was on the DeviantArt website and gave two usernames [Tr. at 53–54]. He agreed that at the time Detective Taylor asked Defendant about the Tennesseetomcat username, Collins believed that if Defendant stated he used that account, it was evidence of a crime [Tr. at 54]. He acknowledged that prior to providing the *Miranda* warnings, he did not tell Defendant he was free to leave or that Defendant he could speak to a lawyer [Tr. at 54–55].

Detective Collins reviewed a section of the video recording [Exh. 3, 8:36:13–8:36:59], then testified that Detective Taylor told Defendant that if he lied to them, he would "be in trouble and go to jail" that day and that Defendant's dogs would go to a shelter [Tr. at 55]. He agreed that when he told Defendant "You're got, dude," he was stating his belief that Defendant had committed a crime and that he had evidence of that crime [*Id.*]. Detective Collins also agreed that at that time, he was seeking additional evidence of criminal conduct [*Id.* at 56].

After reviewing another segment of the video recording [Exh. 3, 8:36:59–8:38:04], Detective Collins stated that Defendant told them Jaycee Corum was a friend of his who lived with him in September and October [Tr. at 56]. He acknowledged that Defendant did not say that he was using the Tennesseetomcat account during the time that Ms. Corum lived with him [*Id.*]. After reviewing another portion of the interview [Exh. 3, 8:41:00–8:41:37], he agreed Detective Taylor asked for Defendant's cellphone and slid it in front of her on the table [Tr. at 56–57]. He acknowledged that Detective Taylor told Defendant she would get a search warrant to search the entire cellphone and that if he has done anything wrong, he would be in trouble [*Id* at 57].

Detective Collins agreed that later in the interview, Detective Taylor told Defendant that law enforcement would perform a Cellebrite analysis, which is a computerized search, on the cellphone [*Id.*]. He acknowledged that a Cellebrite analysis would give a list of all texts, pictures, and videos on the cellphone [*Id.* at 58]. He agreed Detective Taylor was telling Defendant she would search the whole cellphone and did not limit the search to the Tennesseetomcat account issue [*Id.*].

Detective Collins reviewed another segment of the video [Exh. 3, 8:41:37–8:43:12] and testified that both he and Detective Taylor questioned Defendant [Tr. at 58–59]. He agreed they said that they knew Defendant had communicated with a thirteen-year-old girl and that Defendant denied knowing the girl was thirteen [Tr. at 59]. Detective Collins stated at a later point in the interview, Defendant admitted knowing the girl was thirteen, but he did not recall if Defendant claimed not to know what contact he had with the girl after that [*Id.*].

After reviewing another portion of the video [Exh. 3, 8:43:12–8:43:32], Detective Collins stated he did not know where Detective Taylor got the information that Defendant's DeviantArt account was shut down but repeated that law enforcement did not get a subpoena for DeviantArt [Tr. at 60]. He reviewed the next segment of the interview [Exh. 3, 8:43:32–8:46:24], he agreed at this point, Defendant stated he did not have any contact with the girl after he found out she was thirteen [Tr. at 60–61]. Detective Collins viewed the next minute and fifteen seconds of the interview [Exh. 3, 8:46:24–8:47:45][13] and agreed that it was clear Detective Taylor was not giving

---

[13]    At 8:47:07 on the video, Detective Taylor asked Defendant whether he is going to give consent for them to look at his phone or if they will be getting a search warrant [Exh. 3, 8:47:05 – 07]. Defendant responded that he did not like the idea of his private cellphone being reviewed [Exh. 3, 8:47:11–13]. Detective Taylor said the police would look in the cellphone either way, but if Defendant consented, he would get his cellphone back sooner [Exh. 3, 8:47:14–28]. Defendant responded that he did not understand "the technicalities" and asked if he could talk to a lawyer about this [Exh. 3, 8:47:30–37]. Detective Taylor replied that Defendant could talk with a lawyer, but in the meantime, they would get a search warrant [Exh. 3, 8:47:38–42]. Detective Collins told Defendant that whether he talked to a lawyer was up to him [Exh. 3, 8:48:01–03]. Defendant

Defendant's cellphone back and that was true from the moment she took possession of it [Tr. at 61]. He agreed that at this point in the interview, Defendant asked if he could talk to a lawyer and was told that he could but that law enforcement would get a search warrant "either way" [*Id.*]. He acknowledged that during the interview, neither he, nor Detective Taylor, knew what was on Defendant's cellphone [*Id.* at 62].

Detective Collins reviewed another portion of the video [Exh. 3, 8:47:45–8:48:51] and agreed that he told Defendant that Defendant should not have been on the DeviantArt website [Tr. at 62]. He also agreed that simply using the DeviantArt website does not violate the sex offender registry [*Id.*]. Detective Collins testified that during the next two-minute segment of the interview [Exh. 3, 8:48:51–8:50:40], Defendant said the girl told him she was thirteen and said he (Defendant) did not know what was said after that [Tr. at 62–63]. Detective Collins agreed that following that discussion [Exh. 3, 8:55:00–8:56:13], he asked Defendant to empty his pockets onto the table [Tr. at 63]. He then patted Defendant down, checking for weapons [*Id.* at 63–64]. He acknowledged that Defendant had not been advised of the *Miranda* warnings at the time he was frisked [*Id*. at 64]. Detective Collins agreed that Defendant had not done anything to indicate he was a danger to the officers [*Id.*]. He said individuals were not permitted to bring cellphones, knives, or guns into the building, but Defendant had both his cellphone and a pocketknife [*Id.*].

Detective Collins testified that during the next three minutes of the video [Exh. 3, 8:56:13–8:59:09], Detective Taylor, who had possession of Defendant's cellphone for a "significant period," stated she was seizing the cellphone and asked for his passcode, which Defendant declined to provide [Tr. at 64–65]. Defense counsel asked Detective Collins if there "was actually an SD

---

replied that he was talking to the officers and that he was not saying he would not talk to them [Exh. 3, 8:48:04–08].

card inside the phone which evidence was found on," and Detective Collins responded, "That is correct" [*Id.* at 65]. Detective Collins thought no evidence was seized from the cellphone, as opposed to the SD card, during the Cellebrite analysis [*Id.*]. He said they received the Cellebrite report a few days after the interview [*Id.*]. Detective Collins agreed the SD card is a storage device [*Id.* at 66]. He did not recall the SD card being separated from the cellphone and did not know if Detective Taylor or someone else removed the SD card from the cellphone [*Id.*]. Detective Collins said Defendant's cellphone was placed into evidence storage at the JCSO and later "signed over" to Detective Stallings, who performed the Cellebrite analysis [*Id.*].

Detective Collins acknowledged that although the search warrant states probable cause exists to believe Defendant's cellphone contains evidence of the crime of solicitation of a minor, Defendant was never charged with solicitation of a minor [Tr. at 67–68; Exh. 6]. He agreed that, in the interview, Defendant repeatedly denied knowing Nolifelady was thirteen during their conversations; however, Defendant subsequently admitted knowing she was thirteen but stated he did not know what he said to her after that [Tr. at 68]. He agreed that the search warrant is a "general warrant" for any digital or electronic evidence on the cellphone [*Id.*]. Detective Collins stated that although he earlier testified that Defendant's prior conviction, which required him to register as a sex offender, was for child rape, Defendant's prior conviction was for child molestation as stated on his registration form [*Id.*].

On redirect examination, Detective Collins testified that in his experience, sex offenders sometimes lie about their knowledge of the age of the people they contact [Tr. at 69]. He stated that he and Detective Taylor had gone on the DeviantArt website and found much of the information they questioned Defendant about in the interview [*Id.* at 70]. He agreed that Defendant did not report his use of the Tennesseetomcat account before the May 2 interview, when Defendant

admitted using that account [*Id*. at 70–71]. Detective Collins agreed that during the interview, Defendant stated that he accessed the internet with his cellphone [*Id*. at 71]. He agreed that at the time Defendant's phone was seized, around 8:41 on the video recording, he knew that Defendant had used his cellphone to contact a minor on an account that Defendant had not disclosed on his sex offender registration form [*Id.*]. He agreed that as the interview progressed, he and Detective Taylor gathered additional information that was included in the search warrant affidavit [*Id.* at 71–72].

## IV. FINDINGS OF FACT

Based on the testimony and exhibits offered at the April 14, 2021 evidentiary hearing, the Court finds the following facts:

On April 24, 2018, JCSO Deputy Blake Cupp received a call from Samantha Taveras, who reported that she saw a "journal" entry on the DeviantArt website, discussing that an "offender" was "role playing" and sending photographs of his "private area" to a thirteen-year-old girl [Exh 2 p. 3]. Taveras stated she did not know the girl but, based on her investigation, the offender, who used the account Tennesseetomcat, was Glenn Glatz, who lives in Dandridge, Tennessee.

JCSO Detectives Richard Collins and Pam Taylor investigated the information from Taveras, including Detective Taylor's review of the Tennesseetomcat account user's activity on the DeviantArt website. The investigation revealed that the user of the Tennesseetomcat account sent a photograph of a male clad only in underwear and a photograph of a male pulling his pants away from his body and taking a photograph aimed toward his genital area to a minor. Detective Collins determined that Defendant was on the Sex Offender Registry and that he had not reported the Tennesseetomcat account on his March 2018 sex offender registration form. On May 1, 2018,

25

Detective Collins called Defendant and asked him to come to the JCSO the next morning to review his sex offender registration.

On the morning of May 2, 2018, Defendant met with Detectives Collins and Taylor at the JCSO in a ten-by-fourteen-foot interview room, which had recording equipment. Defendant was seated across a small table from the armed detectives, who sat in front of the closed, unlocked door. After a few minutes of chatting about Defendant's dogs, which were in his vehicle in the parking lot, and about his interactions with neighbors at the campground where he lived, Detective Taylor told Defendant that he was asked to come in to discuss his use of websites and asked if he used the DeviantArt website. Defendant replied that he was previously on DeviantArt but did not use that website any longer. Detective Taylor asked him when he last used DeviantArt, cautioning Defendant to be honest and stating that she had already researched the matter and knew the answer. Defendant responded that he did not remember when he last used that website. In response to further questions, Defendant stated that he used his cellphone to access the internet and that he had his cellphone with him.

Five minutes after the interview began and two minutes after first asking about the DeviantArt website, Detective Taylor asked Defendant if he would give consent for the officers to look through his cellphone. Defendant declined to give consent, stating his cellphone was private. Detective Taylor said if Defendant did not give consent, they would get a search warrant for the cellphone but that it would "look better" for him to give consent if the cellphone did not contain anything illegal. Defendant then asked what was happening. Detective Taylor again asked when Defendant had last used DeviantArt. Defendant said he last used that website months ago and that his only usernames were MannGlenn and PeterGriffinIsLove.

Approximately eight minutes into the interview, Detective Taylor again asked Defendant when he last used the Tennesseetomcat account on DeviantArt. Defendant denied that the Tennesseetomcat account was his. Detective Taylor then admonished Defendant not to lie, stating she would put him in jail today and take his dogs to a shelter. Detective Collins told Defendant they had tracked the Tennesseetomcat account back to him and that he was caught. Defendant then stated that his friend Jaycee Corum created the Tennesseetomcat account. Defendant said Corum and her boyfriend lived with him in September and October 2017. Detective Taylor cautioned Defendant that she would give him one more chance to be honest and that, if he continued to lie, she would build a case against him. Defendant stated that he used the Tennesseetomcat account with Corum but did not use it much. Detective Taylor reminded Defendant that sex offenders are required to report all their usernames on their registration form. Defendant responded that he was required to report either his email or his username, and he had provided his three email addresses and two usernames.

Thirteen minutes into the interview, Detective Taylor told Defendant to place his cellphone on the table and then she slid it across the table to rest in front of her. She told Defendant that she would get a search warrant for his cellphone for violations of the sex offender registry or any wrongdoing. She also told him he would be in trouble if the search revealed he was using the Tennesseetomcat account, but the officers would try to help him if he was truthful with them. Defendant again denied using the Tennesseetomcat account and said he had done nothing wrong.

Following the seizure of Defendant's cellphone, the detectives showed him a photograph and asked him if sending a picture of himself in his underwear to a thirteen-year-old girl was appropriate. Defendant denied sending the photograph, which he described as a "modeling" image, to teenage girls. He said he had posted the photograph to his gallery for a short time and

27

then removed it. Detective Taylor showed Defendant a paper containing discussion of the "bulge in his pants" and a "peekaboo" photograph (a picture of Defendant pulling his pants away from his body and taking a photograph of his genital area) copied from the Tennesseetomcat account on DeviantArt. In response, Defendant stated he did not know the girl was thirteen. Detective Taylor said Defendant had conversations on the website with the girl about her being thirteen and the website had closed his account because it received warnings that he was a pedophile. Defendant said he deactivated his account. Detective Collins told Defendant that he asked for pictures on the website, but Defendant responded that he may have asked for a picture of a face. Detective Taylor told Defendant that law enforcement could extract the data from his phone and again encouraged him to be honest. Defendant said there is nothing on his cellphone.

Upon further questioning, Defendant said that the female had "sexual artwork" on her DeviantArt page and that he thought the female was an adult. He said the female mentioned she was thirteen at the end of the time they were messaging each other. He denied having further contact with the female, after he found out she was thirteen.

Approximately seventeen minutes into the interview, Detective Taylor again asked for consent to search Defendant's cellphone, stating she was preparing a consent form. Defendant declined, stating that he did not want them to look at his private cellphone. Detective Taylor again said the officers would get a search warrant. Defendant then stated he did not understand the "technicalities" and asked if he could talk to a lawyer. Both detectives agreed he could talk to a lawyer, but Detective Taylor said, in the meantime, they would begin the search warrant process, and she would review NoLifeLady's page. After Detective Taylor left the room, Detective Collins asked if Defendant wanted to talk to a lawyer about his cellphone. Defendant responded, "Yeah, I don't really . . ." and shook his head from side to side. Detective Collins told Defendant whether

28

he talked to a lawyer was up to him. At that point, Defendant said, he was talking to the detectives and that he was not saying he was declining to talk to them. Thereafter, Detective Collins continued to talk with Defendant, who denied knowing Nolifelady was thirteen. About twenty-one minutes into the interview, Defendant said after the girl said she was thirteen, he did not know what more was said. Detective Collins told Defendant he was in violation of the sex offender registry.

Approximately twenty-six minutes into the interview, Detective Taylor returned to the interview room and then left again briefly to bring Defendant a glass of water. Detective Collins asked Defendant whether he had a knife on his person, and Defendant said he had a pocketknife. Detective Collins asked him to place it on the table and to empty his pockets onto the table. Defendant placed his pocketknife and his keys on the table. Detective Collins then patted the pockets of Defendant's zippered sweatshirt and, feeling items therein, extracted the items and placed them on the table.[14] Detective Collins also patted down Defendant's pants pockets and asked him to place his wallet on the table, which Defendant did. Detective Taylor then told Defendant that she would advise him of the *Miranda* warnings before he told his side of the story and that it was up to him whether he wanted to continue to talk to them. Detective Taylor gave the *Miranda* rights to Defendant, who agreed he understood his rights and signed the rights waiver form. After signing the rights waiver and agreeing to continue talking to the detectives, Defendant said he used the Tennesseetomcat account to chat with Nolifelady over a two-day period about one month earlier. Defendant admitted sending clothed photographs of himself to Nolifelady before he learned she was thirteen.

---

[14]     The items Detective Collins removed from Defendant's pockets cannot be identified from the video; however, none of the items appear to be small enough to be a micro SD card.

29

Approximately one hour and twenty minutes after he arrived, Defendant was allowed to leave the JCSO, but the detectives retained his cellphone. The next day, May 3, 2018, Detective Taylor obtained a state search warrant to search Defendant's cellphone and sixteen gigabyte "sim card" for electronic evidence constituting solicitation of a minor and violation of the sex offender registration laws [Exh. 6]. In her affidavit in support of the search warrant, Detective Taylor recounted the information from Taveras, a statement that Defendant was sending "inappropriate" pictures of himself to a minor and asking the minor for pictures, a statement that Defendant failed to report his use of the Tennesseetomcat account, and a statement that Defendant was interviewed on May 2, 2018, and admitted using the Tennesseetomcat account, chatting with the minor, and requesting a photograph. The execution of the search warrant resulted in the seizure of child pornography.

Also on May 3, 2018, Detectives Collins and Taylor arrested Defendant at the camper where he lived pursuant to an arrest warrant.

## V. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fifth Amendment protects the right not to incriminate oneself. U.S. Const. amend V. Defendant argues that his rights under the Fourth and Fifth Amendments were violated because (1) law enforcement seized his cellphone and SD card without a warrant or his consent, (2) officers questioned him in custody without providing the *Miranda* warnings and his statements in the interview were the product of police coercion, (3) Detective Collins illegally searched his

person during the interview, and (4) officers arrested him without probable cause. The Court examines each of these issues in turn.

### A. Warrantless Seizure of Defendant's Cellphone and SD Card

Defendant asks the Court to suppress all evidence stemming from the warrantless seizure of his cellular telephone and SD card [Doc. 19]. He argues that, at the time the officers seized his cellphone and SD card, they did not have probable cause to believe it contained evidence of a crime [Doc. 19 p. 4; Doc. 96 pp. 2, 19–22]. He also contends that the seizure of his cellphone does not fall within any of the exceptions to the Fourth Amendment's warrant requirement, including the exception for exigent circumstances [Doc. 19 p. 4; Doc. 96 pp. 18–20]. The Government responds that JCSO detectives properly seized Defendant's cellphone because they had probable cause to believe it contained evidence of a crime or crimes and reason to believe that if the cellphone was not seized, the evidence would be destroyed [Doc. 23 pp. 3–4; Doc. 103 pp. 5–6, 9–11]. It also asserts that the officers acted in good faith and suppression of the evidence is not warranted in the absence of police misconduct [Doc. 103 pp. 11–12].

The "central requirement" of the Fourth Amendment is one of reasonableness. *Texas v. Brown*, 460 U.S. 730, 739 (1983). Typically, the warrantless seizure of personal property, such as a cellular telephone, is unreasonable. *United States v. Place*, 462 U.S. 696, 701 (1983). However, if law enforcement has probable cause to believe the property contains evidence of a crime, officers may properly seize the property while seeking a search warrant "if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Id.*; *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997).

The Supreme Court has deemed it reasonable under the Fourth Amendment for officers to seize property for a brief period to prevent the potential destruction of evidence, while law

enforcement is seeking a search warrant. *Illinois v. McArthur*, 531 U.S. 326, 331 (2001) (upholding law enforcement's restriction of defendant's entry into his home, while they sought a search warrant, when police had probable cause to believe marijuana was hidden in residence); *see also Riley v. California*, 573 U.S. 373, 388 (2014) (observing defendants sensibly "concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant"); *Chimel v. California*, 395 U.S. 752, 762–63 (1969) (holding an officer may conduct a warrantless search of an individual incident to arrest for weapons and/or evidence for the dual purpose of officer safety and to prevent the destruction of evidence). In *McArthur*, the Court observed "[w]e have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." 531 U.S. at 334.

Similarly, the Sixth Circuit has held that "[o]fficers may temporarily seize personal property for investigation without a warrant when they have reasonable suspicion that the property contains evidence of a crime [and] . . . 'when there is an urgent need to prevent evidence from being lost or destroyed.'" *United States v. Mason*, No. 21-5384, 2021 WL 5647774, at *3 (6th Cir. Dec. 1, 2021) (quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988)). In *Mason*, the court upheld the warrantless seizure of the defendant's cellphone because officers had probable cause to believe it contained child pornography and "justifiably" perceived the need to protect against the destruction of evidence until a search warrant could be obtained based on the defendant's request to "wipe" the data and make the problem go away. *Id.*

In *McArthur*, the Court examined the circumstances surrounding the seizure and found the following factors significant: (1) law enforcement had probable cause to believe the property contained evidence of a crime; (2) law enforcement had "good reason" to believe the evidence

would be destroyed if not seized; and (3) law enforcement imposed limited restraint on the defendant and his property for a limited time period. 531 U.S. 331–33. In the instant case, the Court looks to the circumstances surrounding the seizure of Defendant's cellphone to determine if the seizure was reasonable.

*(1) Probable Cause*

Defendant argues that at the time the detectives seized his cellphone, they did not have probable cause to believe it contained evidence of a crime. The Court disagrees. The Court finds that the detectives seized Defendant's cellphone and the SD card contained within it thirteen minutes into the interview, when Detective Taylor asked him to place it on the table and then slid it toward her. At the time of the seizure, the detectives knew that Samantha Tavaras, a user[15] of the DeviantArt website, observed on the website a journal entry, depicting a user of the Tennesseetomcat account sending pictures of his "private area" to a thirteen-year-old female. Ms. Tavaras identified the user of the Tennesseetomcat account as Glenn Glatz, an "offender" living in Dandridge, Tennessee, and reported this to the police.[16]

---

[15] Defendant argues that Taveras is not a "user" of the DeviantArt website because no evidence exists that she is a "registered member" of the website [Doc. 100 p. 15–16]. However, the Court employs the term "user" in the general sense of a person who uses the website, rather than a registered account holder. Defendant states that no part of the DeviantArt website is private and "the general public can view all of the published content" on the DeviantArt website [*Id.* at 16]. Given that, the Court finds Taveras's status, registered or not, is without import because both registered and unregistered users have the same access to content.

[16] Defendant argues that Officer Cupp's report does not attribute the information that "'the offender previously used the username (Tennesseetomcat)'" to Taveras [Doc. 96 p. 4 (quoting Exh. 2 from April 14, 2021 hearing)]. He asserts that this sentence is in a separate paragraph from that containing Taveras's statements [Doc. 96 p. 5]. However, a review of the JCSO Preliminary Investigative Report introduced at the April 14, 2021 evidentiary hearing [Exh. 2] reveals that the quoted statement is located within Officer Cupp's description of his conversation with Taveras and is followed by Officer Cupp's statement that he advised the complainant (Taveras) that he would make a report of the complaint and for her to contact the JCSO if she thought of more

Detectives Collins and Taylor investigated this citizen complaint.[17] Detective Collins confirmed that Glenn Glatz was a convicted sex offender living in Jefferson County and that Defendant did not list the Tennesseetomcat account on his March 28, 2018 sex offender registration form. Detective Taylor reviewed the DeviantArt website, which is a type of social media, and corroborated Ms. Taveras's report that the user of the Tennesseetomcat account sent photographs (finding photos of a male clad in underwear and the same male pulling his pants away from his body and taking a photograph toward his genital area) to a minor. Before the detectives seized Defendant's cellphone, he told them he used his cellphone to access the internet and that he had used the Tennesseetomcat account with Jaycee Corum. At this point, the detectives had probable cause to believe Defendant had violated the statute requiring that Defendant timely disclose the information required on the sex offender registration form, which requires disclosure of "any . . . Internet communication name or identity information" [Exh. 1 p. 1].[18]

---

information [Exh. 2 p. 4]. Thus, the Court finds the police report shows that Taveras told Officer Cupp that Glenn Glatz, the offender, was using the Tennesseetomcat account.

[17]     Defendant denies that Detectives Collins and Taylor performed any investigation into Taveras's complaint [Doc. 96 pp. 6, 8–9]. He points to Detective Taylor's testimony at the September 21, 2018 preliminary hearing in Jefferson County General Sessions Court that, after interviewing Defendant and seizing his cellphone, she had no further investigative responsibility, and Detective Collins performed most of the investigation thereafter [Doc. 98-2, Transcript (unofficial), pp. 50–51]. Defendant argues that at the evidentiary hearing in this case, Detective Collins testified that Detective Taylor performed the online investigation of Taveras's tip before Defendant came to the JCSO to be interviewed [*See* Tr. at 20]. These accounts do not contradict each other, nor do they conflict with the Court's finding that Detective Taylor investigated Taveras's tip by reviewing the DeviantArt website prior to Defendant's interview [*See* Doc. 98-2, p. 47 (Detective Taylor acknowledged at the preliminary hearing that she checked the DeviantArt website "to verify the information" from Taveras's tip)].

[18]     Tennessee Code Annotated § 40-39-208(a)(3) provides that "[i]t is an offense for an offender to knowingly violate any provision of this part. Violations shall include, . . . [f]ailure to timely disclose required information to the designated law enforcement agency[.]" "Within three (3) days, excluding holidays, of a[ sex] offender changing the offender's electronic mail address information, any instant message, chat or other internet communication name or identity

34

Defendant argues that law enforcement had no evidence, much less probable cause, that his cellphone would contain incriminating evidence because the allegations of the caller Samantha Taveras were unreliable hearsay and did not show Defendant committed a crime [Doc. 19 p. 5; Doc. 96 pp. 2–3, 6]. He asserts that Taveras, who read about the allegation in another person's online journal, had no direct knowledge of any criminal acts by Defendant [Doc. 19 p. 5; Doc. 96 p. 6; Doc. 100 p. 4]. He also contends the detectives did not corroborate Taveras's information [*Id.*]. Finally, Defendant argues that Taveras did not even allege a crime, because role-playing is not criminal and the pictures at issue were not illegal [Doc. 19 p. 5; Doc. 96 p. 2; Doc. 100 p. 17[19]].

The Court finds that Taveras's report was both reliable and corroborated. Her report was reliable because she gave her name to law enforcement, which would allow the officers to prosecute her if her report proved to be false. *United States v. May*, 399 F.3d 817, 824-25 (6th Cir. 2005) (holding that a report from an informant whose identity is known to law enforcement, thus, subjecting the informant to prosecution for making a false report, is "entitled to far greater weight than . . . an anonymous source"); *see also Navarette v. California*, 572 U.S. 393, 400 (2014) (observing that the 911 emergency system "has some features that allow for identifying and tracing callers, and thus providing some safeguards against making false reports with immunity").

---

information that the person uses or intends to use, whether within or without this state, the offender shall report the change to the offender's designated law enforcement agency." Tenn. Code Ann. § 40-39-203(a)(7) (discussing contents of sex offender registration forms). Significantly, the statute requires disclosure of internet chat names "use[d]" by the sex offender and is not limited to accounts that the offender creates or owns.

[19]    Defendant cites to an unofficial transcript of a September 21, 2018 preliminary hearing in Jefferson County General Sessions Court in which Detective Pamela Taylor testified that prior to Defendant's May 2, 2018 interview, she did not confirm Taveras's report of role-playing or pictures of Defendant's private parts [Doc. 98-2 pp. 57–58 (transcribed by Federal Defender Services of Eastern Tennessee)].

35

Additionally, as set out above, the Court finds that the detectives corroborated much of the information from Tavaras: that Defendant was a sex offender, his residence, and that the user of the Tennesseetomcat account sent a picture of a male's genital area (albeit clad in underwear) to a minor female on the DeviantArt website.[20]

Finally, the Court finds that Taveras's report gave the officers reasonable suspicion that Defendant was sending illegal photographs to a minor. Even though upon seeing the photographs on the DeviantArt website, the detectives learned the male's "private area" was clothed, at that point they also had reasonable suspicion to believe Defendant was using the Tennesseetomcat account, which was not reported on his sex offender registration form.[21] This reasonable suspicion

---

[20] Defendant argues that the detectives did not conduct a sufficient investigation into Taveras's complaint because they did not send an administrative subpoena to DeviantArt for any accounts, nor did they seek search warrants for DeviantArt or his internet service provider [Doc. 96 p. 6]. However, the Court finds the detectives corroborated Taveras's complaint by viewing the Tennesseetomcat user's interactions on the DeviantArt website. Defendant also argues that to date, no evidence exists that the user of the Nolifelady account was a minor [Doc. 100 pp. 17–18]. However, during the May 2, 2018 interview, Detective Taylor states that on the website, Nolifelady told Tennesseetomcat she was thirteen [Exh. 3, 8:43:12–18]. The Court finds this information from Detective Taylor's review of the DeviantArt website is sufficient to corroborate Taveras's report that the user of the Tennesseetomcat account was communicating with a minor.

[21] The Government argues that information from Tavaras's complaint combined with Defendant's admissions that he "was having online conversations of a sexual nature with a minor using his [cellphone]" gave the officers probable cause to believe the cellphone contained evidence of solicitation of a minor [Doc. 23 p. 3]. During the evidentiary hearing, Detective Collins agreed that the photographs that Tennesseetomcat sent to Nolifelady were "sexually suggestive" [Tr. at 31]. The Government contends that the detectives examined Nolifelady's "page" on the DeviantArt website and "confirm[ed] that the defendant sent the minor pictures of his underwear-covered crotch" [Doc. 103 p. 9]. The Government asserts that this information plus Defendant's statements that the "nudity is awesome" banner and "sexual artwork" on Nolifelady's page caught his attention gave the officers probable cause to believe Defendant was "grooming the minor for an online relationship to obtain depictions of her engaged in sexual activity, simulated sexual activity, or [activity] that was patently offensive in violation of Tenn. Code Ann. §§ 39-13-528 and []-1004" [Id. at 6]. However, neither the photographs, nor the online communications between Defendant and Nolifelady were presented to the Court or described in detail at the evidentiary hearing, making it difficult for the Court to analyze probable cause for solicitation of a minor. The Court notes that in a May 30, 2018 FBI report by Agent Bianca Peterson, included in Defendant's

36

ripened into probable cause when Defendant told the detectives that he used his cellphone to access the internet and that he used the Tennesseetomcat account with Corum.

Citing to *In Re Search of a White Apple iPhone*, No. C–12–224M, 2012 WL 2945996 (S.D. Tex. Apr. 11, 2012), Defendant argues that no nexus exists to allow the officers to believe that evidence of a registry violation would be found on his cellphone [Doc. 96 p. 20]. In *White Apple iPhone*, the court held that the search warrant affiant failed to explain how a search of defendant's cellphone would provide evidence of his failure to register as a sex offender after moving to and living in Texas, instead observing that the affidavit seemed tailored to seek evidence of child pornography. *Id.* at *2. *But see United States v. Galpin*, 720 F.3d 436, 448–50 (2d Cir. 2013) (holding search warrant properly permitted search of defendant's electronic devices for evidence of sex offender's failure to register an internet username but remanding for determination of whether this valid part of the warrant was severable from the overly broad portions).

The "nexus [between the location to be searched and the evidence sought] can be inferred from 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Elbe*, 774 F.3d 885, 889–90 (6th Cir. 2014) (quoting *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)). Here, the detectives were seeking evidence of whether Defendant used the Tennesseetomcat account, and they knew, from Defendant's

_____

exhibits, Agent Peterson states that Defendant's "penis is visible" in one of the photographs he "appeared to have provided" to a thirteen-year-old female on the DeviantArt website [Doc. 98-26 p. 2]. However, this report was not presented to the Court at the evidentiary hearing. Accordingly, the Court focuses its analysis on whether the detectives had probable cause to believe the cellphone contained evidence of the registration violation. The Court, however, does *not* find that the Government misstates the evidence in arguing that the photographs are sexually suggestive. The Court also does not question the credibility of Detective Collins's testimony that the photographs are sexually suggestive.

admission during the interview, that Defendant used his cellphone to access the internet. In researching the Tennesseetomcat user on the DeviantArt website, Detective Taylor located a photograph of Defendant in his underwear and the "peekaboo" photograph, which Detective Collins described as depicting Defendant taking a photograph of his genital area. The court finds these photographs establish a nexus between Defendant's cellphone and his use of the Tennesseetomcat account. The Court infers that the peekaboo photograph shows Defendant taking a picture of his genital area with a cellphone.[22] This shows a general nexus between Defendant's cellphone and his use of the Tennesseetomcat account. Defendant's use of his cellphone to take or to mime taking a photograph of his genital area and the sending of the peekaboo photograph to NoLifeLady's account allowed the detectives to infer that Defendant used his cellphone in connection with his activity on the DeviantArt website and that additional evidence of Defendant's use of the Tennesseetomcat account would be found on his cellphone.

Accordingly, the Court finds that at the time Detective Taylor seized Defendant's phone, the detectives had probable cause to believe it contained evidence of a crime, i.e., Defendant's use of the Tennesseetomcat account, which he failed to report on his sex offender registration form.

*(2) Potential Destruction of the Evidence*

In order to seize property without a warrant, the officer must have "an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988) (discussing warrantless entry onto

---

[22] The Court acknowledges that the peekaboo photograph is not introduced into evidence. Moreover, in describing the peekaboo photograph, Detective Collins did not state that Defendant was holding a cellphone, rather than a camera or some other device. However, the Court finds that a cellphone is the most likely device defendant is using to take or mime taking a photograph of his genital area, given its ready mobility and the ease of posting or sharing photographs with a cellphone.

38

property to prevent destruction of drugs). The Court must weigh the governmental interest served by seizing the evidence against the defendant's interest protected by the warrant requirement. *United States v. Plavcak*, 411 F.3d 655, 664 (6th Cir. 2005). In this regard, the Sixth Circuit has recognized that the government has a "'significant interest in curbing the spread of child pornography,'" which "outweighs [the defendant's] individual possessory interest" in his cellphone. *Mason*, 2021 WL 5647774, at *3 (quoting *United States v. Bradley*, 488 F. App'x 99, 105 (6th Cir. 2012)). Defendant argues that there is no evidence that this governmental interest was implicated in this case [Doc. 96 p. 20]. However, the Court observes that Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004 ("SORVTA") states that registration furthers "a compelling and necessary public interest" to enhance public safety and "allow members of the public to adequately protect themselves and their children from" sex offenders. Tenn. Code Ann. § 40-39-201(b)(2) & -(5).[23] Moreover, "the governmental interest in protecting evidence from destruction is particularly high where digital evidence is involved, because such evidence is inherently ephemeral and easily destructible[.]" *Bradley*, 488 F. App'x at 103 (upholding warrantless seizure of laptop for twenty-six hours while seeking search warrant for child pornography); *see also United States v. Friar*, No. 2:15-cr-20206-JTF-tmp, 2016 WL 1090657, at *3 (W.D. Tenn. Mar. 21, 2016) (finding warrantless seizure of iPad for twelve hours, while officers with probable cause to believe iPad contained child pornography sought a search warrant, was reasonable). The Court finds that the governmental interest in protecting the public, including children, from sex offenders and in preserving digital evidence outweighs the brief interference with Defendant's possessory interest in his cellphone.

---

[23] "Persons convicted of these sexual offenses have a reduced expectation of privacy because of the public's interest in public safety[.]" Tenn. Code Ann. § 40-39-201(b)(3).

The Court also finds that Detectives Collins and Taylor reasonably believed if Defendant retained the cellphone, any evidence contained thereon could be destroyed. After the May 2 interview, Defendant knew that officers suspected him of sending and requesting photographs to and from a minor and that they were seeking a search warrant to search the contents of his cellphone. Additionally, the information provided by Defendant in the interview that he had closed his reported account on DeviantArt, that he was using an account created by Corum, and that he had previously withheld the ManGlen account name from his registration form all suggest that Defendant was trying to avoid being linked with his activity on the website. Thus, the detectives reasonably concluded that Defendant, suspecting the search of his cellphone was imminent, could if given the opportunity, quickly destroy any incriminating evidence on his cellphone and SD card. *See McArthur*, 531 U.S. at 332 (observing that the officers "reasonably could have concluded that [defendant, who knew his wife knew the location of his marijuana stash, was angry with him, and had talked with police and who] consequently suspect[ed] an imminent search, would, if given the chance, get rid of the drugs fast").

Defendant argues that the seizure of his cellphone does not fall within any exception to the warrant requirement, such as exigent circumstances, which must be based on information that the officer knows at the time, not on knowledge acquired after the fact [Doc. 19 p. 4; Doc. 96 p. 18].[24] In this case, the Court finds the exigency arose from Defendant's knowledge that the officers

---

[24] Defendant cites to *Commonwealth v. White*, in which the Massachusetts Supreme Court found police lacked probable cause to seize the defendant's cellphone based solely upon officer's experience that people use cellphones to communicate with their cohorts [Doc. 19 p. 4]. 59 N.E.3d 369, 374, 376–77 (Mass. 2016) (declining to address exigency because probable cause was lacking where officers had no information that group suspected of robbery used their cellphones in the crime). This is not so much an exigency argument as a probable cause argument. The Court has already found a nexus between Defendant's cellphone and evidence of a registry violation as discussed above.

40

wanted to search his cellphone and the ease with which Defendant could have deleted evidence on the cellphone and SD card. The officers' fear that Defendant might delete evidence from his cellphone was heightened when they learned during the interview that Defendant was using an account created by another person to access the DeviantArt website, after his account was closed. In other words, Defendant demonstrated his willingness to hide his use of the DeviantArt website. *See Mason*, 2021 WL 5647774, at *3 (determining that the officer "justifiably seized the cell phone because [defendant's] actions [of asking to "wipe" the contents of his phone] created the imperative of preventing the destruction of evidence and of retaining custody of the phone until a magistrate issued a warrant to search it"). Given the government's interest in protecting children from sex offenders, the Court finds that the detective properly seized Defendant's cellphone to prevent the destruction of evidence thereon.[25]

Defendant also contends that destruction of the evidence cannot be deemed imminent when law enforcement created the claimed exigent circumstances, which he contends the detectives did here by calling him to the JCSO to confront him with the information from the DeviantArt website [Doc. 96 pp. 24, 28]. "It is well established that police officers are not free to create exigent circumstances to justify their warrantless searches." *United States v. Campbell,* 261 F.3d 628, 633 (6th Cir. 2001) (holding that the officers did not create the exigency by conducting a controlled delivery of a package containing supposed narcotics and a transmitter because defendant unexpectedly relocated to a residence other than the one for which they had a search warrant).

---

[25]     Defendant also argues that for the exigent circumstances exception to apply, destruction of the evidence must be imminent, and here, he could not have destroyed any information on the cellphone because once the officers seized it, destruction was no longer imminent [Doc. 96 p. 18]. The Court finds Defendant's argument to be circular. Under Defendant's understanding of the exigent circumstances exception, it would never apply, because as soon as the officer seized the device, destruction would no longer be imminent.

41

"[T]he police cannot claim there was insufficient time to seek a warrant if the evidence shows that the police controlled the timing of the encounter giving rise to the search." *Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002) (determining police did not create the exigent circumstances requiring warrantless entry into residence when they had information that defendant's wife and son were at risk for violence). Cases in which law enforcement created the exigency typically involve a "showing of deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement." *Id.*

In the instant case, the Court finds the detectives did not create the exigent circumstances requiring the warrantless seizure of Defendant's phone. Although Detective Collins set up the day and time for Defendant to report to the JCSO, he did not know Defendant would bring his cellphone to the interview. Detective Collins testified at the evidentiary hearing that individuals were not allowed to bring their cellphones into the Justice Center. Moreover, although the officers suspected that Defendant was using the Tennesseetomcat account on the DeviantArt website, they did not have probable cause until Defendant admitted using that account with Corum. Finally, the record is devoid of evidence that the detectives were trying to avoid the warrant requirement by seizing Defendant's cellphone. While the detectives clearly wanted Defendant to consent to a search of his cellphone, they consistently stated they would seek a search warrant for the cellphone, if Defendant did not consent. Thus, the Court finds that the detectives did not create the exigent circumstances that required the temporary warrantless seizure of Defendant's cellphone.

### (3) Reasonableness of the Seizure

Finally, the Court finds the warrantless seizure of Defendant's cellphone for approximately twenty-nine hours while law enforcement obtained a search warrant was reasonable, particularly in light of the significant governmental interest in protecting minors. *See Bradley*, 488 F. App'x

at 105 (finding seizure of laptop for twenty-six hours while seeking search warrant for child pornography to be reasonable); *United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970) (upholding twenty-nine-hour detention of packages while police obtained search warrant); *see also McArthur*, 531 U.S. at 331 (finding the warrantless seizure was not "*per se* unreasonable" because of the "plausible claim of specially pressing or urgent law enforcement need"). Like in *McArthur*, the Court finds the detectives "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"—they did not arrest Defendant at the time they seized his cellphone or search his cellphone without a warrant. *Id.* at 332. Although Defendant was deprived of his cellphone for a little more than a day, his cellphone was not searched "until a neutral [judge], finding probable cause, issued a warrant." *Id.*; *see Sangineto-Miranda*, 859 F.2d at 1513 (finding the warrantless entry into residence to prevent destruction of narcotics was reasonable when "police did no more than 'secure' the premises to ensure their safety and to prevent the loss or destruction of evidence").

Defendant argues that one of the detectives could have sought out a judge in the same building where the interview occurred and obtained a search warrant within fifteen minutes, while the other waited with him and his cellphone [Doc. 96 p. 19]. However, the requirement that the seizure be reasonable does not mandate a near instantaneous response by law enforcement. Although the Supreme Court in *Riley* noted that "[r]ecent technological advances . . . have . . . made the process of obtaining a warrant itself more efficient," it nonetheless recognized that exigent circumstances could justify a warrantless *search* of a cellular telephone. 573 U.S. at 401–02. Here, the officers *seized* Defendant's cellphone and SD card without a warrant, and Detective Taylor announced she was beginning the process of obtaining a search warrant about ten minutes after seizing the cellphone. A search warrant for Defendant's phone was issued at 1:55 p.m. on

43

the following day [Exh. 6].  As stated above, the Court finds the seizure for a little more than a day to be reasonable.

In summary, the Court finds the warrantless seizure of Defendant's cellphone, to prevent the destruction of evidence thereon, while the detectives sought a search warrant was reasonable, because the officers had probable cause and the seizure was for a short period of time.  The seizure of Defendant's cellphone did not violate Defendant's rights under the Fourth Amendment.[26]

## B.  Defendant's May 2, 2018 Statement

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Defendant maintains that all of his statements at the JCSO on May 2, 2018 must be suppressed because they were given in violation of the Fifth Amendment.[27]  He argues that he was

---

[26]     The Government also argues that the evidence obtained from Defendant's cellphone and SD card was not the fruit of the seizure but, instead, was obtained from a valid search warrant for the cellphone [Doc. 23 p. 4].  It contends that no evidence from the cellphone was used to obtain the May 3, 2018 search warrant for the cellphone, and, thus, the purportedly improper seizure did not taint the subsequent search [*Id.*].  Finally, it makes the alternative argument that if the seizure of the cellphone and SD card was unconstitutional, the officers still acted in good faith [Doc. 103 pp. 11–12].  The Court examines only the warrantless seizure of the cellphone and, finding it constitutional, need not reach the matter of the fruits of the seizure or the propriety of suppression of the evidence.

[27]     Defendant also argues that his statements were made in violation of the Fourth Amendment because he was questioned in custody without probable cause [Doc. 96 pp. 7, 22].  Police may not "seek to verify their [reasonable] suspicions by means that approach the conditions of arrest."

44

subjected to custodial interrogation and, thus, the detectives should have provided the *Miranda* warnings at the onset of the interview [Doc. 19 p. 4; Doc. 96 pp. 5, 7, 9–12, 15].  He also argues that his unwarned statements were not voluntary and were the product of coercion [*Id*. at 12].  Defendant contends that law enforcement initiated the continuation of the interview, after he requested a lawyer [*Id*. at 15, 27].  Finally, he asserts the involuntariness of his statements "carried over" after he executed a rights waiver [*Id*. at 25–28].  The Court examines each of these arguments.

### (1) Custodial Interrogation

As stated above, law enforcement may not question a person in custody until they have advised the person of their rights.  *Miranda,* 384 U.S. at 478-79.  In other words, the obligation to administer *Miranda* warnings only arises if there has been "such a restriction on a person's

---

*Florida v. Royer*, 460 U.S. 491, 499 (1983).  Thus, "reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." *Id.*  Here, unlike in *Royer*, or the other cases cited by Defendant, Defendant's "investigatory detention" was not mandatory.  *Compare id.* at 494, 496, 499 (holding detention of defendant was "tantamount to an arrest" when officers, suspecting he was a drug courier, seized his driver's license and ticket and detained him in a small room in the airport and asked to search his luggage); *Hayes v. Florida*, 470 U.S. 811, 815 (1985) (holding nonconsensual "transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment"); *Dunaway v. New York*, 442 U.S. 200, 212 (1979) (holding that Dunaway's detention, involving his transport in a police car to police station where he was questioned in an interrogation room "was in important respects indistinguishable from a traditional arrest"); *Brown v. Illinois*, 422 U.S. 590, 603–05 (1975) (holding that provision of *Miranda* warnings did not cure taint from illegal arrest without probable cause and transport to police station); *Davis v. Mississippi*, 394 U.S. 721, 726–28 (finding Fourth Amendment violation because police took Davis to police station, where he was questioned and fingerprinted, without probable cause).  Here, Detective Collins asked Defendant to come to the JCSO the following day for a meeting about his sex offender registration forms.  The fact that Defendant brought his dogs with him to the JCSO indicates that Defendant did not believe he was being arrested and, instead, thought that he would be free to leave after the meeting.  The Court finds that Defendant's interview did not violate the Fourth Amendment.

freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Custodial interrogation is questioning after the subject is "taken into custody or the restraint on his freedom . . . rise[s] to the level associated with a formal arrest." *Salvo*, 133 F.3d at 948. The central question is whether a reasonable person would have felt free to end the interview and leave. *Id.* at 949–50 (citing *Thompson v. Keohane*, 516 U.S. 99, 111–13 (1995)).

The Court determines whether the person was in custody by examining the circumstances surrounding the questioning and assessing "'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury*, 511 U.S. at 325). "Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told [he] need not answer the questions." *Id.*; *United States v. Swanson*, 341 F.3d 524, 529–30 (6th Cir. 2003). Other factors are "the purpose of the questioning," whether the suspect was told he or she was free to leave, and whether the "suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." *Salvo*, 133 F.3d at 950.

Defendant argues that these factors show he was in custody from the moment he arrived in the interview room [Doc. 96 pp. 10–12]. The Government counters that the interview was neither custodial, nor coercive [Doc. 103 pp. 8–9].

The Court first examines "whether the place of the questioning was hostile or coercive[.]" *Salvo*, 133 F.3d at 950. Defendant was asked to come to the JCSO to review his sex offender registration. Detectives Collins and Taylor interviewed Defendant in a fourteen-by-ten-foot interview room. The detectives sat across the table from Defendant and the door was closed but

46

not locked. Although the detectives were likely armed, they never displayed their weapons. "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495); *United States v. Protsman*, 74 F. App'x 529, 533 (6th Cir. 2003) (quoting *Mathiason*). Although Defendant was not handcuffed or otherwise physically restrained, the Court finds the location and circumstances of the interview had an "aura of coerciveness" because Defendant was questioned at the JCSO, in a closed room by two officers. *Protsman*, 74 F. App'x at 534 (finding an "aura of coerciveness" existed because defendant was interviewed by three officers, away from his friend, and in a room attached to the police station).

Second, the Court examines the purpose of the questioning to include whether Defendant or law enforcement initiated the questioning. The Court finds the stated purpose of the questioning was to review Defendant's sex offender registration. The detectives also sought to determine whether Defendant was using an unreported account on the DeviantArt website and to learn whether Defendant sent a photograph of his "private parts" to a minor on that website. The questioning and Defendant's appearance at the JCSO was initiated by law enforcement. Defendant notes that the meeting was not a routine sex offender compliance check, which he contends occurs quarterly in March, June, September, and December, not in May [Doc. 96 p. 10]. However, the Court finds Defendant's status as a sex offender cuts both ways. On the one hand, Defendant was familiar with brief, noncustodial meetings at the JCSO, where he reported for his compliance checks. On the other hand, because Defendant was required to register as a sex offender, he arguably believed he could not refuse Detective Collins's request that he come to the JCSO. However, the Court must make the custody determination not from Defendant's perspective but

from the viewpoint of a reasonable person, "innocent of any crime," in Defendant's circumstances. *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003) (observing that "a reasonable guilty person will aways perceive his situation as coercive"). On balance, the Court finds the purpose and initiation of the interview indicate the questioning was custodial.

The Court also examines the length and manner of the questioning. The detectives spoke with Defendant approximately twenty-nine minutes before giving the *Miranda* warnings. Defendant was in the interview room for one-hour and twenty minutes but spoke with the detectives for about fifty minutes.[28] *See Panak*, 552 F.3d at 467 (observing that interviews less than one hour are generally non-custodial); *see United States v. Mahan*, 190 F.3d 416, 420, 422 (6th Cir. 1999) (finding an interview lasting one and one-half hours was not custodial). The tone of the interview was initially cordial, with Defendant and the detectives chatting about Defendant's dogs and Defendant raising complaints about his neighbors. The Court finds that the detectives never raised their voice or yelled at Defendant, although as the interview progressed, they confronted him with information from the Tennesseetomcat account. Detective Taylor repeatedly pressed Defendant to be honest and, six minutes into the interview, said if he continued to lie to her, she would put him in jail that day and take his dogs to a shelter. *See Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991) (determining the officers "severe and accusatory" tone coupled with the officers repeated admonitions about the seriousness of the situation and threat to arrest defendant if he did not cooperate rendered the interview custodial), *affirmed in part and reversed*

---

[28]     Both detectives left the interview room approximately forty-seven minutes after the interview began [Exh. 3, 9:14:53]. Detective Taylor returned to the room briefly to give Defendant a receipt for his cellphone and to bring him water [Exh. 3, 9:38:11–15, 9:38:40]. Detective Collins returned to the interview room and questioned Defendant for two minutes about a drawing from Nolifelady's account [Exh. 3, 9:41:33–9:43:12]. Defendant is permitted to leave at 9:48:49, one hour and twenty minutes after the interview began. Defendant spoke to the detectives for a total of about fifty minutes.

*on other gnds*, 507 U.S. 680 (1993) (determining court erroneously held post-*Miranda* statements were involuntary without evidentiary hearing or argument on that issue).  Thirteen minutes into the interview, Detective Taylor seized Defendant's cellphone and told him that if he did not consent to a search of its contents, she would seek a search warrant.  The Court finds that while the length of the interview does not suggest it was custodial, the increasingly accusatory tone and threatened arrest would cause a reasonable person to believe he or she could not end the interview.

Finally, the Court examines whether Defendant possessed unrestrained freedom of movement during the interview and whether he was told he did not have to answer questions or that he could leave.  In the instant case, the Court finds that although Defendant was not handcuffed or otherwise physically restrained, the door to the interview room was closed throughout the interview.  *See Protsman*, 74 F. App'x at 534 (finding the absence of handcuffs or physical restraints supported a finding that the interview was noncustodial).  Defendant was not told that he could leave.  Instead, Detective Taylor threatened to arrest him if he did not tell the truth.  *Cf. Mahan*, 190 F.3d at 422 (finding interview noncustodial where defendant was not threatened with arrest).  Although Detective Taylor told Defendant it was up to him whether he wanted to continue to talk to them, this occurred nearly thirty minutes into the interview and just before she advised him of the *Miranda* warnings.  The Court finds that these factors suggest the interview was custodial.

Considering the totality of the circumstances, the Court finds that the interview was custodial because a reasonable person in Defendant's position would not have felt free to end the questioning and leave.  Custodial statements resulting from questioning and made without the benefit of the *Miranda* warnings must be excluded from the prosecution's case-in-chief.  *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  Unless the Court finds the provision of *Miranda* warnings

49

during the interview exempts the statements made after the rights waiver from exclusion (discussed in subsection 3 below), Defendant's May 2, 2018 statements during his interview at JCSO may not be used in the Government's case-in-chief at trial.

### (2) Invocation of Right to Counsel

Defendant also argues that his statements are inadmissible because he asked for counsel and the officers continued questioning him after that request [Doc. 96 pp. 15, 27]. Once a person in custody "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. "*Miranda* requires the police to scrupulously honor" a suspect's assertion of his or her right to have counsel present. *McKinney v. Ludwick*, 649 F.3d 484, 489 (6th Cir. 2011). If the suspect invokes his or her right to counsel, the police may not interrogate the individual outside of the presence of counsel, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015) (suspects who have invoked the right to counsel "remain free to change their minds," to initiate further conversation with the officer, and to waive the right to counsel). The reason for this rule is "to protect an accused in police custody from being badgered by police officers" into waiving the rights he or she has asserted. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (plurality opinion). "[I]nitiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994) (discussing *Bradshaw*, 462 U.S. at 1045, 1055).

A suspect's request for counsel must be clear and unequivocal. *Davis v. United States*, 512 U.S. 452, 459 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only

that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* The right to counsel is not invoked by the mere mention of a lawyer or "'a question about having an attorney.'" *United States v. Abdi*, 827 F. App'x 499, 510 (6th Cir. 2020) (quoting *United States v. Potter*, 927 F.3d 446, 451 (6th Cir. 2019)). In *Abdi*, the court found the defendant's questions about whether a lawyer was around and the procedures if he were to request a lawyer but could afford one were "equivocal at best," observing that defendant "never asked for an attorney or requested that questioning stop until he had an opportunity to consult one." *Id.*

Here, the Court finds that in response to Detective Taylor's repeated requests for consent to search his cellphone, Defendant said he did not understand "the technicalities and stuff" and asked, "Can I talk to a lawyer about it?" [Exh. 3, 8:47:33–37]. Both detectives agreed Defendant could talk to a lawyer, and Detective Taylor announced that they would begin the search warrant process and she would check the website for more information on Nolifelady before returning [Exh.3, 8:47:48–52]. Defendant responded that she should do that because "it don't look like no thirteen-year old" [Exh. 3, 8:47:53]. After Detective Taylor left the room, Detective Collins asked Defendant if he wanted to talk to a lawyer about his cellphone, and Defendant responded, "Yeah, I don't really . . ." and shook his head slightly from side to side [Exh. 3, 8:47:55–48:00]. Detective Collins said, "That's up to you," and Defendant then said, "I mean, I'm talking to you guys. So, I'm not saying I ain't talking to you." [Exh. 3, 8:48:00–07]. After Defendant's statement that he would continue talking with the detectives, Detective Collins said, "we just want to get to the bottom of it, okay?," and Defendant resumed his conversation with Detective Collins about Nolifelady's account [Exh. 3, 8:48:13–14].

In the instant case, Defendant followed his question about whether he could talk to a lawyer with a statement that he still wanted to talk with the detectives. The Court finds that Defendant

did not unequivocally request counsel. Moreover, Defendant affirmatively resumed further conversation with Detective Collins by stating that he was not ending the interview and resuming the discussion of the images on Nolifelady's page. Thus, the Court finds Defendant's inquiry about counsel had no effect on the admissibility or voluntariness of his statements.

*(3) Effect of Rights Waiver*

Twenty-nine minutes into the interview, after Detective Taylor had seized Defendant's cellphone and Detective Collins had frisked Defendant, Detective Taylor advised Defendant of his rights [Exh. 3, 8:56:58–8:57:19]. Defendant stated he understood his rights and signed a rights waiver [Exh. 3, 8:57:19–8:58:12; Exh. 5, Admonition and Waiver]. Defendant argues this waiver is invalid because the coerciveness of his prior unwarned statement contaminated and invalidated his subsequent waiver [Doc. 19 p. 5; Doc. 96 pp. 26–27]. Relying on *Missouri v. Seibert*, 542 U.S. 600, 604 (2004), Defendant argues that *Miranda* warnings given mid-interrogation, after a defendant gave an unwarned confession, are ineffective.[29]

"A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314. In such cases, the Court has held that the prior unwarned confession in no way compelled the subsequent warned confession. *Id.* at 311–14 (rejecting the "cat out of the bag" argument). However, in *Seibert*, the Court distinguished *Elstad*, in which the unwarned statement occurred in the defendant's home at an earlier time before the warned questioning at the police station, from the case before it, in which the unwarned questioning occurred at the police station with only a fifteen-to-twenty-minute pause before

---

[29]     The Government does not address Defendant's argument that the "midstream" rights waiver was ineffective, instead responding that the interview was not custodial or coercive and, thus, the *Miranda* warnings when given were not required [Doc. 103 p. 9].

provision of *Miranda* warnings and resuming the questioning. 542 U.S. at 614–16. In *Seibert*, a plurality of the Court held that the "midstream recitation of warnings after interrogation and unwarned confession [can]not effectively comply with *Miranda*'s constitutional requirement" and, thus, "a statement repeated after a warning in such circumstances is inadmissible." *Id.* at 604.

To determine the effectiveness of "midstream" advice of rights, the Court evaluates whether the subsequent questioning would be viewed as a "new and distinct experience" by "a reasonable person in the suspect's shoes" and whether the *Miranda* warnings presented the suspect with a "genuine choice" to comment on the earlier statements. *United States v. Ray*, 803 F.3d 244, 272–73 (6th Cir. 2015) (internal quotation omitted) (adopting five-factor test from *Seibert*). "The factors . . . relevant to this inquiry are 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.'" *Id.* at 273 (quoting *Seibert*, 542 U.S. at 616); *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th 2008). If application of these factors reveal that the midstream *Miranda* warning was effective, then the court must analyze the standard issues of the voluntariness of the waiver and the statement, but if the warning was not effective, the post-warning statement is inadmissible due to the absence of an adequate *Miranda* warning. *Id.* (citing *Seibert*, 542 U.S. at 615). In the latter case, where the midstream warning is ineffective, "'the earlier and later statements are *realistically seen as parts of a single, unwarned sequence of questioning*.'" *Id.* (supplying emphasis) (quoting *Seibert*, 542 U.S. at 612).

In this case, the Court agrees with Defendant that the application of these factors support a finding that the post-warning statement is imbued with the assumed compulsion of the unwarned

portion of the interview. First, the Court finds that although the questions in the unwarned portion of the interview were not as specific as the questioning that followed the advice of rights, the subject matter of the questions (whether Defendant used the Tennesseetomcat account and Defendant's interactions with Nolifelady on the DeviantArt website) was largely the same. Like in *Ray*, the Court finds that Defendant's post-*Miranda* comments elaborated on the information provided in the unwarned portion of the interview. *See* 690 F. App'x at 374 (observing that Ray's elaboration on his pre-*Miranda* admissions "was made possible solely because of the overlapping content between what he was asked pre- and post-*Miranda*). Detective Taylor told Defendant that after the Miranda warnings, he could provide his "side of the story," *i.e.*, he could explain his previous admissions [Exh. 3, 8:56:46–56].

The other *Seibert* factors also support a finding that the *Miranda* warning was not effective. The unwarned and warned portions of the interview occurred with little to no break in between, in the same place, and with the same law enforcement personnel. Finally, the Detectives treated the warned interview as contiguous with the unwarned questioning, with Detective Taylor telling Defendant that she would "mirandize" him and then, "it's up to you whether you want to continue and explain your side of the story to us" [Exh. 3, 8:56:26–55]. Accordingly, the Court finds that provision of the *Miranda* warnings approximately halfway through the interview was not effective and the entire interview is inadmissible at trial due to the failure to provide the *Miranda* warnings before the interrogation began.

*(4) Voluntariness of Statements*

Because the detectives should have advised Defendant of the *Miranda* warnings at the onset of the questioning, Defendant's statements to the detectives during the May 2, 2018 interview at the JCSO may not be used in the Government's case-in-chief at trial. *Elstad*, 470 U.S.

at 307 (observing that "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*"). However, the fruits of an un-*Mirandized* statement are not "inherently tainted," *id.*, and need not be suppressed. *Vega v. Tekoh*, 142 S. Ct. 2095, 2103 (2022). Voluntary but unwarned custodial statements may be used for other purposes, such as to impeach a defendant on cross-examination, if defendant testifies contrary to his statement. *Id.* (citing *Harris*, 401 U.S. at 225). *Cf., Michigan v. Tucker*, 417 U.S. 433, 440 (1974) (determining that the Fifth Amendment protects against "genuine compulsion of testimony"). An important consideration in this case is whether Defendant's statements during the May 2, 2018 interview were properly used to support probable cause both for an arrest warrant and for a search warrant for Defendant's cellphone.[30] *See United States v. Stark*, No. 09–cr–20317, 2009 WL 3672103, at *3–4 (E.D. Mich. Nov. 2, 2009) (declining to suppress physical evidence—a computer containing child pornography—seized pursuant to a search warrant based on defendant's voluntary statement, given in violation of *Miranda*).

In *Knuckles v. Brigano*, our appellate court raised, without deciding, the question of whether the Supreme Court's then recent decision in *United States v. Dickerson*, 530 U.S. 428, 444 (2000), holding that *Miranda* is a constitutionally compelled rule, made the "fruit of the poisonous tree doctrine" applicable to physical evidence gained through *Miranda* violations. 70 F. App'x 830, 837 (6th Cir. 2003). The Supreme Court recently answered this question, holding that a *Miranda* violation is not "tantamount to a violation of the Fifth Amendment." *Vega*, 142 S. Ct. at 2101, 2105. Even though the *Miranda* warnings are "'constitutionally based,'" as determined in *Dickerson*, those rules are nonetheless prophylactic, and the violation of those rules

---

[30] The Court will address the probable cause for issuance of the state search warrant for Defendant's cellphone in a separate report and recommendation on Defendant's motions to suppress evidence from three search warrants [Doc. 20] and for a *Franks* hearing [Doc. 34].

55

do not necessarily constitute a violation of the Fifth Amendment. *Id.* at 2101, 2105–06 (concluding that "a violation of *Miranda* does not necessarily constitute a violation of the Constitution, and therefore such a violation" is not a basis for a deprivation of a constitutional right under 42 U.S.C. § 1983); *see e.g., United States v. Rodgers*, No. 2:22-cr-20118-1, 2022 WL 3645992, at *4 (E.D. Mich. Aug. 24, 2022) ("Because any alleged *Miranda* violation would not suppress the physical evidence found on Defendant's person or in his backpack, the denial without prejudice [of defendant's motion to suppress unwarned statements] does not affect the admissibility of the firearm discovered in Defendant's backpack.").

In *Vega*, the Supreme Court cited to situations in which it upheld the use of the fruit of an unwarned yet voluntary statement. 142 S. Ct. at 2103; *Tucker*, 417 U.S. at 450–52 (admitting testimony of witness whom police discovered through defendant's unwarned statement); *Harris*, 401 U.S. at 225 (voluntary statement obtained in violation of *Miranda* can be used to impeach defendant's testimony at trial); *Elstad,* 470 U.S. 306–09 (second statement after *Miranda* warning); *see also United States v. Patane,* 542 U.S. 630, 636–37 (2004) (*Miranda* violation does not require suppression of physical evidence—a gun—gained through defendant's voluntary statement). Similarly, the Sixth Circuit permits the use of the fruits of a voluntary statement despite the presence of a *Miranda* violation. *Sansineto-Miranda*, 859 F.2d. at 1518 ("cocaine found in Sanineto's truck was admissible, even though knowledge of the existence and whereabouts of the truck were proximately derived from a *Miranda* violation"); *see also United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 886 n.10 (S.D. Ohio 2016) (noting *Miranda* violation does not require suppression of physical evidence—defendant's fingerprints—gained through his voluntary statements) (collecting cases).

56

Thus, the Court turns to the voluntariness of Defendant Glatz's statements during the May 2, 2018 interview. Defendant contends that he first denied using the Tennesseetomcat account and that his subsequent statements were involuntary and coerced because Detective Taylor threatened to put him in jail and to take his dogs to a shelter [Doc. 96 pp.7, 12, 25–26]. He likens his case to *Williams v. Withrow*, in which our appellate court determined that the interrogating officer's accusation of lying, threat of arrest, and promise of leniency if the defendant cooperated rendered defendant's confession involuntary. 944 F.2d at 289. "[W]hen promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect, [the court is] obliged to inquire whether the coercion in question was sufficient to overbear the will of the accused." *Id.* (internal quotation omitted).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "If the police misconduct at issue was not the 'crucial motivating factor' behind [the defendant's] decision to confess, the confession may not be suppressed." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (citing *Connelly*, 479 U.S. at 163-64). To assess whether a confession was voluntary, the Court must "examine 'the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine[] their psychological impact on an accused's ability to resist pressures to confess.'" *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991) (quoting *United States v. Brown*, 557 F.2d 541, 546 (6th Cir. 1977)). A voluntary confession "must not [have been] extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *United States v. Bloomer*, No. 4:05CR-43-M, 2006 WL 1548951, at *7 (W.D. Ky. June 1, 2006) (internal

quotations omitted). If a defendant asserts that his statement was coerced, the government has the burden to demonstrate the statement was voluntary by a preponderance of the evidence. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992).

To find a statement is involuntary, the court must find the following three factors are present: (1) "the police activity was 'objectively coercive';" (2) "the coercion in question was 'sufficient to overbear defendant's will';" and (3) "the alleged police misconduct 'was the crucial motivating factor in the defendant's decision to offer the statements.'" *United States v. Luck*, 852 F.3d 615, 622 (6th Cir. 2017) (quoting *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016)). The Court considers the influence of external circumstances, such as "the location of the questioning, whether *Miranda* warnings were given, the number of interrogators, the length of questioning, whether or not the defendant was denied food, water or toilet facilities, and whether the police used threats, promises, lies or tricks." *United States v. Everson*, No. 2:13–cr–02, 2013 WL 5719422, at *3 (W.D. Mich. Sept. 19, 2013), *recommendation adopted in part,* 2013 WL 5719420 (W.D. Mich. Oct. 21, 2013) (remanding for factual findings on whether second written statement provided after *Miranda* warnings was voluntary). The Court also considers the characteristics of the accused, such as age, education/intelligence, "physical condition and emotional state at the time of the confession," as well as the accused's "expressed fears of violent reprisal." *Wrice*, 954 F.2d at 411. The defendant's "prior experience with the criminal justice system" is also relevant to the voluntariness analysis. *Ledbetter v. Edwards*, 35 F.3d 1062, 1069–70 (6th Cir. 1994).

Here, the Court questions whether the detectives used "objectively coercive" tactics. Detective Taylor confronted Defendant with information from her review of the DeviantArt website, she admonished him to be honest, she made vague references that his situation would be

better if he cooperated and consented to a search of his cellphone, and she told Defendant that she would get a search warrant, if he did not consent. These tactics, though abrasive, appear to be ordinary interrogation techniques. *See, e.g. United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021) (declining to find coercion when defendant failed to "identify any acts by the police that went beyond normal police-interrogation tactics"). While "promises of leniency may be coercive if they are broken or illusory," *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003), here, the detectives made no specific promises to Defendant, nor did they attempt to trick him or overstate the evidence against him. *United States v. Irons*, 646 F. Supp. 2d 927, 969 (E.D. Tenn. 2009) (adopting in whole recommendation that ruse by law enforcement to arrest officer in whom defendant confided was "objectively coercive"). Moreover, the other circumstances of the interview were not coercive: The interview was not lengthy, only two officers questioned Defendant, he was not deprived of sustenance for long periods, the detectives brought him water, and he received advice of rights. Defendant was provided the *Miranda* warnings about halfway through the interview, and he affirmed that he understood his rights.

Detective Taylor's threat to arrest Defendant and to put his dogs in a shelter if he lied about his use of the Tennesseetomcat account goes beyond normal interrogation tactics. *See Williams*, 944 F.2d at 289 (finding the officer's accusations of lying and threats of arrest were coercive). The coerciveness of this threat pales in comparison to traditional examples of police overreach, such as holding defendant at gunpoint, or long periods of interrogation with no sleep and/or little food. *Connelly*, 479 U.S. at 163 n.1 (collecting examples of police coercion). However, threatened consequences to others can be psychologically coercive. *United States v. Flack*, No. 3:08–CR–108, 2009 WL 5031320, at *5 (E.D. Tenn. Dec. 11, 2009). In *Lynumn v. Illinois*, the Court found the threat to cut off the defendant's financial assistance, imprison her for ten years, and take away

her children was coercive and rendered her statement involuntary. 372 U.S. 528, 532–34 (1963); *see also Johnson*, 351 F.3d at 254 (holding a threat to arrest a family member is coercive if it is illusory and could not have been "lawfully executed").

Although the " tactic of inducing a suspect to talk by threatening adverse consequences to a friend or loved one is . . . particularly pernicious[,]" it "is not always improper. Sometimes such a suggestion may be an honest statement of a possible outcome." *United States v. Rodgers*, 186 F. Supp. 2d 971, 976 (E.D. Wis. 2002). In *Rodgers*, the Court found the following factors to be relevant:

> (1) whether the officers actually intended to take action against the friend or loved one or whether the threat constituted a misrepresentation; (2) whether there was a legitimate basis for taking action against the friend or loved one; (3) the severity of the threatened action; and (4) whether the friend or loved one suffered from an infirmity that would render him or her particularly vulnerable to official action.

*Id.; United States v. Hunter*, 332 F. App'x 285, 289 (6th Cir. 2009) (holding that "[w]hether a threat to prosecute a third party is coercive turns on the issue of whether the threat could have been lawfully executed.") (internal quotation omitted). Applying these factors, the *Rodgers* court found the officers' implication that defendant's girlfriend could be held responsible for the drugs in the car if he did not claim them was not coercive. 186 F. Supp. 2d at 980; *Reay v. Henry*, No. CIV S–05–0356, 2009 WL 1451712, at *23–24 (E.D. Cal. May 22, 2009) (applying the *Rodgers* factors and finding officer's threat to bring the suspect's mother and aunt in for questioning, though "hard-hitting, did not rise to the level of an improper threat that would renders petitioner's confession involuntary").

For some, an officer's threat to take one's dogs to a shelter may not equate to a threat to arrest a family member, but here, Defendant told the detectives at the start of the interview that his

dogs are his family. Thus, the Court finds the considerations raised by the court in *Rodgers* to be persuasive. Although the Court has no information on Detective Taylor's actual intentions with regard to Defendant's dogs, it finds that the JCSO may well have had to take the dogs to a shelter, if Defendant was arrested and did not have a friend or associate who could pick them up. In his brief, Defendant equates Detective Taylor's statement to a threat to kill his dogs. The Court finds Detective Taylor's statement about Defendant's dogs to be serious but not necessarily a threat of fatal consequence. Moreover, the record does not reflect that the dogs were particularly vulnerable. On balance, the Court finds the threat to arrest Defendant and take his dogs to a shelter did not rise to the level of coercion.

Even taking Detective Taylor's threat to arrest Defendant and take his dogs to a shelter as coercive, the video recording of the interview reveals Defendant's will was not overborne. Defendant repeatedly declined consent to search his cellphone, telling the detectives its contents were private. He denied any wrongdoing on the DeviantArt website. Defendant did not change his position that he thought the user of the Nolifelady account was an adult until the user told him otherwise. While Defendant did admit using the Tennesseetomcat account with Corum, he maintained his position that the account was created by Corum and that he used it with her or through her. Defendant's age, intelligence level, and emotional and physical condition did not render him particularly susceptible to coercion. Instead, his prior criminal history, experience registering as a sex offender, and experience with a registry violation[31] suggests he would be resistant to police coercion. *See Flack*, 2009 WL 5031320, at *4 (finding "[d]efendant's criminal

---

[31] During the interview, Defendant told the detectives that he was previously arrested for failing to report his ManGlenn username on his sex offender registration form [Exh. 3, 8:40:21–39].

record–and therefore experience with law enforcement officers–makes it more likely that his unwarned statements were made voluntarily").

Finally, the Court does not find that Detective Taylor's threat to arrest Defendant and take his dogs to a shelter was "the crucial motivating factor in the defendant's decision to offer the statements." *Luck*, 852 F.3d at 622 (internal quotation omitted). Defendant argues that he did not admit using the Tennesseetomcat account on DeviantArt until after Detective Taylor made this threat and that his answers after that point were made to save his dogs' lives [Doc. 112 p. 2]. However, as discussed above, Defendant repeatedly stated his cellphone was private, declined consent to search his cellphone, and declined to give the detectives the passcode to his cellphone. Defendant's desire to prevent a search of his cellphone appears to be the critical motivating factor in Defendant's continued participation in the interview.

Examining the circumstances of the May 2, 2018 interview as a whole, the Court finds Defendant's statements during the interview were voluntary, even though they were unwarned. The Court considers whether Defendant's statements were properly used to support probable cause for the arrest warrant in section D below.

**C. Search of Defendant's Person**

Defendant argues the warrantless search of his person during the May 2, 2018 interview violated the Fourth Amendment, because the officers lacked probable cause to search him and no exception to the warrant requirement applied [Doc. 96 pp. 2, 31]. He asserts that although Detective Collins claimed that he "patted down" Defendant, the video recording of the interview shows that Collins reached inside his pockets and pulled out items, including his micro SD card [*Id.* at 31]. Defendant contends that all fruits of this illegal search, which he argues includes his cellphone, his SD card, and their contents must be suppressed [*Id.*].

The Court disagrees with Defendant's interpretation of the video recording. Approximately twenty-seven and one-half minutes after the start of the interview, Detective Collins asked Defendant if he had a knife, and when Defendant said he had a pocketknife, Collins instructed him to place it on the table and to empty his pockets onto the table, explaining he forgot to ask Defendant about knives earlier [Exh. 3, 8:55:29–38]. Defendant placed a pocketknife and, at Detective Collins's direction, his keys on the table [Exh. 3, 8:55:37–49]. Detective Collins then patted the outside of Defendant's sweatshirt pockets and reached inside to remove several items, which he placed on the table [Exh. 3, 8:55:52–56:10]. Detective Collins patted down Defendant's pants pockets, stating he was confirming that Defendant did not have any items that are prohibited in the building, such as guns [Exh. 3, 8:56:11–20]. Defendant placed his wallet on the table at Detective Collins's request [Exh. 3, 8:56:24]. At the evidentiary hearing, Detective Collins testified that Defendant had not acted in a way that indicated he was a danger to the officers [Tr. at 64]. He also testified that individuals were not permitted to bring cellphones, knives, or guns into the building, but Defendant had both his cellphone and a pocketknife [*Id.*].

An officer who reasonably believes that a person, whose suspicious behavior the officer is investigating in close proximity, "is armed and presently dangerous to the officer or others" can pat down the outer clothing of the person to determine whether the person has a weapon. *Terry v. Ohio*, 392 U.S. 1, 24–25 (1968). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams*, 407 U.S. 143, 146 (1972). The officer may reach inside the person's pocket to secure weapons or contraband the officer has identified by "plain feel." *Minnesota v. Dickerson*, 508 U.S. 366, 374–75 (1993). However, "[i]f the protective search goes beyond what is necessary to

determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* at 373.

Here, Detective Collins testified that he had no reason to believe Defendant was a danger to the detectives or others. Thus, a *Terry* pat down was not warranted. Moreover, the Court has no evidence that Detective Collins felt what he believed was weapons or contraband in Defendant's jacket pocket, so reaching inside the pocket was also unwarranted as part of an investigatory detention. However, suspicionless, "cursory" administrative searches are permissible under certain special circumstances, such as providing security for public buildings. *Downing v. Kunzig*, 454 F.2d 1230, 1232 (6th Cir. 1972) (holding that "cursory" visual examination of entrants' belongings to assure that no explosives or dangerous weapons were carried into the federal building was reasonable under the Fourth Amendment); *see also Johnston v. Tampa Sports Authority*, 530 F.3d 1320, 1328 n.7 (11th Cir. 2008) (noting "special needs" exception to the Fourth Amendment warrant requirement, permitting suspicionless searches "to address the 'special needs' of the government beyond 'the normal need for law enforcement,'" such as "airport searches for weapons and explosives" and "searches upon entrance to federal buildings"); *Barrett v. Kunzig*, 331 F. Supp. 266, 273 (M.D. Tenn. 1971) (upholding visual inspection of packages and briefcases brought into federal courthouse and observing that "a citizen who ha[s] legitimate business in a jail . . . c[an] gain access to it so long as he obey[s] reasonable rules and regulations" about items brought into the jail). Here, Detective Collins testified that persons entering the Jefferson County Justice Center are not permitted to bring knives, guns, or cellphones into the building. Defendant produced his cellphone during the interview and told Detective Collins that he had a pocketknife. Accordingly, the Court finds requiring Defendant to empty his pockets to

confirm he had no other prohibited items was reasonable, given that Defendant had violated the building security protocol.

Additionally, even if Detective Collins's search of Defendant's person exceeded the limitations of a cursory administrative search, the Court finds it yielded no evidence to be suppressed. Contrary to Defendant's assertion otherwise, the video does not show that Detective Collins seized an SD card from Defendant's pocket. Nor do the items seized appear to include an envelope that may have contained an SD card. Detective Collins agreed that the SD card was inside Defendant's cellphone, when the cellphone was seized on May 2, 2018, and testified that he did not recall it being removed from the cellphone [Tr. at 65–66].[32] The Court has no evidence

---

[32]    Defendant alleges that the SD card was not installed in his cellphone but, instead, was seized from an envelope removed from his pocket during Detective Collins's warrantless search of his person [Doc. 100 p. 13]. In support of this contention, Defendant contends the video of the interview shows the removal of the SD card from his pocket; forensic examiner Detective Michael Stallings testified that Detective Collins brought the cellphone and separate SD card to him in an envelope; and neither Collins nor Stallings knew who removed the SD card from the cellphone [Id. at 13–14]. Defendant's references to FBI documents and Agent Bianca Pearson's affidavit do not support his argument that the SD card was seized separately from the cellphone [Doc. 96 p. 32; Doc. 98-21; Doc. 98-25 p. 2; Doc. 98-8; Doc. 98-11]. Defendant asserts that an FBI chain of custody document reveals that his SD card was seized from his person [Doc. 138-1; see Doc. 157 (permitting substitution)]. However, the description of the item states it is a "16GB Micro SD card located inside LG smart phone" [Doc. 138-1].

The Court disagrees that the video of the May 2, 2018 interview shows Collins removing either a micro SD card or an envelope from Defendant's jacket pocket [Exh. 3, 8:55:52–56:05]. Although Detective Stallings testified at the September 21, 2018 preliminary hearing in Jefferson County General Sessions Court, that the micro SD card had been removed from the cellphone at the time he received it for analysis and that he did not know who removed the SD card from the cellphone [Doc. 98-2, Transcript (unofficial), p. 83], this testimony does not negate Detective Collins's testimony at the April 14, 2021 evidentiary hearing that he did not recall the SD card being separated from the cellphone [Tr.at 66]. Nor does it negate Detective Collins's testimony that he did not know who removed the SD card from the cellphone [Id.].

Finally, the Court observes that in the JCSO Preliminary Investigative Report, Detective Taylor made notes on May 10, 2018, regarding the May 2, 2018 interview and the May 3, 2018 search warrant application [Exh. 2 p. 4]. For both dates, Detective Taylor references only the cellphone and not the SD card, stating "I seized Glenn's phone and gave him a property receipt for the phone." and "I did [sic.] a search warrant for the phone and gave it to Detective Michael Stalling with JCPD for examination." [Id.]. Per the report, Detective Taylor made these notes on

that the detectives retained anything from Defendant after the interview, aside from the cellphone and the SD card within it. Accordingly, even if Detective Collins improperly searched inside Defendant's jacket pockets, no evidence was seized during this search and, thus, suppression is not warranted.

### D. Defendant's May 3, 2018 Arrest

Finally, Defendant argues that he was illegally arrested on May 3, 2018, due to an insufficient and faulty arrest warrant [Doc. 96 p. 29]. He contends that Detective Collins's affidavit in support of the arrest warrant does not provide probable cause for his arrest [*Id.*]. He also argues that the form of the May 3, 2018 arrest warrant does not comport with the requirements of the Tennessee Rules of Criminal Procedure [*Id.* at 30]. Additionally, Defendant argues that a second arrest warrant issued on May 10, 2018, alleges he committed an offense on May 4, 2018, which was impossible, because he was in jail at that time [*Id.*]. Defendant asks the Court to suppress sixty jail telephone calls, which he contends are the fruit of his illegal arrest and which he argues are used to provide probable cause in the affidavit supporting the November 19, 2019 federal search warrant for the contents of his cellphone and SD card [*Id.*].

The Government contends that law enforcement had probable cause to believe Defendant used the undisclosed Tennesseetomcat account when they arrested him for a registry violation on May 3, 2018 [Doc. 105 p. 1].

---

May 10, 2018 [*Id.*]. The Court finds this account of the seizure and transfer of the phone to Detective Stallings supports a finding that the SD card was contained within the cellphone at the time it was seized.

*(1) Scope of the Issue*

The Court finds Defendant's challenges to the content and form of his arrest warrants, issued on May 3 and May 10, 2018, fall outside the scope of the issues raised in his suppression motion [Doc. 19] and the evidence presented at the April 14, 2021 evidentiary hearing. The motion currently before the Court was filed by former defense counsel, now elbow counsel, who also represented Defendant at the April 14, 2021 evidentiary hearing. Shortly thereafter, on April 19, 2021, Defendant asserted his right to represent himself and asked to file his own post-hearing briefs [Doc. 41]. The undersigned permitted Defendant to represent himself and set a briefing deadline [Doc. 48]. At that time, the Court declined to reopen the motion deadline but permitted Defendant to raise additional issues stemming from the evidence that was presented at the April 14 evidentiary hearing [*Id.* at 5, 8]. Defendant's initial post-hearing briefs [Docs. 69 & 80] exceeded the page limitation in Local Rule 7.1(b) by nearly seventy-five pages, not including his forty-five exhibits [Docs. 80-1 through 80-45].

At a hearing discussing the length and content of his post-hearing briefs, Defendant argued that he sought to raise a new issue that his arrest pursuant to two Jefferson County arrest warrants was illegal [Doc. 87 p. 4]. "The Court reminded Defendant that it permitted him to raise additional issues stemming from the evidence that was presented at the April 14, 2021 evidentiary hearing, which was the video recording of his May 2, 2018 interview, the search warrant affidavits for the three search warrants, and other testimonial and documentary evidence" [*Id.* at 4 n.2; s*ee* Doc. 40, Witness and Exhibit List]. With regard to the legality of his May 3, 2018 arrest, the Court ruled that "Defendant may challenge the legality of his May 2018 arrest to the extent that it flowed from evidence presented at the April 14, 2021 evidentiary hearing, specifically his May 2, 2018 interview" [*Id.* at 4 n.4].

Defendant's arguments about the content and form of his arrest warrants exceed the Court's limited expansion of the issues it permitted Defendant to raise in his post-hearing briefs. In support of his arguments on the arrest warrants, Defendant provides copies of the May 3, 2018 Affidavit of Complaint and arrest warrant [Doc. 98-5] and a May 10, 2018 Affidavit of Complaint [Doc. 98-6] and arrest warrant [Doc. 151-2 p. 1][33] as exhibits to his post-hearing briefs. The May 3 arrest warrant is stamped a "copy" on both the Affidavit of Complaint and the arrest warrant and the arrest warrant is not signed [Doc. 98-5 pp. 1–2]. None of these documents were introduced at the April 14, 2021 evidentiary hearing, nor have they been authenticated. Accordingly, the undersigned finds Defendant's arguments about the content and form of the May 3 and 10, 2018 arrest warrants are not properly before the Court.

### (2) Probable Cause for the May 3, 2018 Arrest Warrant

At the evidentiary hearing, Detective Collins testified that he obtained an arrest warrant on May 3, 2018, and arrested Defendant on that day [Tr. at 44]. The Court generally construes Defendant's argument to be that Detective Collins did not have probable cause to arrest him for failing to report his use of an internet communication account belonging to another person.

The Court has already determined (*see* section (1) in part A. above) that at the time the detectives seized Defendant's cellphone on May 2, 2018, they had probable cause to believe that he had violated the sex offender registration law, Tenn. Code Ann. § 40-39-208, by failing to list the Tennesseetomcat username on his sex offender registration form. Section 40-39-208(a)(3) provides that "[i]t is an offense for an offender to knowingly violate any provision of this part. Violations shall include, . . . [f]ailure to timely disclose required information to the designated law

---

[33]     On October 31, 2022, the Court permitted Defendant to supplement Exhibit 98-6, adding the May 10, 2018 arrest warrant [Doc. 152-2 p. 1; *see* Doc. 157 p. 3].

68

enforcement agency[.]"  Sex offenders are required to disclose internet communication accounts or identities:  "Within three (3) days, excluding holidays, of a[ sex] offender changing the offender's electronic mail address information, any instant message, chat or other internet communication name or identity information that the person *uses or intends to use*, whether within or without this state, the offender shall report the change to the offender's designated law enforcement agency."  Tenn. Code Ann. § 40-39-203(a)(7) (discussing contents of sex offender registration forms) (emphasis supplied).  Significantly, the statute requires disclosure of internet chat names "use[d]" by the sex offender and is not limited to accounts that the offender creates or owns.

At the time Detective Collins sought a warrant for Defendant's arrest, he knew that Defendant was a sex offender required to register, Defendant had admitted using the Tennesseetomcat account, and Defendant did not list the Tennesseetomcat account on his March 28, 2018 registration form.  Thus, Detective Collins had probable cause to arrest Defendant for a violation of § 40-39-203.  *See United States v. Ellis*, 910 F. Supp. 2d 1008, 1023 n.5 (W.D. Mich. 2012) ("When a defendant admits to committing a crime, that admission, alone, suffices to establish probable cause to arrest.").  "The Fifth Amendment, by its terms, prohibits only *compelled* self-incrimination; it makes no mention of 'unwarned' statements."  *Williams*, 507 U.S. at 707 (O'Connor, J., concurring in part) (disagreeing that a *Miranda* violation is an appropriate basis for a habeas review).  Thus, a voluntary but unwarned statement does not violate the Fifth Amendment "'privilege against compulsory self-incrimination, but departs only from the prophylactic standards later laid down by th[e Supreme] Court in *Miranda*.'"  *Id.* (quoting *Tucker*, 417 U.S. at 446); *see also Vega*, 142 S. Ct. at 2108 (holding "a violation of *Miranda* is not itself a violation of the Fifth Amendment").  Although the Court finds Defendant's statements in the May

69

2, 2018 interview must be excluded from the Government's case-in-chief at trial, the statements were voluntary and may be used for other purposes, such as permitting Detective Collins to seek an arrest warrant.[34]  Accordingly, the Court finds the *Miranda* violation does not invalidate the May 3, 2018 arrest warrant.[35]

## IV.  CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** Defendant's motion to suppress evidence from the seizure of his cellphone and SD card [**Doc. 19**] be **GRANTED in part** in that his May 2, 2018

---

[34]    Courts disagree on whether the Fifth Amendment protection against self-incrimination is solely a trial right or extends to pretrial proceedings, including the initiation of charges.  *Compare United States v. Hulen*, 879 F.3d 1015, 1018–19 (9th Cir. 2018) ("A compelled statement is used in a criminal case when it is 'relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status.'") (quoting *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009)) *& Vogt v. City of Hays,* 844 F.3d 1235, 1240–46 (10th Cir. 2017) (discussing circuit split and joining the Second, Seventh, and Ninth Circuits in holding that the "the right against self-incrimination is more than a trial right") *with Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005) ("The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only *at* trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right."), *see also Vogt,* 844 F.3d at 1240 (observing the Third, Fourth, and Fifth Circuits find the Fifth Amendment protection against self-incrimination is solely a trial right).  However, the Sixth Circuit has not spoken on this issue, and, importantly in this case, the Court finds Defendant's statement was voluntary and, thus, its use does not violate the Fifth Amendment.

[35]    Defendant argues that Detective Collins's affidavit in support of the May 3 arrest warrant contains false statements—that Defendant owned rather than used "an email and chat ID" and failed to notify law enforcement of "the email and chat ID"—and that if these allegations are stricken from the Affidavit of Complaint, it fails to provide probable cause that he violated the sex offender registry laws [Doc. 96 pp. 29–30].  The Court finds that Defendant's attack on the specific language in the May 3, 2018 Affidavit of Complaint exceeds the scope of his motion to suppress [Doc. 19] and cannot be determined without recourse to exhibits not properly in the record.  Moreover, Defendant applies *Franks v. Delaware*, 438 U.S. 154 (1978) and case law relating to probable cause for issuing a search warrant without providing authority to support an expansion of the *Franks* analysis to affidavits supporting arrest warrants.  The Court does not address these arguments, which it finds are not properly raised.

70

statements to JCSO detectives cannot be used in the Government's case-in-chief at trial and that

his motion be **DENIED** in all other respects.[36]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[36] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

71