IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:19-CR-218-TAV-DCP |
| | ) | |
| GLENN FRED GLATZ, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Glenn Glatz's Motion to Suppress All Evidence Obtained by May 3, 2018 Jefferson County Search Warrant, a June 6, 2018 Federal Search Warrant, and a November 2019 Federal Search Warrant [Doc. 20], Motion for a "Franks" Hearing [Doc. 34], and pro se motion relating to irregularities with the November 2019 search warrant [Doc. 99 pp. 4–6]. *See* 28 U.S.C. § 636(b). Defendant asks the Court to suppress all evidence obtained from three searches of his cellular telephone and SD card pursuant to a May 3, 2018 state search warrant ("state search warrant"); a June 6, 2018 federal search warrant ("first federal search warrant"); and a November 19, 2019 federal search warrant ("second federal search warrant"). Defendant argues that the searches of his cellular phone and SD card pursuant to these warrants violated the Fourth Amendment because the affidavits supporting all three search warrants fail to provide probable cause for their issuance. Defendant also requests an evidentiary hearing to challenge statements in the three affidavits supporting the search warrants, arguing the affidavits contain false statements and omissions that are material to probable cause. Defendant asserts that the three search warrants fail to allege the items to be seized with particularity. He challenges the execution of the state search warrant, which he contends did not permit the search of his SD card, and the second federal search warrant, which he asserts was

unduly delayed.  Finally, Defendant contends the second federal search warrant was never signed by the issuing judge.

For the reasons discussed below, the Court finds that the supporting affidavits provide probable cause for the issuance of the two federal search warrants and that although the state search warrant is lacking in a sufficient nexus, the executing officers acted in good faith.  The Court also finds that Defendant fails to establish that the affidavits contain material false statements or omissions requiring a *Franks* hearing and that all three search warrants are sufficiently particular. The Court finds that the state search warrant permitted the search of the SD card contained within the cellphone, and that the execution of the second federal search warrant was timely.  Finally, the Court finds that the second federal search warrant was signed and issued and that its delayed return does not require suppression of the evidence obtained in the search.  Accordingly, the Court respectfully recommends that Defendant's motions to suppress evidence and for a *Franks* hearing [Docs. 20, 34, and 99] be **DENIED**.

## I.      BACKGROUND

Defendant is charged [Doc. 1] with four counts of inducing a minor to engage in sexually explicit conduct to produce child pornography (Counts 1, 4, 6, & 8), one count of receiving child pornography (Count 2), three counts of transfer of obscene materials to a minor (Counts 3, 5, & 7), and one count of possession of child pornography (Count 9).  These charges are alleged to have occurred between December 2015 through May 2, 2018.  Count 1 relates to minor A.A., and Counts 3 through 6 and Count 8 relate to minor F.R.  Counts 3, 5, and 7 relate to a minor under age sixteen, and Count 9 relates to a minor under age twelve.  These charges all arise from the data extracted from Defendant's cellular telephone and SD card, which were seized on May 2, 2018, by the Jefferson County Sheriff's Office ("JCSO").

2

On May 2, 2018, JCSO Detectives Richard Collins and Pamela Taylor interviewed Defendant Glatz at the Jefferson County Justice Center and seized his cellular telephone, which contained a 16-gigabyte micro-SD card.[1] The following day, May 3, 2018, Detective Taylor applied for and received a search warrant for Defendant's LG cellphone and "16 gigabyte sim card" [Doc. 20-1 p. 1].[2]

In her supporting affidavit, Detective Taylor alleges the following as probable cause to search Defendant's cellphone and "sim card" for evidence of solicitation of a minor and violation of the sex offender registration law: On April 28, 2018, law enforcement received a complaint from Samantha Taveras, a user of the DeviantArt website, who reported that Glenn Glatz, a registered sex offender, was using the username Tennesseetomcat on DeviantArt and was "chatting and 'role-playing'" with a thirteen-year-old girl, who used the username Nolifelady [*Id.* at 2]. Detective Taylor also stated that Glatz was sending "inappropriate" photographs of himself and asking the minor to send photographs of herself to him [*Id.*]. Detective Taylor alleged that Glatz failed to report using the Tennesseetomcat username on the DeviantArt website [*Id.*]. Detective Taylor stated that "Mr. Glatz was interviewed on 5/2/18 and did admit to using the username,

---

[1]     In a Report and Recommendation issued on February 21, 2023, the Court found that the micro SD card was located inside Defendant's cellphone at the time JCSO detectives seized the cellphone [Doc. 175 pp. 65–66 & n.32].

[2]     A copy of the May 3, 2018 Jefferson County search warrant and affidavit is attached to Defendant's motion [Doc. 20-1]. A copy of this search warrant and affidavit was also introduced at the April 14, 2021 evidentiary hearing [Doc. 40, Witness and Exhibit List, Exh. 6] and is provided in Defendant's exhibits to his post-hearing brief [Doc. 98-7], as supplemented [Doc. 151-2 p. 2, Search Warrant; *see* Doc. 157 p. 3 (permitting Defendant to supplement exhibit 98-7 with the May 3, 2018 search warrant)]. For ease of reference, the Court will cite to the copy of the state search warrant and affidavit attached to Defendant's motion [Doc. 20-1], finding it identical to the copy received as evidence at the evidentiary hearing, with the exception that Defendant's copy does not include the attached photograph of the cellphone and SD card and the search warrant return appears as page 3, rather than page 2.

3

Tennesseetomcat and also chatting with the minor child and requesting a photograph" [*Id.*]. Detective Taylor stated that based upon this evidence and her knowledge, training, and experience, she believes Glatz's cellphone will contain text messages, photographs, unreported website usage, and unreported usernames, all "depicting illegal activity," namely solicitation of a minor in violation of Tennessee Code Annotated § 39-13-528 and violation of the Tennessee sex offender registration laws at § 40-39-208 [*Id.* at 4]. A judge issued the search warrant on May 3, 2018 [*Id.* at 1].

According to Detective Richard Collins, who testified at the April 14, 2021 evidentiary hearing in this case, Glatz's cellphone was submitted to Detective Michael Stallings, forensic examiner, for a Cellebrite analysis [Doc. 44, Transcript, p. 66]. Detective Collins testified that the execution of the May 3, 2018 search warrant resulted in the seizure of child pornography [*Id.* at 40].

On June 6, 2018, Federal Bureau of Investigation ("FBI") Special Agent Bianca Pearson ("SA Pearson") sought and obtained a federal search warrant for the contents of Defendant's LG cellular phone and SD card "previously installed inside the cellular telephone" [Doc. 35-1, p. 1].[3] The warrant permits the search of the cellphone and SD card for "visual depictions . . . of minors

---

[3]     The June 6, 2018 search warrant and the accompanying documents are filed in case number 3:18-MJ-1069, as follows:  Application for a Search Warrant [Doc. 1], Affidavit of Bianca L. Pearson [Doc. 2], Search and Seizure Warrant [Doc. 3] with attached return and attachments. Defendant also filed this search warrant [Doc. 98-8] and SA Pearson's affidavit [Doc. 98-10], as exhibits to his post-hearing briefs [Docs. 97 & 100] in this case.  The Court notes a page from another exhibit is erroneously filed as page 2 of the search warrant [Doc. 98-8 p. 2; *see* Doc. 157 p. 2].  Comparing Defendant's exhibit [Doc. 98-8] with the search warrant in case number 3:18-CR-1069, document 3, the Court finds that Defendant's exhibit is missing the return, which is page two of the search warrant.  The Government attaches a complete copy of the first federal search warrant [Doc. 35-1 p. 1] with attached return [*Id.* at 2] and attachments [*Id.* at 3–5], the application and attachments [*Id.* at 6–9], and SA Pearson's affidavit with attachments [*Id.* at 10–25] to its response to the *Franks* motion [Doc. 35].  For ease of reference, the Court will cite to the copy of the search warrant and affidavit provided by the Government as exhibits to its response.

engaged in sexually explicit conduct," child erotica, passwords and security devices, and evidence of who was using the cellphone at the time the aforementioned items were created, all of which constitute evidence of violations of the receipt and possession of child pornography in violation of 18 U.S.C. § 2252A and enticement of minors to engage in sexual activity in violation of 18 U.S.C. § 2422(b) [*Id.* at 5 (Attachment B)].

In her affidavit in support of the June 6, 2018 search warrant, SA Pearson states that she met with JCSO Detective Richard Collins on May 23, 2018, and learned that based on a May 2, 2018 interview of Glatz, he was arrested for violation of the Tennessee Sex Offender Registration law for failing to report "a chat application and email address" on the registry [Doc. 35-1 ¶17]. The affidavit relates that in May 2018, Detective Michael Stallings of the Jefferson City Police Department examined Glatz's cellphone and SD card pursuant to a May 2018 search warrant issued by Jefferson County Circuit Court Judge Duane Slone [*Id.* at ¶18]. Detective Stallings was not able to search the cellphone's memory, which was "pass code encrypted," but he searched the SD card and seized images of a nude minor female [*Id.* at ¶¶18–19]. The affidavit describes four of the images seized from the SD card, stating three images were focused on the minor's face and naked breasts and one on her naked vagina [*Id.* at ¶19]. The words "Glenny's Bitch" are superimposed over and just above image of the minor's vagina [*Id.*].

SA Pearson's affidavit states the SD card also contained an image of three SIM cards and one SD card taped to a note from "Mindy" asking "Rainna" to forward the attached SIM and SD cards to another female [*Id.* at ¶21]. In the same image with the note is an envelope addressed to Rainna Nelson in Alaska with a return address to Mindy Parks in Dandridge, Tennessee [*Id.*]. The affidavit relates that Postal Inspector John Wallace Bowden believes that the parties mentioned in the note and on the envelope "are attempting to hide their true identity by using fictitious names

in order to exchange digital storage media" [*Id.* at ¶21].  SA Pearson states that based upon her "training, experience, and discussions with FBI computer forensic examiners, the FBI has the capability to examine the internal memory of the device by bypassing the pass-code lock features of this phone" [*Id.* at ¶22].  Finally, the affidavit states that Glatz was arrested for child molestation and sentenced to twenty years of incarceration "on May 24, 2005" [*Id.* at ¶23] and was indicted in Sevier County, Tennessee, on September 11, 2017, for possessing items in an attempt to lure a minor to engage in sexual activity, violation of the sex offender registry, and contributing to the delinquency of a minor [*Id.* at ¶16].  The affidavit relates that Defendant's SD card also contained photographs of the clothed minor involved in the Sevier County charges while she was inside Defendant's camper [*Id.* at ¶20].

On November 19, 2019, FBI Special Agent Kristina L. Norris ("SA Norris") sought and obtained a federal search warrant for four Blu-ray discs containing the extracted data from the Defendant's cellphone and SD card [Doc. 102-1 pp. 1–5].[4]  The search warrant permits the search

---

[4]      The November 19, 2019 search warrant and the accompanying documents are filed in case number 3:19-MJ-1117, as follows:  Application for a Search Warrant [Doc. 1], Affidavit in Support of Search Warrant [Doc. 2], Search and Seizure Warrant [Doc. 3] with attached return and attachments.  Defendant also filed this search warrant as an exhibit [Doc. 98-9], but Defendant's exhibit is missing page 2, which contains the judge's signature at the top above the return, and page 4, which is Attachment B, describing the items to be seized.  Defendant also filed Agent Norris's application and affidavit with attachments as an exhibit [Doc. 98-11], but this exhibit is missing pages 9–10 and the remaining pages are out of order.  The Government attaches the search warrant and related documents to its response to the *Franks* motion [Doc. 35-2]; however, this copy of the search warrant is also missing page 2, which bears the judge's signature above the return.  The Government's affidavit of SA Norris is complete [Doc. 35-2, pp. 5–20 (includes attachments)].  The Government attaches a complete copy of the search warrant [Doc. 102-1] to its response to Defendant's allegations regarding irregularities with the search warrant.  For ease of reference, the Court will cite to the Government's copy of the affidavit from its response to the *Franks* motion [Doc. 35-2] and the Government's copy of the search warrant from its response to Defendant's motion challenging the issuance of second federal search warrant [Doc. 102-1].  Defendant's argument that the second federal search warrant was never issued is discussed in Part D. of the analysis below.

6

of four Blu-ray discs, containing the extractions from Defendant's LG cellphone and micro-SD card for the items in Attachment B, which are images of child pornography as defined in 18 U.S.C. § 2256; data reflecting the transfer of obscene material to minors under age sixteen; communications concerning child pornography, transferring obscene materials to minors under age sixteen, or soliciting minors for sex; child erotica; data on ownership of the devices used in the commission of these offenses; passwords and data security devices; and data revealing the presence of malware or viruses on the devices [*Id.* at pp. 1, 3].

In her affidavit in support of the second federal search warrant, SA Norris states that on May 22, 2018, JCSO Detective Richard Collins contacted SA Pearson for assistance with an investigation of Glenn Glatz, who was in custody for violating the Tennessee sex offender registration law and sexual exploitation of a minor [Doc. 35-2 ¶15]. The affidavit relates that SA Pearson met with Detective Collins on May 23, 2018, and learned Collins "had received a report that Glatz was using social media to communicate with a 13[-]year-old girl" [*Id.* at ¶16]. Detective Collins asked Defendant to come for a "sex offender compliance check" and interviewed Defendant on May 2, 2018 [*Id.*]. "Based on [this] interview," Defendant "was subsequently arrested for violation of the Tennessee Sex Offender Registration law because [he] was using a chat application and e-mail address that were not listed on his sex offender registry as required" [*Id.* at ¶16]. The affidavit states that the JSCO obtained a search warrant for Defendant's LG cellphone "containing a micro SD card, 16GB," but law enforcement was able to search only the SD card because the cellphone was "password encrypted" [*Id.* at ¶17].

SA Norris's affidavit relates that pursuant to a federal search warrant, the FBI accessed Defendant's cellphone in February 2019, extracted the contents of the cellphone, and placed the results of the forensic examination of the cellphone on four Blu-ray discs [*Id.*]. The affidavit

alleges that probable cause for the first federal search warrant relied in part on the evidence gained from the state search warrant and "[u]pon further review, the facts set forth in the affidavit in support of the state search warrant arguably may not sufficiently establish probable cause for the state search warrant" [*Id.* at ¶18]. SA Norris states that "out of an abundance of caution," she seeks "to search the same data without relying on the information obtained through" the prior state and federal search warrants [*Id.*].

Agent Norris's affidavit provides the facts in support of this separate probable cause as follows: Beginning shortly after his arrest, Defendant made over sixty recorded jail telephone calls to a telephone number that law enforcement identified as that of a minor female ("V1") from Hawthorne, Florida [*Id.* at ¶19]. Identifying information (V1's unique first name, that she lives in Florida, and that she moved to Florida from Alaska) disclosed during the recorded calls allowed law enforcement to identify V1 and her parents [*Id.* at ¶20]. On January 31, 2019, FBI agents contacted V1 and her parents and interviewed V1, who said she met Defendant on DeviantArt, Defendant was her boyfriend, she knew Defendant was "much older" than her, and she told Defendant she was eighteen, although she had recently turned fourteen [*Id.* at ¶21]. V1 told agents that Defendant gave her a SIM card to use in communicating with him, and she confirmed that she sent naked pictures of herself to Defendant over the internet shortly before his arrest in May 2018 [*Id.* at ¶22].

SA Norris's affidavit further relates that on July 18, 2019, FBI agents contacted a second minor ("V2"), who was communicating with Defendant and V1 [*Id.* at ¶23]. V2's parents permitted the FBI to perform a forensic evaluation of V2's cellphone, which revealed that V2 communicated with Defendant and V1 on the WhatsApp messaging application at Defendant's direction, "because it has end to end encryption" preventing others from viewing the conversations

[*Id.* at ¶23].   The affidavit recounts several conversations taken from V2's cellphone in which Defendant tells V1 and V2 that the application they are using is "safe for perverts" [*Id.* at ¶24(b)], Defendant tells V2 that V1 is only thirteen so V2 will need to "take the lead" in lesbian "rp" (role-play) [*Id.* at ¶24(e)], V1 tells V2 that she is concerned and embarrassed about police finding pictures of "her body" after Defendant's arrest [*Id.* at ¶26], V1 tells V2 that she wished her cellphone did not delete the "hottt" [sic] pictures Defendant sent her and that she knows Defendant sent V2 and others "dick pics or vids or something" once when he was mad at V1 [*Id.* at ¶27], and after Defendant's arrest, V1 told V2 that she deleted her pictures and videos from Defendant, changed her password, and "locked [her] apps" in case the police seized her cellphone, knowing that she could get "new stuff" if Defendant got out of jail [*Id.* at ¶28(c)].  The affidavit states V2's contact lists for both WhatsApp and her cellphone contain Defendant's cellphone number [*Id.* at ¶29].

SA Norris's affidavit provides the following additional information in support of probable cause:  Defendant was arrested for child molestation and sentenced by a Georgia criminal court to twenty years of incarceration "on May 24, 2005" [*Id.* at ¶30].  Defendant's adult male roommate told the manager of the trailer park where they lived that Defendant tried to convince girls, aged thirteen or fourteen, from North Carolina to come to his trailer [*Id.* at ¶31].  The trailer park manager saw Defendant throw a laptop computer and cellphones into a dumpster, after Defendant was approached by law enforcement and after his LG cellphone was seized by officers [*Id.* at ¶31].  The FBI reviewed Defendant's correspondence, written while in state custody, in which he discussed his online friendships with teenage girls he met on DeviantArt and that he was accused of being a "pedophile" by users of DeviantArt website [*Id.* at ¶32].  Defendant also used an adult friend to send V2 handwritten correspondence professing his love for V2 and discussing "sexual

matters" [*Id.* at ¶33].  SA Norris submitted that based upon this information, probable cause exists to believe evidence of violations of 18 U.S.C. §§ 1470, 2252A, and 2422(b) would be found in the data on the four Blu-ray discs [*Id.* at ¶39].

## II.    PROCEDURAL HISTORY

At Defendant's initial appearance on January 28, 2020, the Court appointed Assistant Federal Defender Jonathan A. Moffatt and the Federal Defender Services of Eastern Tennessee ("FDS") to represent him.  On June 19, 2020, counsel filed a Motion to Suppress All Evidence Resulting from the Warrantless Seizure of Defendant's LG Cellphone and an SD Card [Doc. 19][5] and the instant Motion to Suppress All Evidence Obtained by a May 3, 2018 Jefferson County Search Warrant, a June 6, 2018 Federal Search Warrant, and a November 2019 Federal Search Warrant [Doc. 20].  Thereafter, counsel asked to delay the evidentiary hearing on these motions, while counsel reviewed the voluminous discovery and researched legal matters, all while hampered by limitations relating to the Covid-19 pandemic [Docs. 25, 28, & 37].  Counsel also requested and was granted leave [Doc. 32] to file a third dispositive motion, the Motion for a "Franks" Hearing [Doc. 34].[6]  The Government responded in opposition to Defendant's suppression motions [Docs. 23, 24, & 35].  The Court held an evidentiary and suppression hearing

---

[5]    The undersigned prepared a separate Report and Recommendation on this motion [Doc. 75].

[6]    Counsel was also granted leave [Doc. 32] to file a Motion to Suppress Evidence Obtained from a Google Drive Cloud Storage Service [Doc. 33] ("Google Cloud motion").  At the April 14, 2021 evidentiary hearing, Mr. Moffatt moved to withdraw the Google Cloud motion, based upon the Government's representation that it did not access Defendant's Google Cloud accounts [Doc. 44 pp. 5–7].  When Defendant assumed his own representation, the Court held counsel's withdrawal of this motion in abeyance [Doc. 48].  Although Defendant stated that he wanted to pursue this motion [Doc. 87], the Government stipulated that it would not use any evidence from Defendant's Google Cloud storage accounts at trial [Docs. 124 & 134].  Accordingly, the Court found the Google Cloud motion to be moot [Doc. 124].

on these motions on April 14, 2021, at the conclusion of which the parties asked to file post-hearing briefs [Doc. 44, Transcript, pp. 110–12].

Defendant subsequently asserted his right to represent himself and asked to file his own post-hearing briefs [Doc. 41]. On June 8, 2021, the undersigned found Defendant knowingly and voluntarily waived his right to counsel, permitted him to represent himself, and appointed Mr. Moffatt to serve as elbow counsel [Doc. 48]. Defendant filed post-hearing briefs [Docs. 96, 97 & 100] and exhibits [Doc. 98] on September 24, 2021.[7] The Government filed responding post-hearing briefs on October 15, 2021 [Docs. 103–05], and Defendant filed replies on October 25, 2021 [Docs. 112 & 113].

On October 1, 2021, the Court denied [Doc. 101] Defendant's motion for disciplinary action against Government's counsel [Doc. 99] but reserved ruling on the issue of irregularities with the November 19, 2019 search warrant and other documents in case number 3:19-MJ-1117 [Doc. 99 pp. 4–6]. The Government responded to the assertion of irregularities [Doc. 102], and Defendant filed a reply [Doc. 111]. Defendant also addressed this issue in his post-hearing brief [Doc. 97] and reply [Doc. 113].[8] On September 20, 2022, Defendant filed a motion for leave to correct references to

---

[7] Defendant Glatz initially filed post-hearing briefs [Docs. 69 & 80], which together exceeded the page limitation in Local Rule 7.1(b) by nearly seventy-five pages, exclusive of Defendant's forty-five exhibits [Docs. 80-1 through 80-45]. The Court required Defendant to refile his post-hearing briefs, limited to a combined page limit of one hundred pages and to resubmit his exhibits, omitting exhibits 43 and 44 [Doc. 87].

[8] Defendant has filed numerous other motions relating to the irregularities in the second federal search warrant: On October 19, 2021, Defendant sought to reargue this issue in a second motion for disciplinary action [Docs. 106, 106-1, 106-2], which the Government opposed [Doc. 108]. On April 26, 2022, Defendant moved the Court for leave [Doc. 139] to file a supplemental brief on the irregularities in the November 19, 2019 search warrant [Doc. 139-2] and a Motion to Correct the Record and/or Docket Sheet with regard to that search warrant [Doc. 139-4]. The Government opposed these untimely filings, arguing the proposed brief and motion seek to reallege issues that have been fully briefed [Doc. 140]. On November 28, 2022, Defendant filed yet another motion for leave to file a motion to correct the record with regard to the November 19, 2019 search warrant [Doc. 160], which the Government again opposed as duplicative and frivolous [Doc. 168]. On

11

exhibit numbers, a citation, and a date in his post-hearing briefs and to add a missing page to two exhibits [Doc. 151]. The Government did not respond to this motion, which the Court subsequently granted [Doc. 157].

## III.  POSITIONS OF THE PARTIES

Defendant Glatz asks the Court to dismiss all evidence obtained from the execution of the state search warrant and the two federal search warrants because they were issued without probable cause [Doc. 20 pp. 8–10]. Defendant further contends that all three affidavits contain false statements and/or material omissions necessary for probable cause [Doc. 34 pp. 1-5; Doc. 100 p. 1]. He argues that the three search warrants fail to state the items to be seized with sufficient particularity [Doc. 97 pp. 7–8]. He also maintains that law enforcement exceeded the scope of the state search warrant, which did not permit the search of his SD card [Doc. 20 pp. 8–9]. He asserts that the information used to provide probable cause for the two federal search warrants stems from the search of his SD card in May 2018 [Doc. 20 p. 9]. Defendant also contends that law enforcement "unreasonably delayed" seeking the second federal search warrant [Doc. 20 pp. 9–10]. Finally, Defendant argues that the second federal search warrant was never issued by a judge based upon irregularities in format, disclosure in discovery, and docketing [Doc. 97 pp. 1, 4; Doc. 99 pp. 4–6; Doc. 113].

The Government responds that Defendant's cellphone and SD card and the data contained thereon were lawfully searched pursuant to three valid search warrants [Doc. 24]. It contends that the state and federal search warrants are supported by ample probable cause, including information from Defendant's consensual interview [Doc. 24 p. 1]. The Government argues that even if

---

December 19, 2022, Defendant filed a reply brief [Doc. 169] and a motion for leave to correct errors in an attachment to his motion [Doc. 170].

12

probable cause was lacking for the issuance of the state search warrant, the second federal search warrant is based upon probable cause independent of the investigation and fruits of the state search warrant [Doc. 24 p. 9]. The Government alleges that Defendant has failed to make a substantial preliminary showing that the affiants deliberately or recklessly included false information or made material omissions necessary to probable cause [Doc. 35 pp. 1–2; Doc. 105 p. 1]. It contends that the state search warrant is sufficiently particular because it directs the executing officers to search for evidence of a specific crime or crimes [Doc. 104 pp. 6–7]. The Government also asserts that the state search warrant's reference to the SD card as a "SIM" card was a clerical mistake, which does not affect the authority of law enforcement to search the SD card contained within the cellphone [Doc. 24 p. 2 n.2; Doc. 35 pp. 7–8]. Finally, it maintains that suppression of the evidence seized from the execution of the search warrants is not the appropriate remedy because law enforcement acted in good faith reliance on the search warrants [Doc. 24 pp. 1, 10–12].

## IV.    ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Defendant Glatz argues that his Fourth Amendment rights were violated by the issuance and execution of three search warrants for his cellphone, SD card, and the data extracted from his cellphone and SD card and saved on four Blu-ray discs. First, he argues that the affidavits supporting each of these search warrants fail to provide probable cause and that each of the three affidavits contained false statements and omissions necessary to probable cause. Second, Defendant argues that the search warrants do not state the items to be seized with sufficient

13

particularity. Third, Defendant challenges the execution of the state and second federal search warrants. Finally, he contends that the second federal search warrant was never actually issued. The Court examines each of these issues, along with the Government's argument that suppression of evidence is not appropriate because the executing officers relied on the search warrants in good faith.

### A. Probable Cause

A search warrant issued in compliance with the Fourth Amendment must be based on "particularized facts" that demonstrate "'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Defendant argues that the affidavits supporting the three search warrants failed to provide probable cause for the following reasons: (1) He contends the state search warrant is not supported by probable cause because the complainant Samantha Taveras was not sufficiently reliable and failed to allege a crime, his unwarned statement cannot be considered in the probable cause analysis, and Detective Taylor's affidavit fails to establish a nexus between his cellphone and SD card and the alleged crimes. (2) Defendant contends that both federal search warrants also lack probable cause because they rely on evidence seized pursuant to the invalid state search warrant and fail to state a nexus between criminal activity and his cellphone. (3) Finally, Defendant asserts that all three affidavits contain false statements and/or omissions that are necessary to probable cause.

The Court begins by observing that an issuing judge's determination that probable cause exists is entitled to "'great deference.'" *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the

issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238-39. In making this determination, the Court considers only the information that was before the issuing judge—in other words, only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir.), *cert. denied,* 560 U.S. 959 (2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n.13. Thus, the Supreme Court has observed that "probable cause is a flexible, common-sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. *Gates*, 462 U.S. at 238. With these principles in mind, the Court turns to the affidavits in this case.

*(1) Probable Cause for State Search Warrant*

Defendant raises three primary challenges to probable cause for the issuance of the state search warrant. He contends that Samantha Taveras's report was not reliable and did not allege a crime. He asserts that his unwarned statement cannot be considered in the probable cause analysis,

and he maintains that Detective Taylor's affidavit fails to establish a nexus between the alleged crimes and his cellphone and SD card.

### (a)  Reliability of Complainant

Detective Taylor's affidavit in support of the state search warrant provides the following information relating to a report from Samantha Taveras:  "On 4/4/18 it was reported from a website user, Samantha Taveras that a registered sex offender, Glenn Glatz was using the website 'Deviantart', and chatting and 'role-playing' with a 13 year old girl with the username 'nolifelady'. The username Mr. Glatz was using was 'Tennesseetomcat'" [Doc. 20-1 p. 2].  Defendant Glatz argues that Detective Taylor's affidavit fails to show that the information from Samantha Tavaras was sufficiently reliable [Doc. 20 p. 3].  He contends that Taveras lacked direct knowledge of the information she provided to JCSO and did not allege that he committed any criminal acts [*Id.* at 8].  The Government responds that law enforcement need not corroborate information from a known citizen complainant and that Taveras's complaint provided probable cause to believe Defendant violated the Tennessee sex offender registration law [Doc. 24 p. 8].

Typically, if probable cause to issue a search warrant is gained from information provided by a confidential source, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided.  *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009); *see also Gates*, 462 U.S. at 233 (holding that a confidential informant's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); *Allen*, 211 F.3d at 972–73.  An informant's reliability may be established by a statement that the informant previously provided reliable information or by independent corroboration of the informant's information.  *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006); *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005) (observing

that facts permitting the reviewing judge to determine the informant's reliability "need not take any particular form").

However, when an affidavit identifies the complainant by name and states that person observed evidence of a crime, independent corroboration of the complaint is not necessary for the observation to provide probable cause. *See United States v. Braden*, 248 F. App'x 700, 703 (6th Cir. 2007). Here, the Court finds the information from Taveras was reliable because she gave her name to law enforcement, which would allow the officers to prosecute her if her report proved to be false. *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005) (holding that a report from an informant whose identity is known to law enforcement, thus, subjecting the informant to prosecution for making a false report, is "entitled to far greater weight than . . . an anonymous source"); *see also Navarette v. California*, 572 U.S. 393, 400 (2014) (observing that the 911 emergency system "has some features that allow for identifying and tracing callers, and thus providing some safeguards against making false reports with immunity").

Also, although not necessary, additional information in the affidavit provides some corroboration of Taveras's report. The affidavit states that Glatz "failed to report" the Tennesseetomcat username, and the fact he had reporting requirements supports Taveras's claim that Glatz is a sex offender [*See* Doc. 20-1 p. 2]. The affidavit provides that Glatz was using the DeviantArt website [*Id.*]. The affidavit also contains Glatz's admissions in the May 2, 2018 interview that he was using the Tennesseetomcat account and chatting with a minor, which corroborate Taveras's report that Glatz was chatting with a minor using the Tennesseetomcat username [*See id.*].

Defendant also argues that the information in the affidavit on Taveras's complaint does not allege he engaged in any criminal conduct [Doc. 20 p. 8]. However, Defendant cites no authority,

nor is the Court aware of any, requiring that probable cause come from a single source or complaint. Instead, Taveras's report that Defendant was using the Tennesseetomcat username on the DeviantArt website, in combination with Detective Taylor's statement that he failed to report that username on his sex offender registration and Defendant's admission that he used "Tennesseetomcat" together provide probable cause that Defendant Glatz violated the Tennessee sex offender registration law.[9]

Finally, Defendant contends Taveras "did not have direct knowledge through her own observations of any crime" [Doc. 34 p. 1]. He alleges that, instead, Taveras was only "surfing the web" and reading entries on DeviantArt, and, thus, had no firsthand information of any criminal activity [Doc. 100 p. 4]. However, the Court can infer from the affidavit's characterization of Taveras as a user of the DeviantArt website, that Taveras's report is based on her observation of communications on the DeviantArt website. Defendant contends that all parts of DeviantArt are open for observation by the public [Doc. 100 p. 16]. Thus, the issuing judge could reasonably infer that Taveras's information came from her own observations of communications she viewed on the DeviantArt website.

*(b) Defendant's Statements*

Defendant argues that information from his May 2, 2018 interview at the JCSO cannot be considered in support of probable cause for the state search warrant because his statements were

---

[9] Tennessee Code Annotated § 40-39-208(a)(3) provides that "[i]t is an offense for an offender to knowingly violate any provision of this part. Violations shall include, . . . Failure to timely disclose required information to the designated law enforcement agency[.]" "Within three (3) days, excluding holidays, of a[ sex] offender changing the offender's electronic mail address information, any instant message, chat or other internet communication name or identity information that the person uses or intends to use, whether within or without this state, the offender shall report the change to the offender's designated law enforcement agency." Tenn. Code Ann. § 40-39-203(a)(7) (discussing contents of sex offender registration forms).

18

unwarned and involuntary [Doc. 20 p. 4, 7–8; Doc. 100 pp. 11, 19–20]. The Court analyzed the admissibility of Defendant's statements made during the May 2, 2018 interview in its Report and Recommendation on Defendant's Motion to Suppress All Evidence Resulting from the Warrantless Seizure of Defendant's LG Cellphone and an SD Card [Doc. 175]. There, the undersigned found that although Defendant's statements during the May 2, 2018 interview were obtained in violation of the prophylactic requirements of *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), due to the detectives' failure to provide the *Miranda* warnings, they were voluntary [*Id.* at 49–50, 62]. The fruits of an un-*Mirandized* statement are not "inherently tainted," *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), and need not be suppressed, *Vega v. Tekoh*, 142 S. Ct. 2095, 2103 (2022).

Both the Supreme Court and our appellate court have permitted other uses of evidence derived from voluntary but unwarned statements, which cannot be admitted in the government's case-in-chief. *United States v. Patane*, 542 U.S. 630, 636–37 (2004) (holding *Miranda* violation does not require suppression of physical evidence—a gun—gained through defendant's voluntary statement); *Michigan v. Tucker*, 417 U.S. 433, 450–52 (1974) (admitting testimony of witness whom police discovered through defendant's unwarned statement); *Harris v. New York*, 401 U.S. 222 (1971) (voluntary statement obtained in violation of *Miranda* can be used to impeach defendant's testimony at trial); *Elstad*, 470 U.S. 306–09 (permitting use of second statement after *Miranda* warning); *United States v. Sangineto-Miranda*, 859 F.2d. 1501, 1518 (6th Cir. 1988) (holding "cocaine found in Sangineto's truck was admissible, even though knowledge of the existence and whereabouts of the truck were proximately derived from a *Miranda* violation"); *see also United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 886 n.10 (S.D. Ohio Dec. 29, 2016)

(noting *Miranda* violation does not require suppression of physical evidence—defendant's fingerprints—gained through his voluntary statements) (collecting cases).

In *United States v. Stark*, the court declined to suppress physical evidence (a computer containing child pornography) seized pursuant to a search warrant based on defendant's voluntary statement, given in violation of *Miranda*. No. 09–cr–20317, 2009 WL 3672103, at *3–4 (E.D. Mich. Nov. 2, 2009). While on parole for convictions of felony eavesdropping, officers questioned Stark in his driveway about violating his curfew, without providing the *Miranda* warnings, and Stark made incriminating statements, which were used to provide probable cause for a search warrant for his residence. *Id.* at *1. The court found that Stark's unwarned statements were made while he was in police custody and, thus, prohibited the government's use of the statements in its case-in-chief at trial. *Id.* at *2. Stark argued that "if his statements are suppressed, so also should be the evidence seized pursuant to the warrant predicated on his statements." *Id.* at *3. Relying on the Supreme Court's analysis in *Patane*, the district court held "although the physical evidence obtained by police [from the use of defendant's unwarned but voluntary statement in the search warrant affidavit] would technically [be] the fruit of the poisonous tree, this conclusion does not warrant suppression of the evidence, because the fruit doctrine does not apply to physical evidence seized as a result of a *Miranda* violation." *Id.* (citing *Patane*, 542 U.S. at 634); *see also Vega*, 142 S. Ct. at 2104 (observing that the fruit-of-the-poisonous-tree doctrine does not apply to *Miranda* violations).

Like the defendant in *Stark*, Defendant Glatz also argues that his unwarned statements cannot form the basis for probable cause for the issuance of the state search warrant. The Court has already determined that Defendant's statements at the May 2, 2018 interview were voluntary. Accordingly, the Court finds that the *Miranda* violation does not create a barrier to the use of

Defendant's statements in support of probable cause. Moreover, the Court observes that nothing within the four corners of Detective Taylor's affidavit would permit the reviewing judge to find the Defendant's statement was not properly obtained.[10]

### (c) Nexus

Defendant also argues that Detective Taylor's affidavit fails to provide a nexus between his cellular phone and a suspected crime [Doc. 20 p. 8; Doc. 97 p. 8]. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*). In other words, probable cause requires a "'nexus between the place to be searched and the evidence sought.'" *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances. *Id.* The Court must assess "'whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *United States v.*

---

[10]     Alternatively, the Government argues that even if Defendant's statements from the May 2, 2018 interview are excluded, Detective Taylor's affidavit still provides probable cause to issue the search warrant [Doc. 24 p. 8]. It contends that the information from Taveras that Defendant was using the Tennesseetomcat account to chat and role-play with a minor on the DeviantArt website along with information that Defendant did not report the Tennesseetomcat account on his sex offender registration form provides probable cause to believe Defendant violated the Tennessee sex offender registration law, Tenn. Code Ann. § 40-39-208 [*Id*]. The Government argues that even removing Defendant's admissions that he used the Tennesseetomcat account, chatted with a minor, and asked for a picture, the remaining information is sufficient to provide probable cause. However, the Court has already determined that Taveras's report alone provides reasonable suspicion, not probable cause, to believe Defendant used the Tennesseetomcat account [Doc. 175, pp. 36–37]. As discussed above, the Court, however, finds that Defendant's admissions from the interview were properly included in the affidavit and properly form the basis for probable cause.

*Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

In her affidavit, Detective Taylor states that the LG cellphone was in the custody of Defendant and is now in the custody of the JCSO [Doc. 20-1 p. 2]. The affidavit states that Taveras reported that while Defendant was on the DeviantArt website and using the Tennesseetomcat username, Defendant chatted and "role play[ed]" with a minor female [*Id.*]. The affidavit further provides that in an interview on May 2, 2018, Defendant admitted using the Tennesseetomcat username, chatting with a minor, and requesting a photograph [*Id.*]. Finally, the affidavit relates that the affiant "believes based on her knowledge, training, and experience that evidence of violations of Tenn. Code Ann. § 39-13-528 Solicitation of a minor[ and §] 40-39-208 Violation of sex offender registration laws, will be found in the mobile device to be searched" [*Id.* at 4]. "Specifically," the affiant believes the cellphone "will contain evidence of text messaging, photographs, unreported website usage and username[]s not report[ed as] required by law, [all] depicting illegal activity" [*Id.*].

The Court finds Detective Taylor's affidavit fails to establish that Defendant used his cellphone to access the DeviantArt website, to chat with a minor, or to send or request photographs. The affidavit does not state that based upon her training and experience, Detective Taylor knows that sex offenders use their cellphones to access the internet and to send texts and photographs. Instead, the affiant asks the issuing judge "to simply take [her] word for it" that Defendant's cellphone would contain evidence of solicitation of a minor or violations of the sex offender registry laws. *United States v. White*, 874 F.3d 490, 499 (6th Cir. 2017). "'[A] mere affirmation of suspicion and belief without any statement of adequate supporting facts'" is insufficient for probable cause. *Id.* at 498 (quoting *Nathanson v. United States*, 290 U.S. 41, 46 (1933)).

22

In *White*, the court distinguished a conclusory, "bare-bones" affidavit with no nexus, from the affidavit before it, in which the affiant "showed his work" by stating that defendant, who had a history of drug offenses, engaged in a recorded drug deal in the driveway of the premises to be searched. *Id.* at 499. The court found the controlled buy at the residence "provided a concrete factual link between defendant, his criminal activity, and the residence" and, along with defendant's criminal history of drug offenses and the presence of guard dogs at the residence, stated a sufficient nexus. *Id.* at 498. Here, Detective Taylor's affidavit does not state that Defendant used his cellphone to perform any of the actions—accessing the DeviantArt website, chatting, or sending or receiving photographs—alleged in the affidavit. Accordingly, the Court finds the affidavit fails to establish a nexus between Defendant's cellphone and the evidence sought.[11]

The Government argues that even if Detective Taylor's affidavit fails to provide probable cause, the executing officer, here Detective Mark Stallings, reasonably relied on the state search warrant and believed in good faith that it authorized him to search Defendant's cellphone and SD card [*See* Doc. 24 pp. 10–12]. "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *United States v. Herring*, 555 U.S. 135, 701

---

[11]    Defendant argues that during the May 2, 2018 interview, he never said he used his cellphone to access DeviantArt or that his cellphone was his only means of accessing the internet [Doc. 97 pp. 8–9]. Instead, he contends that he told the detectives that he uses computers and a "phone" but did not specify which cellphone or for what purpose he used the electronic devices [*Id.*]. The Government responds that during the interview, Defendant told the detectives that he "used to use" computers but that now all he has is a cellphone [Doc. 104 p. 2]. However, neither interpretation of Defendant's statement regarding his cellphone is included in Detective Taylor's affidavit. In assessing probable cause, the Court is constrained to look only at the four corners of Detective Taylor's affidavit to determine whether a nexus exists. Comments made in the May 2, 2018 interview but not presented to the judge in the affidavit are not relevant to the Court's analysis.

23

(quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)) (rejecting automatic exclusion of evidence and, instead, asking whether exclusion will provide "appreciable deterrence"). This is because "'[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *White*, 874 F.3d at 505–06 (quoting *Leon*, 468 U.S. at 921).

However, the *Leon* "good faith exception" to the exclusionary rule does not apply in the following circumstances:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;
>
> (2) if the issuing magistrate wholly abandoned his judicial role;
>
> (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or in other words, where the warrant application was supported by [nothing] more than a 'bare bones' affidavit;
>
> (4) if the warrant may be so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized—the executing officers cannot reasonably presume it to be valid[.]

*United States v. Bullard*, 659 F. App'x 288, 293–94 (6th Cir. 2016) (quoting *Van Shutters*, 163 F.3d at 337 (internal quotation omitted)). Here, Defendant argues that Detective Taylor's affidavit was a "bare bones" affidavit such that no officer could reasonably believe it contained probable cause for the search of his cellphone and SD card [Doc. 100 pp. 2–4].[12]

A "bare bones affidavit" is one that "'states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of

---

[12] Defendant also argues that Detective Taylor's affidavit contained deliberately false statements and material omissions that misled the issuing judge [Doc. 100 p. 10]. The Court examines the merits of this argument in section (A)(3) below.

24

knowledge[.]'" *United States v. Laughton*, 408 F.3d 744, 748 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). To find the affidavit qualifies as bare bones, the Court must find more than the search warrant was not supported by probable cause; instead, it must determine that "'there were no reasonable grounds for believing that the warrant was properly issued.'" *White*, 874 F.3d at 506 (quoting *Leon*, 468 U.S. at 922–23). Thus, the Court asks "'whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization.'" *United States v. Leake*, 998 F.2d 1359, 1367 (6th Cir. 1993) (quoting *Leon*, 468 U.S. at 922 n.23).

In making this determination, the Court must keep in mind that affidavits are drafted by law enforcement officers, not lawyers, "in the midst and haste of a criminal investigation," and, thus, should not be interpreted in a "hypertechnical manner." *Weaver*, 99 F.3d at 1378 (internal quotation omitted); *see also Merriweather*, 728 F. App'x at 504 (observing the court should look to the affidavit as a whole, rather than conducing "'a line-by-line scrutiny'") (internal quotation omitted). In assessing whether the officer relied on the search warrant in good faith, the Court must take into "account . . . the inferences [the officer] may draw from the affidavit." *Merriweather*, 728 F. App'x at 505. "[R]easonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable." *White*, 874 F.3d at 500. "[A] minimally sufficient nexus exists if the reviewing court is able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched. *United States v. Tucker*, 741 F. App'x 994, 999 (6th Cir. 2018) (internal quotations omitted); *see United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004) (observing

25

that an affidavit that lacks sufficient probable cause may still permit the officer's good-faith reliance).

In *Merriweather*, the Court found the officer acted in reasonable reliance on the search warrant permitting the search of the defendant's cellphone. 728 F. App'x at 505–06. In that case, the affidavit stated that a confidential informant conducted two controlled drug buys from defendant, both of which were arranged by cellphone. *Id.* at 505. The cellphone to be searched was seized from the car driven by defendant and the car also contained controlled substances. Finally, the affiant stated that based upon "his training and experience, drug dealers use cell phones to coordinate with conspirators, customers, and suppliers." *Id.* Based on this information, the court found the officer could infer that defendant's cellphone would contain evidence of drug trafficking: "[W]hile rote recitations about officers' 'training and experience' might in some instances ring hollow, . . . such a claim is consistent with common sense in this case: it seems obvious there is a good chance Merriweather at times used his cell phone to carry out the goals of this distribution conspiracy, given the manner in which the controlled purchases were coordinated and the further fact that he had his phone with him as he traveled around with drugs." *Id.* The court in *Merriweather* distinguished *United States v. Ramirez*, 180 F. Supp. 3d 491, 495–96 (W.D. Ky. 2016), in which the affiant stated only that defendant had a cellphone on his person at the time of his arrest for participating in a drug conspiracy and the affiant said in his training and experience, drug conspiracies are often conducted via cellphone. *Merriweather*, 728 F. App'x at 506.

In *United States v. Smith*, our appellate court recently examined whether officers reasonably relied on a search warrant to search two cellphones for evidence that defendant was involved in a shooting, despite the affidavit's failure to state the defendant used a cellphone in connection with the shooting. No. 21-1457, 2022 WL 4115879, at *8–9 (6th Cir. Sept. 9, 2022).

26

The court rejected a finding that the affidavit was conclusory, bare bones, or "devoid of any factual allegations for probable cause" or that it failed to provide "*some* connection, regardless of how remote, between the illegal activity and the place searched." *Id.* at 9. Instead, it found that although the affidavit did not "directly implicate" defendant's cellphones in the shooting, a "connection may be reasonably inferred based on the affiant officer's training and experience, consistent with common sense." *Id.* (internal quotation omitted). The affidavit's information that defendant and a codefendant fired guns at the victim in an apparently coordinated effort, the seizure of a loaded gun and two cellphones from defendant's person at the time of his arrest, and the affiant's training and experience that people involved in illegal activity use their cellphones to plan crimes permitted the executing officer to "reasonably infer that [defendant's] cell phones contained communications" between the defendant and his codefendant about the shooting. *Id.* Accordingly, the court found the search was permitted under the good faith exception and the exclusionary rule did not apply. *Id.*

The instant case resembles *Merriweather* and *Smith* more than *Ramirez*. Here, a cellphone was seized from Defendant, who admitted using the Tennesseetomcat username to chat with minors and to request a photograph from the minor, both activities that were conducted over the internet. A citizen complainant stated she observed Defendant communicating with and sending "inappropriate" photographs to a minor on the DeviantArt website. A reasonable officer could infer that Defendant was using his cellphone to access the Tennesseetomcat account and to contact minors. Detective Taylor's belief, based on her training and experience, that the cellphone would contain evidence, such as texts and photographs, of solicitation of a minor or violations of the sex offender reporting requirements, further supports a reasonable reliance on the search warrant. Accordingly, the Court finds Detective Taylor's affidavit is "not so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable." *Merriweather*, 728 F. App'x at 504 (internal quotation omitted). Detective Stallings, the executing officer, reasonably relied on the warrant in good faith and evidence seized from the search of Defendant's cellphone and SD card pursuant to the state search warrant should not be suppressed.

### (2) Probable Cause for Federal Search Warrants

Defendant also asserts three primary reasons that the affidavits supporting the two federal search warrants lack probable cause. First, he contends they are based on information illegally obtained from the invalid state search warrant [Doc. 97 p. 13]. As a part of this analysis, the Court also addresses the Government's argument that the second federal search warrant is based on independent probable cause [Doc. 24 pp. 9–10]. Second, Defendant contends that the two federal affidavits fail to establish a nexus between his cellphone and the items to be seized [Doc. 97 pp. 8, 14]. Third, Defendant argues that the federal affidavits fail to provide probable cause because they rely on stale information, specifically his prior conviction [*Id.* at 15–16].

### (a) Information from State Search Warrant

Relying on *Murray v. United State*s, 487 U.S. 533, 540 (1988), Defendant argues that information gained from an illegal search cannot form the basis for a search warrant [*Id.* at 13]. He contends that SA Pearson's affidavit relies on images seized from the SD card in the execution of the state search warrant and that if the evidence gained from the execution of the state search warrant is stricken, the remaining allegations fail to provide probable cause [*Id.* at 14].[13] With

---

[13] Defendant also argues that the allegations in paragraph 16, relating to Sevier County charges, should not be considered in the probable cause analysis because the Tennessee Court of Criminal Appeals subsequently reversed his conviction for these charges due to insufficient evidence [Doc. 97 p. 15 (citing *State v. Glatz*, E2019-00431-CCA-R3-CD, 2020 WL 865071 (Tenn. Crim. App. Feb. 21, 2020))]. First, the Court observes that the Tennessee appellate court reversed Defendant's conviction for attempted sexual exploitation of a minor but affirmed his conviction for contributing to the delinquency of a minor. *Glatz*, 2020 WL 865071, at *5–6.

28

regard to SA Norris's affidavit, Defendant alleges that the allegations necessarily turn on the search of his SD card pursuant to the state search warrant because he would have never made the alleged jail telephone calls if it were not for the initial search [*Id.* at 17–18].[14]  The Government denies that information seized from the search of Defendant's cellphone and SD card was illegally gained but argues that even if it was, the second federal search warrant is supported by "independent probable cause" [Doc. 24 p. 9].

In *Murray*, the Supreme Court explained that the exclusionary rule generally prohibits the introduction of evidence seized during an unlawful search as well as evidence derived from the illegally obtained evidence.  487 U.S. at 36–37.  However, when evidence obtained from the execution of a search warrant lacking in probable cause is used to provide the probable cause for a second search warrant, "each warrant must be sought and executed by law enforcement in good faith as prescribed by *Leon*."  *Tucker*, 742 F. App'x at 1003.  As discussed above, the Court finds that the evidence seized from the execution of the state search warrant need not be suppressed because the executing officer acted in good-faith reliance on the state search warrant.  The Court also finds that the executing officers relied on both the first and second federal search warrants in

---

Moreover, the Court must consider whether probable cause exists based upon the four corners of SA Pearson's affidavit and cannot consider either Defendant's subsequent conviction for contributing to the delinquency of a minor or the reversal of his conviction for attempted solicitation of a minor in assessing whether the affidavit provides a sufficient basis for the issuing judge to find probable cause.

[14]    Defendant also makes several arguments that ask the Court to look outside the four corners of SA Norris's affidavit:  He contends that the affidavit's explanation of how agents identified F.R. (V1) and E.B. (V2) is implausible [Doc. 97 pp. 17–18].  He asserts that F.R.'s first name was never mentioned in the sixty jail telephone calls, an open-source search of F.R.'s first name along with the states of Florida and Alaska does not yield F.R.'s parents' names, and that agents did not rely on information from F.R. to identify E.B.  [*Id.* at 18].  As stated above, the Court is limited to the four corners of the affidavit in determining whether probable cause exists.  Defendant's assertions are unsupported and wander far afield of the four corners of SA Norris's affidavit.

good faith because both contain ample probable cause to believe evidence of solicitation of a minor would be found on Defendant's cellphone. Thus, the photographs obtained from the search of Defendant's SD card pursuant to the state search warrant could properly form the basis for the subsequent federal search warrants. *See Tucker*, 742 F. App'x at 1003.

Moreover, the Court agrees with the Government that the second federal search warrant contains probable cause separate from the evidence seized from Defendant's cellphone and SD card pursuant to the state search warrant and the first federal search warrant. The Government contends that without relying on information gained in the prior searches of Defendant's cellphone and SD card, SA Norris's affidavit provides probable cause that evidence of sending and receiving child pornography, transfer of obscene material to a minor under age sixteen, and solicitation of a minor would be on the data from the cellphone and SD card [Doc. 24 p. 9]. Thus, it contends that evidence seized from the search of the data pursuant to the second federal search warrant was obtained independently from the evidence seized pursuant to the two prior search warrants [*Id.* at 9–10].

Evidence initially seized in an unlawful search may still be admissible if later obtained through a lawful "independent source." *Murray*, 487 U.S. at 537. The independent source doctrine applies if the illegally obtained evidence "was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). In the case of a search warrant that relies in part on unlawfully obtained information, the evidence seized from the execution of the search warrant "may nevertheless be admissible under the independent-source doctrine . . . '[i]f the application for a warrant contains probable cause apart from the improper information . . . [and] the officers were not prompted to obtain the warrant by what they observed during the initial [improper

search].'" *United States v. Chapman-Sexton*, 758 F. App'x 437, 441 (6th Cir. 2018) (quoting *Jenkins*, 396 F.3d at 758 (internal quotations omitted)); *United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016) (observing the court must inquire whether the initial illegal search is what prompted the subsequent search warrant and whether probable cause existed for issuing the search warrant in the absence of evidence from the illegal search). The independent source doctrine seeks to return the government to the same position it would have enjoyed without the illegal search, rather than a worse position. *Jenkins*, 396 F.3d at 757; *see also United States v. Whipple*, No. 3:20-CR-31-TAV-HBG-1, 2020 WL 7241058, at * 2 (E.D. Tenn. Dec. 9, 2020) (citing *Murray*, 487 U.S. at 542).

To find whether the judge would have issued the second federal search warrant in the absence of the prior illegality, the Court "'excis[es] the illegally obtained information from the affidavit and then decid[es] whether the remaining *legally* obtained information sufficiently supports a finding of probable cause to search.'" *Id.* at *2 (quoting *Williams*, 656 F. App'x at 753–54) (internal alterations omitted). Here, SA Norris's affidavit expressly does not rely on information obtained through the execution of the state or first federal search warrants to provide probable cause to search Defendant's cellphone and SD card for evidence of transferring obscene materials to a minor under age sixteen, receipt and possession of child pornography, and enticing a minor to engage in sexual activity constituting a criminal offense [Doc. 35-2 ¶18]. Instead, the affidavit states that through review of the recordings of Defendant's jail telephone calls, law enforcement learned the unique first name and telephone number of a minor female ("V1") along with information that V1 had moved from Alaska to Florida, where she currently resided [*Id.* at ¶¶19–20]. This information along with the subscriber information linked to V1's telephone number allowed law enforcement to identify V1's parents and subsequently to interview V1 [*Id.*

31

at ¶¶19–21].  V1 told agents that she met Defendant on the DeviantArt website, she had recently turned fourteen, Defendant gave her a SIM card to use when communicating with him, and she sent naked pictures of herself to Defendant just before his arrest in May 2018 [*Id.* at ¶¶19–20].

SA Norris's affidavit relates that on July 18, 2019, agents contacted a second minor victim ("V2"), whom they "discovered [was] in communication with Glatz and V1" [*Id.* at ¶23].  V2's parents permitted agents to conduct a forensic review of V2's cellphone [*Id.*].  The review of V2's cellphone revealed conversations between V2 and V1 after Defendant was arrested in May 2018, in which V1 told V2 she was concerned about the police obtaining pictures of "her body" that she had sent to Defendant [*Id.* at ¶26].  V1 told V2 that she knew Defendant sent V2 pictures of his genitalia and that V1 had to delete all her pictures from Defendant in case the police seized her cellphone [*Id.* at ¶¶ 27–28].  V2 had the number to Defendant's LG cellphone saved in her contact lists both for her cellphone and on the What's App application [*Id.* at ¶29].  The Court finds that this information provides probable cause to search the data extracted from Defendant's cellphone and SD card.  Thus, SA Norris's affidavit provides probable cause without relying on evidence seized pursuant to the two prior search warrants.

For the independent source doctrine to apply, the Court must also find that law enforcement would have sought the second federal search warrant without knowing about the photographs and other evidence seized pursuant to the state and first federal search warrant.  *See Jenkins,* 396 F.3d at 758.  In conducting this analysis, the Court should not give "dispositive effect to officer assurances that a warrant would have been sought in the absence of the illegal search" but must examine the totality of the circumstances to determine whether the officer's assurance is plausible. *Williams*, 656 F. App'x at 751, 753.

32

Defendant argues that the information used to obtain the second federal search warrant is derived from the investigation launched pursuant to the initial search of his cellphone and SD card [Doc. 20 p.10]. Specifically, Defendant contends that law enforcement discovered and identified V2 from the evidence on his cellphone [Doc. 97 pp. 17–18].[15] However, the investigation of Defendant began with a citizen complaint, Detective Taylor's review of Tennesseetomcat's activity on the DeviantArt website, and Defendant's admissions during the May 2, 2018 interview [Doc. 44, Transcript, pp. 18–19, 36, 39], all of which occurred before his cellphone was searched by law enforcement. Defendant was arrested on May 3, 2018, the day Detective Taylor obtained the state search warrant and before Detective Stallings began his forensic review of the cellphone and SD card [Id. at 40, 65]. According to SA Norris's affidavit, the jail telephone calls between Defendant and V1 began "almost immediately" following Defendant's arrest.[16] Detective Collins contacted federal authorities for assistance, when the state forensic analyst was not able to unlock and search Defendant's cellphone [see Doc. 35-1, Pearson Affidavit, ¶¶15, 18]. Based on this information, the Court finds that law enforcement would have continued to attempt to search Defendant's cellphone based upon their investigation of the Taveras complaint and Defendant's admissions in the May 2, 2018 interview, even if sexually explicit photographs had not been seized from Defendant's SD card.

---

[15] Defendant provides a May 8, 2019 FBI Report by SA Pearson stating that V2 was identified through obtaining the subscriber information for her cellphone number, which was found on Defendant's cellphone [Doc. 98-42 pp. 2–3]. The report also shows that SA Pearson obtained V2 and Defendant's WhatsApp conversations that were cited in SA Norris's affidavit from a review of Defendant's cellphone prior to their interview of V2 or review of her cellphone [Id. at 3; see also Doc. 35-2 ¶24].

[16] With regard to V1, Defendant also argues that V1's name was never mentioned during the sixty jail telephone calls and that an open-source search of V1's first name, Florida, and Alaska does not yield V1's parent's names [Doc. 97 p. 18]. These arguments are unsupported.

As to Defendant's argument that law enforcement never would have discovered V2 without the illegal search of his cellphone, the Court finds that the contact with V2 and her parents, who permitted the search of her phone, was sufficiently attenuated from the allegedly illegal search of his SD card pursuant to the state search warrant to permit the evidence of the identity of V2. "[T]he attenuation doctrine states that if evidence seized is sufficiently 'attenuated' from the initial Fourth Amendment wrongdoing, the taint may also be so attenuated as to permit the admission of the evidence." *United States v. Powell*, 943 F. Supp. 2d 759, 788 (E.D. Mich. 2013) (quoting *United States v. Williams*, 615 F.3d 657, 668–69 (6th Cir. 2010)). Application of the attenuation doctrine involves examining the "temporal proximity" of the illegal search to the discovery of the particular evidence, whether intervening circumstances exist, and "the purpose and flagrancy of the official misconduct." *Id.* (internal quotations omitted). Here, each of these three factors weigh in favor of permitting the use of the information from V2's cellphone.

First, the FBI report cited by Defendant shows approximately one year elapsed between the alleged illegal search of Defendant's SD card by Detective Stallings in May 2018 and the identification of V2 in May 2019 [*See* Doc. 98-42]. Defendant provides a May 8, 2019 FBI Report by SA Pearson stating that V2 was identified through obtaining the subscriber information for her cellphone number, which was found on Defendant's cellphone [Doc. 98-42 pp. 2–3]. Second, the Court finds that the first federal search warrant and the identification and interview of V1 both are intervening circumstances between the initial search of Defendant's SD card and law enforcement's contacting V2 on July 18, 2019. Moreover, V2's parents' consent to the examination of her cellphone is yet a third intervening circumstance between Agent Stallings's execution of the state search warrant and the location of the What's App conversations on V2's cellphone. Finally, the Court finds that that the "official misconduct" in Detective Taylor's

affidavit (i.e., her failure to provide a nexus between the alleged illegal activity and Defendant's cellphone) was not flagrant. Instead, as the Court found above, the exclusionary rule should not apply to the evidence seized pursuant to the state search warrant because Detective Stallings reasonably relied on it. Moreover, law enforcement sought another search warrant, the first federal search warrant, in order to search Defendant's cellphone, which indicates officers were trying to comport with the Fourth Amendment, rather than circumvent it.

Thus, the Court finds that even if law enforcement's identification of V2 stemmed from its review of Defendant's cellphone, rather than an independent source, the contact with V2 and consensual examination of her cellphone was sufficiently attenuated from the initial alleged illegality (the lack of nexus in Detective Taylor's affidavit) as to permit the use of this evidence in support of probable cause in the second federal search warrant.

In summary, the Court finds that the independent source and attenuation doctrines permit the search of Defendant's cellphone and SD card wholly apart from the evidence gleaned from the initial search of the SD card pursuant to the state search warrant or the cellphone pursuant to the first federal search warrant.

*(b) Nexus in Federal Search Warrants*

Defendant also contends that the affidavits supporting the first and second federal search warrants fail to establish a nexus between his cellphone and the alleged crimes [Doc. 97 p. 8]. He summarily argues that SA Pearson's affidavit fails to show a nexus between the suspected crimes and his LG cellphone [Doc. 97 p. 14]. Defendant also denies that the conversations described in SA Norris's affidavit demonstrate that he used his cellphone in connection with the crimes alleged [*Id.* at 8 (citing paragraph 28 of SA Norris's affidavit)].

As discussed above, probable cause requires a specific and concrete connection between the place to be searched and the evidence sought. *Brown*, 828 F.3d at 382; *Carpenter*, 360 F.3d at 594. Defendant argues that boilerplate language on the characteristics or habits of collectors of child pornography is insufficient to show that he is such a collector [Doc. 97 pp. 14, 16 (citing SA Pearson's affidavit at ¶¶24–38 and SA Norris's affidavit at ¶¶34–38)]. *See United States v. Walling*, No. 1:16-cr-250, 2017 WL 1313898, at *4–5 (W.D. Mich. Apr. 10, 2017) (finding affidavit, which stated characteristics common to collectors of child pornography based on affiant's knowledge, experience, and training, lacked any information that defendant shared characteristics of collectors of child pornography), *aff'd* 747 F. App'x 382 (6th Cir. 2018). *But see United States v. Shesso*, 730 F.3d 1040, 1045 (9th Cir. 2013) (rejecting trial court's finding that the affidavit failed to link general statements about child pornography collectors to defendant where defendant downloaded a specific pornographic video of a minor to a file sharing site). Thus, he argues that neither federal affidavit provides a nexus to search his cellphone and SD card for evidence of child pornography.

Both federal affidavits contain a section describing the characteristics of collectors of child pornography, which are gleaned from the affiant's knowledge, training, and experience [Doc. 35-1 ¶¶24–26, Doc. 35-2 ¶34]. However, unlike in *Walling*, cited by Defendant, the affidavits contain evidence of nexus beyond this language. SA Pearson's affidavit relates that photographs of a minor's naked breasts and vagina were seized from Defendant's SD card [Doc. 35-1 ¶19]. The affidavit also relates that the SD card was "installed inside of [Defendant's] cellular phone" [*Id.* at ¶18] and that "because child pornography was stored on the micro SD card, as discussed above, it is probable that child pornography and other evidence related to the identity of the victims will be found on the cellular telephone's internal memory" [*Id.* at ¶22]. Thus, SA Pearson's affidavit

36

provides specific and concrete connection between the place to be searched (the internal memory of Defendant's cellphone) and the evidence to be seized (child pornography).

Similarly, in her affidavit, SA Norris states that "[c]onversations between V1 and V2 related to when Glatz was arrested further support the fact that Glatz used the LG cell phone to send and receive pornographic photographs to/from minors" [Doc. 35-2 ¶28]. SA Norris then describes a conversation in which V1 tells V2 that she deleted all her photographs from Glatz in case the police got her cellphone [Id.]. SA Norris also describes a conversation between the minor victims in which V1 tells V2 that Defendant admitted to her that he sent V2 "dick pics or vids" [Id. at ¶27(b)]. Additionally, V1 told law enforcement that Defendant sent her a Subscriber Identification Module (SIM) card to use when communicating with him on her cellphone and that she sent Defendant naked pictures of herself to Defendant just before his arrest in May 2018 [Id. at ¶22]. SA Norris's affidavit explains that Defendant directed V1 and V2 to communicate with him through the WhatsApp application because it was encrypted and "safe for perverts" [Id. at ¶¶23–24] and that V2 had the number to Defendant's cellphone in her WhatsApp contacts list [Id. at ¶29]. Based on this specific and concrete information from SA Norris's affidavit, the Court finds it reasonable to infer that evidence of child pornography would be found on Defendant's cellphone and SD card.

In summary, the Court finds that both federal affidavits provide a nexus showing that evidence of child pornography would be found on Defendant's cellphone and SD card.

*(c) Staleness*

Both federal affidavits state that Defendant was arrested for child molestation, convicted in 2005, and sentenced to twenty years of incarceration [Docs. 35-1 ¶23, 35-2 ¶30]. Defendant argues that the evidence regarding his prior conviction for child molestation is stale, whether the

37

Court considers the actual year of conviction (1995) or the year of conviction stated in the affidavits (2005), and irrelevant because a conviction for child molestation does not indicate a propensity to possess child pornography or to commit crimes involving child pornography [Doc. 97 pp. 15–16]. *See United States v. Hodson*, 543 F.3d 286, 290–92 (6th Cir. 2008) (observing that evidence of child molestation and illicit online activity with minors does not establish probable cause to search for child pornography).

The Court finds that both federal search warrants contain ample probable cause based upon recent evidence without relying on the reference to Defendant's prior conviction. *See United States v. Neuhard*, 770 F. App'x 251, 253 (6th Cir. 2019) (while evidence of child molestation alone does not provide probable cause to search electronic devices for child pornography, the affidavit contained additional information of defendant showing child pornography stored on his computer to the minor and producing child pornography with his cellphone). SA Pearson's affidavit describes a sexually explicit photograph of a minor's naked genitalia and photographs of a minor's naked breasts found on the SD card installed within Defendant's cellphone [Doc. 35-1 ¶19]. SA Norris's affidavit describes evidence gleaned from an interview of V1 and the review of V2's cellphone that near the time of Defendant's arrest on May 3, 2018, V1, a minor, sent Defendant naked and "embarrassing" photographs of her body [Doc. 35-2 ¶¶22, 26]. SA Norris's affidavit also recounts conversations between V1 and V2 discussing Defendant sending photographs or videos of his penis to V2, a minor [*Id.* at ¶27(b)]. Thus, the Court finds the probable cause in both federal affidavits goes beyond his child molestation conviction and is not stale.

Additionally, the Court disagrees with Defendant's characterization of his prior conviction of child molestation as irrelevant. While Defendant's prior conviction alone may not provide probable cause to believe his cellphone and SD card would contain evidence of child pornography,

38

Defendant's prior conviction does indicate his sexual interest in minors. *United States v. Libbey-Tipton*, 948 F.3d 694, 702 (6th Cir. 2020) (discussing Fed. R. Evid. 414 and observing prior convictions for child molestation "create the logical inference that the defendant has a sexual interest in children that is strong enough to cause him to break the law") (internal quotations omitted). Moreover, both federal search warrants seek evidence of enticing a minor to engage in sexual activity as well as evidence of child pornography. Thus, the Court finds that both federal affidavits provide probable cause despite Defendant's prior conviction being for child molestation and purportedly occurring in 2005.

### (3) *Franks* Challenge

Defendant argues that all three affidavits[17] contain false statements and/or material omissions necessary for probable cause [Doc. 34 pp. 1-5; Doc. 100 p. 1]. He contends that

---

[17] In his post-hearing brief, Defendant also alleges the May 3, 2018 affidavit of Detective Collins in support of an arrest warrant contains false statements and material omissions, which, if excluded or, in the case of omissions included, would negate any probable cause [Doc. 100 pp. 2–15]. The Court finds that Defendant's attack of the specific language in the May 3, 2018 Affidavit of Complaint exceeds the scope of his motion for a *Franks* hearing [Doc. 34] and cannot be determined without recourse to exhibits not properly in the record [*See* Doc. 175 p. 70 n.35 (declining to address Defendant's allegations of false statements in Detective Collins's Affidavit of Complaint to the arrest warrant)].

Additionally, even aside from the improper filing and evidentiary issues, Defendant cannot prevail. Our appellate court has applied the test from *Franks v. Delaware* to analyze alleged false statements in an affidavit supporting an arrest warrant. *United States v. Holmes*, 503 F. App'x 383, 386 (6th Cir. 2015). However, here, no evidence was seized from Defendant Glatz at the time of his arrest. Defendant argues that the evidence gleaned from his jail telephone calls and used in the second federal search warrant must be suppressed because that evidence stems from his illegal arrest [See Doc. 96 p. 30]. The Supreme Court has "declined to adopt a 'per se,' or 'but for,' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978). Here, the Court finds that the jail telephone calls are sufficiently attenuated from Defendant's arrest that suppression of those calls is not warranted because they are separated in time at least by days and the circumstances of Defendant's arrest did not influence the statements made in the calls. *See United States v.* Gross, 662 F.3d 393, 401–02 (6th Cir. 2011) (observing suppression of the "indirect fruits" of an illegal arrest is only warranted if the fruits "bear a sufficiently close relationship to the underlying illegality") (internal

39

"material information was either deliberately or recklessly omitted from the affidavit[s], consequently undermining the showing of probable cause" [Doc. 34 pp. 5–6]. According to Defendant, an evidentiary hearing is necessary for the Court to make findings of fact regarding the falsehoods and omissions in the affidavits [Doc. 34 p. 5].

The Government contends that Defendant fails to make a preliminary showing that the specified parts of the affiants' statements are deliberately or recklessly false or that the affidavits would lack probable cause if the allegedly false statements were removed [Doc. 35 pp. 1– 2; Doc. 105 p. 1]. It maintains that Defendant is not entitled to a *Franks* hearing because the affiants did not misrepresent or omit material information [Doc. 35 p. 1]. The Government argues that, instead, the three affidavits were based upon information that Defendant corroborated in his May 2, 2018 interview [Doc. 35 p. 1].

As discussed above, the reviewing court's evaluation of whether an affidavit establishes probable cause is typically limited to only the information that was before the issuing judge, i.e., only what is contained within the four corners of the supporting affidavit. *Brooks*, 594 F.3d at 492. "In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). The affidavit supporting a search warrant is

---

quote omitted); *see also United States v. Houston*, No. 3:13–10–DCR, 2013 WL 5595405, at *8 (E.D. Tenn. Oct. 10, 2013) (holding "the fruit of the poisonous tree doctrine did not apply to the defendant's . . . jail telephone conversation" when defendant was warned that calls were recorded and monitored). Thus, even if the matter of the legality of Defendant's arrest warrant were properly before the Court and even if it found Detective Collins's affidavit did not provide probable cause for the issuance of an arrest warrant, the Court would find that the information gleaned from Defendant's jail telephone calls should not be suppressed.

presumed to be valid. *Franks*, 438 U.S. at 171. A defendant seeking a *Franks* hearing, "must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.*

In *Crawford,* our appellate court described the "two questions of fact, and one of law," upon which "[a] *Franks* analysis turns:"

> The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

943 F.3d at 309. Moreover, the defendant seeking a *Franks* hearing, must make a substantial showing of the affiant's culpability:

> The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id* at 171–72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards: negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

41

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *Bateman*, 945 F.3d at 1008 (6th Cir. 2019). "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

Material omissions may also merit a *Franks* hearing in certain circumstances; however, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Adkins*, 107 F.3d 1213, 1217 (6th Cir. 1997). An affidavit does not have to include all facts gathered in the course of an investigation. *Id.* Thus, "except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir.), *cert. denied*, 524 U.S. 942 (1998). The purpose of this heightened standard for omissions is to prevent "'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *Adkins*, 107 F.3d at 1217.

To demonstrate entitlement to a *Franks* hearing, Defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 170; *see United*

*States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (observing that "this court's well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements.'") (quoting *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990)). Here, Defendant Glatz asserts that Detective Taylor's affidavit contains one false statement and several omissions, SA Pearson's affidavit contains six false statements and two omissions, and SA Norris's affidavit contains seven false statements and one omission.

(i)    *Taylor Affidavit*

Defendant alleges that Detective Taylor's affidavit contains a false statement, a false inference, and omissions in relation to the report by Samantha Taveras. He contends the affidavit's statement that Taveras was a "user" of DeviantArt is false because her report to the police does not indicate she was a user or had an account [Docs. 34 p. 2; 100 pp. 15–16]. Additionally, he argues that the inference that Defendant knowingly "chatted" with a minor was not true [Doc. 20 p. 8]. Defendant also contends that Detective Taylor's affidavit contains material omissions with regard to the Taveras report because it fails to provide information that Taveras had no direct knowledge of any crimes, did not know Nolifelady, her information came from her reading a third-party's online journal, and no role-playing was corroborated by the detectives' investigation or other evidence in this case [Doc. 34 pp. 1–2; Doc. 100 p. 4].[18] Defendant argues that the report by Taveras is material to probable cause because the facts contained in the affidavit are "primarily attributed to Samantha Taveras" [Doc. 34 p. 6].

---

[18]    Defendant also asserts that JCSO failed to investigate properly because they did not issue a subpoena to the DeviantArt website to learn who owned the Tennesseetomcat account [Doc. 100 p. 5]. The Court agrees with the Government that Defendant's dissatisfaction with the JDSO's investigation of his case does not factor into the *Franks* analysis [Doc. 105 p. 2]. As the Government observes, Defendant admitted using the Tennesseetomcat account on DeviantArt, and this admission establishes a nexus between the account and Glatz, as stated in the affidavits [*Id.*].

43

The Government responds that the affidavit's omission of information that Taveras did not know the "backstory" or have firsthand knowledge is immaterial to probable cause because Defendant admitted Taveras's allegations were true in the May 2, 2018 interview [Doc. 35 p. 2, 6; Doc. 105 p. 2.]. It asserts that Detective Taylor's affidavit would still provide probable cause for a registry violation if it contained only her knowledge of Defendant's failure to disclose the Tennesseetomcat username and Defendant's admission that he used that account [Doc. 36 p. 6]. Thus, the Government maintains that Defendant has not shown that any omissions regarding information by Taveras were material or that the information was deliberately or recklessly false or omitted [Doc. 35 p. 1].

The Court agrees with the Government that Defendant's allegations of false statements or material omissions have no impact on probable cause in light of Defendant's admission in the May 2, 2018 interview that he used the Tennesseetomcat account on DeviantArt to talk with and request pictures from a minor. The Court also finds the information that Taveras was a "website user" is not false. Defendant asserts that any visitor to DeviantArt may view all pages, journals, and messages regardless of whether the individual has an account [Doc. 100 p. 16]. The JCSO police report documenting Taveras's call states that Taveras saw the post on the DeviantArt website [Doc. 98-19, JCSO Preliminary Investigative Report, p. 1]. Accordingly, the Court finds that the affidavit properly characterizes Taveras as a website user.

Similarly, with regard to the information from Taveras's complaint, Defendant contends that the affidavit fails to inform the judge that Taveras did not have firsthand information, i.e., that she saw the information in a "journal" from an unknown user and that she does not know NoLifeLady [Doc. 100 pp. 16–17]. However, as stated above, the Court finds this omitted information is not essential to probable cause because the affidavit states that Defendant admitted

44

to using the Tennesseetomcat account and "chatting with *the* minor child," referring to the "13[-]year[-]old girl with the username 'nolifelady'" reported by Taveras [*See* Doc. 20-1 p. 2 (emphasis added)].

Defendant also asserts that Detective Taylor's affidavit creates the false inference that he *knowingly* "chatted" with a minor because it omits that he told the detectives during the May 2 interview that he did not know Nolifelady was a minor [Doc. 20 p. 8]. However, the Court observes that Defendant also told the detectives that at some point during their conversations he learned Nolifelady was a minor and that he did not know what more they discussed after that point [Doc. 98-1, unofficial Transcript of May 2, 2018 Interview, p. 23]. Thus, the Court finds that to the extent that the affidavit creates the alleged inference, it is not false.

Defendant also argues that Detective Taylor omitted the fact that the Tennesseetomcat username was "registered to" someone other than Defendant and that agents had interviewed that individual [Doc. 34 p. 2]. He contends that the affidavit fails to inform the reviewing judge that the Tennesseetomcat account "was owned and operated solely by Jaycee Corum [Doc. 100 p. 3]. Defendant asserts that JCSO had "multiple sources" from which they learned Corum owned and operated the account [*Id.*]. Defendant lists five "reasons that JCSO knew that Tennesseetomcat was solely owned and operated by Jaycee Corum": (1) Corum's identity, address, and social security number appear on the police report stating Taveras's complaint from April 24, 2018 [Doc. 100 pp. 5–6; *see* Doc. 98-19].[19] (2) Collins testified that JCSO tried to interview Corum before

---

[19]    The JCSO Preliminary Investigative Report that Defendant provided as an exhibit [Doc. 98-19] does not contain Corum's identifying information. However, the notes in the report state that Detective Taylor called Corum on May 3, 2018 [*Id.* at 3], so the Court finds Detective Taylor had Corum's telephone number. Defendant speculates that the JCSO must have gained Corum's contact information illegally because there was not time for a subpoena, the journal entry on DeviantArt does not mention Corum, and the Tennesseetomcat account was deactivated before the

the May 2 interview [Doc. 100 p. 6; *see* Doc. 44, Transcript, p. 49]. (3) JCSO had no information that Defendant owned or used Tennesseetomcat at the start of the May 2 interview [Doc. 100 p. 6; *see* Doc. 44, Transcript, p. 48]. (4) Defendant repeatedly stated during the May 2 interview that only Corum owned and operated Tennesseetomcat [Doc. 100 p. 6; *see* Doc. 44 p. 48 & 98-1, unofficial Transcript of May 2, 2018 Interview, pp. 11, 12, 24, 43, 44, 49]. (5) During the May 2 interview, Defendant gave the detectives Corum's name and telephone number so they could verify this [Doc. 100 p. 7; *see* Doc. 98-1 p. 37]. Defendant asserts that Detective Taylor contacted Corum, who confirmed that Tennesseetomcat was her account and that Defendant was never authorized to use it [Doc. 100 p. 7]. He argues that Detective Taylor should have disclosed this potentially exculpatory information in the affidavit [*Id.*].

The Government responds that the "suspected originator" of the Tennesseetomcat account was interviewed on May 23, 2018, after the issuance of the state search warrant, and Defendant's friend did not state that she had "originated the [Tennesseetomcat] account on Deviant[]Art" [Doc. 35 p. 6]. It contends that the affiant's failure to disclose that Defendant's friend and former roommate created the Tennesseetomcat account on DeviantArt is not necessary to probable cause because the statute (Tenn. Code Ann. § 40-39-203) requires sex offenders to report all usernames or identities that the offender "uses or intends to use" [Doc. 105 p. 1]. The Government argues that Defendant admitted in the May 2 interview that he used the Tennesseetomcat account [Doc. 35 p. 6–7; Doc. 105 p. 1]. Thus, the fact that someone else "established" the account is not a defense [*Id.*].

---

JCSO received the Taveras complaint [Doc. 100 p. 6]. However, as Defendant notes, he gave the detectives Corum's contact information during the May 2, 2018 interview [*Id.* at 7].

The JCSO Preliminary Investigative Report states that on May 3, 2018, Detective Taylor spoke with Corum by telephone, and Corum said she created the Tennesseetomcat account, that she never used it with Glatz, and that she did not give him permission to use it [Doc. 98-19 p. 3]. Detective Taylor's notes on her conversation with Corum appear after her entry stating she obtained a search warrant for Defendant's phone [*Id.*]. According to the report, although Corum agreed to give a written statement the following day, Corum did not return Detective Taylor's calls after Glatz's arrest on May 3, 2018 [*Id.*]. The report notes that on May 10, 2018, Corum finally replied to a text message from Detective Taylor that she would not come to the JCSO and that she "pleads the [F]ifth" [*Id.*].

The Court finds the fact that Corum created and maintained the Tennesseetomcat account is not necessary to probable cause. The affidavit states that in the May 2, 2018 interview, Defendant admitted using the Tennesseetomcat account [Doc. 20-1 p. 2]. Under Tennessee law, sex offenders are required to report all online identities that they *use*, not just those they create. *See* Tenn. Code Ann. § 40-39-208. Thus, Corum's creation and ownership of the Tennesseetomcat account was not a material omission.

#### (ii)    *Pearson Affidavit*

Defendant argues that SA Pearson's affidavit contains six false statements and two omissions [Doc. 100 pp. 21–27]. First, Defendant contends SA Pearson falsely states that the micro-SD card was located inside or previously located inside his cellphone and that Detective Michael Stallings examined the SD card that was located inside the cellphone [Doc. 100 pp. 21, 26]. As proof of this alleged falsehood, he points to two reports by SA Pearson, stating the LG

47

cellphone and SD card were seized from his person [*Id.*; Doc. 98-22[20] & Doc. 98-26[21]]. He also argues that Detective Collins and Detective Stallings both testified that they did not know who removed the SD card from Defendant's cellphone prior to the forensic analysis by Stallings [Doc. 100 p. 26; *see* Doc. 44 p. 66; Doc. 98-2, unofficial Transcript of Sept. 21, 2018 Prelim. Hg in Jefferson Co. Gen'l Sessions Ct, p. 83]. As discussed in the Court's Report and Recommendation relating to the warrantless seizure of Defendant's cellphone and SD card, the Court finds that the SD card was located inside the SD card at the time it was seized [Doc. 175 pp. 2, 33, 65–66 & n.32]. Accordingly, these statements in SA Pearson's affidavit are not false.

Second, Defendant argues that SA Pearson's affidavit falsely states that he communicated via Skype with K.G., the alleged victim of his Sevier County charges for possession of items in an attempt to lure a minor into sexual activity, violation of sex offender reporting requirement, and contributing to delinquency of minor [Doc. 100 pp. 21–22; *see* Doc. 35-1 ¶16]. He contends that no evidence of Skype communications exist and that his conviction stemming from the Sevier County charges related to K.G. was later reversed due to insufficient evidence [Doc. 100 p. 21]. Defendant asserts that the statement about Skype erroneously implies that he and K.G. had an

---

[20]     Defendant provides what appears to be an evidence log sheet for a "16GB Micro SD card located inside LG smart phone" with a "Specific" "Discovery Location" of "on person" of Glenn Glatz [Doc. 98-21; *see* Doc. 156 (permitting substitution of Doc. 138-1)]. This log does not state that the SD card was seized separately from the cellphone. At the April 14, 2021 evidentiary hearing, Detective Collins testified that Defendant had his cellphone on his person when he came to the JCSO on May 2, 2018 [Doc. 44 p. 64].

[21]     Defendant provides an FBI Collected Item Log dated May 30, 2018, by SA Pearson, stating she received an LG smart phone and a "16GB Micro SD card located inside LG smart phone" from Detective Collins on May 23, 2018 [Doc. 98-25 p. 1]. The second page of this log states that both items were taken from the "Specific Location" of Defendant's person [*Id.* at 2]. This log does not state that the SD card was seized separately from the cellphone. As stated in the above footnote, Detective Collins testified Defendant had his cellphone on his person when he came to the JCSO for the May 2 interview [Doc. 44 p. 64].

online friendship, when they were only "neighborhood friend[s]," which creates an erroneous parallel to his alleged online relationship with Nolifelady [*Id.* at 22]. None of Defendant's arguments demonstrate that the information in the affidavit about K.G. and the Sevier County charges is false, much less knowingly or recklessly so. SA Pearson presented her sworn affidavit on June 6, 2018, well before Defendant's conviction on the Sevier County charges and reversal of same on appeal.[22]

Third, Defendant maintains that SA Pearson falsely states that "'Detective Collins requested Glatz meet with him for a sex offender compliance check'" [Doc. 34 p. 3; Doc. 100 pp. 22–23 (quoting affidavit [Doc. 35-1 ¶17])]. Defendant contends that Detective Collins admitted in his testimony at the April 14, 2021 evidentiary hearing that he asked Defendant to come to JCSO to "update some paperwork" but did not tell Glatz they were investigating potential registry violations or other wrongdoing [Doc. 34 p. 3; Doc. 100 p. 22 (citing transcript [Doc. 44 p. 42])]. Defendant argues that his compliance checks occur quarterly in March, June, September, and December, not in May [Doc. 100 p. 22]. The Court finds that Defendant fails to demonstrate that the term "compliance check" was false or was used to deceive the issuing judge. Moreover, whether Defendant was called in for a "compliance check" or to "update paperwork" is not necessary to probable cause.[23]

---

[22] Footnote 12 above discusses Defendant's Sevier County conviction and appeal.

[23] Defendant also argues that SA Pearson's statement in the affidavit that he was "'subsequently arrested'" based upon his May 2, 2018 interview creates a false inference that he was arrested at the end of the interview [Doc. 100 p. 23 (quoting affidavit [Doc. 35-1 ¶17])]. The Court finds that Defendant was arrested the day after his interview and that his arrest was based, at least in part, on his statements in the May 2, 2018 interview. The Court also finds the omitted fact that Defendant was arrested the day after his interview is not necessary to probable cause.

49

Fourth, Defendant asserts that SA Pearson's statement that he was arrested for a violation of the registry law for "using a chat application and email address that were not listed on his sex offender registry as required" [Doc. 35-1 p. 14 ¶17] is false because DeviantArt does not offer chat applications and the username and email address belonged to Corum [Doc. 100 pp. 8–9, 23]. However, Defendant makes no showing that this statement was knowingly or recklessly false. Instead, Defendant's admission in the May 2, 2018 interview that he used the Tennesseetomcat account, which was set up by Corum, to talk to Nolifelady supports a finding that at most SA Pearson negligently characterized the notes feature on DeviantArt website as a chat application [*See* Doc. 98-2, unofficial Transcript, pp. 13, 23 (Defendant states he knew Nolifelady was thirteen "near the end of our notes. We were sending notes."), 25 (Defendant states, "[a]ll I did was talk to her."), 34 (Defendant says Nolifelady told him "in notes that she was thirteen."), 39 (Defendant states that he used the Tennesseetomcat account in response to question about account he used when "chatting" with Nolifelady), & 41–43]. In the interview, Defendant states he did not know what email address Corum used to create the Tennesseetomcat account [*Id.* at 13, 49]. However, Defendant also stated that Corum created the Tennesseetomcat account to tell his "side of things" with regard to the individuals accusing him of being a pedophile and to assist him in using DeviantArt website [Id. at 44, 49]. Thus, the interview supports an inference that Corum used her email address to create the account for Defendant. Moreover, the Court finds the statement about the email address is not necessary to probable cause.

Fifth, Defendant argues that paragraph 21 of SA Pearson's affidavit, describing an image of a note from "Mindy Parks" with three SIM cards and an SD card taped to it and giving Postal Inspector John Wallace Bowden's opinion that the image depicts individuals exchanging digital media with false names, "is an entirely false paragraph" [Doc. 100 p. 23–24]. Defendant contends

that Mindy Parks is a former "roommate and good friend" and that both JCSO Detectives Collins and Taylor met her when Defendant brought her to his March 2018 meeting on his sex offender registration form [*Id.* at 24]. Defendant argues that because SA Pearson, Detective Collins, and Inspector Bowden all attended a meeting on May 22, 2018, SA Pearson and Inspector Bowden could have asked Detective Collins about the image and learned "Mindy Parks" was not a false name [*Id.*].

The Court finds that Defendant's assertion that Mindy Parks is an actual person, rather than an alias as opined by Inspector Bowden, does not demonstrate that paragraph 21 is false. The significance of the paragraph, that Defendant was sending digital media to others—whether using a false name or through a third party—is the same. Finally, Defendant's assertion that Detective Collins had met Mindy Parks is unsubstantiated.[24] Thus, Defendant also fails to show that SA Pearson knowingly or recklessly included false information in the affidavit.

Sixth, Defendant contends that SA Pearson's affidavit falsely states that he had "lengthy criminal history" and that his prior conviction for child molestation was from "May 24, 2005" [Doc. 34 p. 3; Doc. 100 p. 27]. Defendant alleges that he had a single prior conviction from 1995 [*Id.*]. He summarily argues that this ten-year discrepancy in the dates is material to probable cause [Doc. 34 p. 3]. The Government responds that inclusion of the incorrect year of conviction—2005,

---

[24]     At the beginning of the May 2, 2018 interview, Detective Taylor told Defendant she met him when he came in to register and his girlfriend came with him [Doc. 98-1, unofficial Transcript of May 2, 2018 Interview, p. 1]. Defendant responded that the woman was not his girlfriend but, instead, was his roommate and good friend [*Id.* at 1–2]. He states she moved to Pigeon Forge, "chasing her boyfriend" [*Id.*]. Defendant does not name the woman [*Id.*]. Detective Collins does not state that he was present when Detective Taylor met Glatz and the woman [*Id.*]. Detective Taylor is listed as the reporting officer on Defendant's March 28, 2018 sex offender registration form, which was introduced as Exhibit 1 at the April 14, 2021 evidentiary hearing. Accordingly, Defendant fails to demonstrate that Detective Collins knew Mindy Parks was a person, rather than an alias.

51

rather than 1995—was a typographical error [Doc. 35 p. 8]. It contends that Defendant presents

no evidence that the inclusion of the incorrect date was deliberate or reckless and that, in any event,

the erroneous date is not relevant to probable cause [*Id.*].

The Court agrees with the Government on both points. First, the mere fact that the date is

incorrect is not proof that SA Pearson knowingly or recklessly included a false statement in the

affidavit. *See Bateman*, 945 F.3d at 1008 (observing a defendant must show the officer

subjectively held "serious doubts" about the truth of a matter in order to show reckless disregard);

*Franks*, 438 U.S. at 171 ("Allegations of [an officer's] negligence or innocent mistake are

insufficient."). Second, the date of the Defendant's prior conviction is not necessary to probable

cause when the affidavit describes nude photographs of a child's breasts and vagina seized from

Defendant's SD card, that was located inside the cellphone, and explains that evidence of crimes

would be located on the cellphone's internal memory [Doc. 35-1 ¶¶18–19, 22]. SA Pearson's

affidavit states that Defendant is required to register as a sex offender and that he has pending

charges of online child exploitation and violation of the Tennessee sex offender registry laws

stemming from his online communications with a minor on June 27, 2017 [*Id.* at ¶¶15–18]. These

allegations establish probable cause to search Defendant's cellphone without need for Defendant's

prior conviction.

Finally, Defendant challenges two alleged omissions from SA Pearson's affidavit. He

contends SA Pearson failed to mention the complaint by Taveras and failed to inform court that

the search of Defendant's SD card was a warrantless search because the state search warrant did

not authorize the search of the SD card [Doc. 34 p. 2; 100 p. 27]. Defendant argues that the

omission of the Taveras complaint, including the facts that Taveras did not know Nolifelady and

52

received her information by reading an online journal, is material to probable cause because the Taveras complaint was the central information leading to the state search warrant [Doc. 34 p. 2]. He argues the omission of the warrantless search of his SD card is material because the issuing judge was not told that illegally obtained information was being offered as the basis for a new search warrant [*Id.* at 6–7].

The Court finds neither of these alleged omissions warrant a *Franks* hearing. The Court finds the Taveras complaint is not material to probable cause in light of Defendant's admission in the May 2, 2018 interview that he used the Tennesseetomcat account on DeviantArt to talk with and request pictures from a minor. Additionally, the Court does not find the search of Defendant's SD card was warrantless. The Court has already found that the SD card was inside Defendant's cellphone at the time the cellphone was seized [*See* Doc. 175 pp. 2, 33, 65–66 & n.32]. As discussed fully in the execution section C(1) below, Detective Taylor's erroneous description of the SD card as a "16GB sim card" in her affidavit did not render the search of the SD card "warrantless." Thus, SA Pearson's statement that the SD card was searched pursuant to a search warrant is not false.

After examining each of Defendant's allegations about SA Pearson's affidavit, the Court finds that Defendant fails to make a prima facia showing that a *Franks* hearing is warranted.

> (iii)    *Norris Affidavit*

Defendant argues that SA Norris's affidavit contains seven false statements and one omission.[25]  First, Defendant challenges the statement that the manager of the trailer park where

---

[25]    As a part of his *Franks* argument, Defendant contends that the second federal search warrant was never issued by a judge and, thus, the Government's arguments in support of the issuance of the second federal search warrant are themselves false and "fraudulent" [Doc. 100 p. 28]. As discussed in section D. below, the second federal search warrant was signed and issued on November 19, 2023, at 10:53 a.m. *In re Search Warrant for Four Blu-Ray Disks*, No. 3:19-

Defendant resided saw Defendant throw a laptop computer and cellphones into a dumpster at the trailer park after Defendant was approached by law enforcement and SA Norris's assertion that the manager observed this after Defendant's LG cellphone had been seized [Doc. 34 p. 3–4; Doc. 100 p. 28; *see* Doc. 35-2 ¶31]. Defendant argues that this statement is false because the only time he was approached by law enforcement in early 2018 was when he was arrested on May 3, 2018, and taken to jail [Doc. 34 p. 4; Doc. 100 pp. 28–30]. Defendant asserts that it would be impossible for him to have disposed of a laptop and cellphones as alleged because he was continuously detained after his arrest by law enforcement at the trailer park [*Id.*].

The Court finds this information in the affidavit is neither false, nor impossible. The Government attaches to its response a June 2018 FBI report by SA Pearson and another agent describing their interview of residents of the trailer park where Defendant resided [Doc. 35-3]. This report states that a resident told the agents that "[t]he day after Glatz was approached by law enforcement," the resident "observed the [sic] Glatz throwing away several items in the trash dumpster at the trailer park, including the laptop computer, mobile telephones and items contained in trash bags" [*Id.* at 1]. The identity of the persons interviewed is redacted from the Government's attachment, but Defendant agrees it was the trailer park manager [Doc. 100 pp. 28–30]. Defendant argues that it was physically impossible for him to dispose of these items following the seizure of his LG cellphone during the interview on May 2, 2018, and after he was approached by officers who immediately arrested him on May 3, 2018. While Defendant maintains that his May 3 arrest was the only time he was approached by law enforcement in early 2018, the Court observes there was also a noted encounter in April. At the beginning of Defendant's May 2 interview, he told the

MJ-1117, Doc. 3 p. 2 (E.D. Tenn. Sept. 13, 2021) (Original search warrant issued November 19, 2019, and docketed upon its return on September 13, 2021).

54

detectives that he recently called the police to come to the trailer park due to a conflict with his neighbors [Doc. 98-1, unofficial Transcript of May 2, 2018 Interview, pp. 3–4; *see also* Doc. 100 p. 28 (Defendant acknowledges police came to his campground on April 25, 2018, in response to his 911 call)]. In any case, Defendant could have disposed of items following his interview on May 2, 2018, and before his arrest on May 3, 2018, and therefore, Defendant fails to demonstrate the information in paragraph 31 is false.[26]

Second, Defendant challenges SA Norris's statement that that "'[t]he FBI was able to gain access to the contents of the cellular telephone[in] February 2019'" [Doc. 100 p. 31–32 (quoting 35-2 ¶17)]. Defendant alleges that multiple pieces of evidence reveal that the FBI had access to the contents of his cellphone in June 2018 and began a "full-fledged multi-prong investigation . . . on June 26, 2018" [*Id.* at 32; *see also* Doc. 34 p. 3 (arguing SA Norris's affidavit omits that SA Pearson reviewed the SD card prior to the execution of the first federal search warrant)[27]]. He

---

[26]     Defendant also challenges another statement in paragraph 31 of SA Norris's affidavit that he had a short-term male roommate in January or February 2018, who related to the trailer park manager that Defendant tried to persuade thirteen or fourteen-year-old girls from North Carolina to come to his trailer [Doc. 34 p. 4; Doc. 100 p. 30]. Defendant asserts this information about the roommate is false and the source of the trailer park manager's information is unknown and unreliable [Doc. 34 p. 4; Doc. 100 p. 30]. Again, the Court finds this information is supported by the June 26, 2018 FBI report [Doc. 35-3] and is not contradicted by Defendant's referenced exhibits [Doc. 98-35, June 26, 2018 FBI Report; Doc. 98-36, Notes from May 31, 2018; Doc. 98-38, June 18, 2018 FBI Report (May 31, 2018 interview of trailer park resident); *see* Doc. 157 (permitting Defendant's chart renumbering exhibits)]. Additionally, Defendant told the detectives during the May 2, 2018 interview at JCSO that he rented a room in his camper as a source of income [Doc. 98-1 p. 7]. Defendant fails to demonstrate the information from the trailer park manager is false.

[27]     In her affidavit, SA Pearson states that she "review[ed] files stored on the micro SD card" and she also describes images "extracted from the SD card" [Doc. 35-1 ¶¶20–21]. It is not clear from these statements whether SA Pearson looked through the entire SD card or examined the pictures extracted by Detective Stallings. However, even if the former is true, a Fourth Amendment violation is not apparent. With regard to electronically stored information, "the time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Fed. R. Crim. P. 41(e)(2)(B). Generally, a search

55

contends that FBI SA Stephen McFall ("SA McFall") accessed the contents of his cellphone pursuant to the June 6, 2018 search warrant and provided the results to SA Pearson on June 25, 2018 [Doc. 100 p. 32]. However, the Court finds that whether the FBI first gained access to the contents of Defendant's cellphone in June 2018, following the issuance of the first federal search warrant, or in February 2019 is not material to probable cause for the second federal search warrant. The challenged statement occurs in SA Norris's description of the prior state and federal investigation of Defendant, including the execution of the state search warrant and the first federal search warrant. SA Norris's affidavit expressly relates that she is "seeking another search warrant to search the same data without relying on the information obtained through the aforementioned state search warrant or federal search warrants" [Doc. 35-2 ¶18].[28] Accordingly, even assuming, *but not finding*, that the FBI was able to review the contents of Defendant's cellphone prior to February 2019, the Court concludes this is not a basis for a *Franks* hearing.[29]

Defendant's also raises an omission in relation to the FBI's investigation, arguing that SA Norris's affidavit omits the fact that the FBI learned about V2 from law enforcement's seizure of

---

warrant authorizes a single search of the premises that is the subject of the warrant. *United States v. Keszthelyi*, 308 F.3d 557, 568-69 (6th Cir. 2002). However, the repeated search of an electronic device properly seized as evidence in a case does not run afoul of this rule, which was created in the context of searches of residences. *United States v. Castro*, 881 F.3d 961, 967-68 (6th Cir. 2018). "Officers may conduct a more detailed search of an electronic device after it was properly seized so long as the later search does not exceed the probable cause articulated in the original warrant and the device remained secured." *Id.* at 967.

[28]    Defendant also faults SA Norris's affidavit for failing to state the source of Taveras's information [Doc. 34 p. 3]. The affidavit's mention of "a report that [Defendant] was using social media to communicate with a 13 year-old girl" is present merely to relate the chronology of the investigation [*See* Doc. 35-2 ¶¶16, 18]. The Court finds the omission of Taveras's source is not material to probable cause.

[29]    The Court discusses Defendant's argument that the FBI exceeded the scope of the first federal search warrant by accessing his cellphone multiple times in the section relating to the execution of the search warrants in part C(2) below.

his cellphone and review of its data [Doc. 100 p. 32; *see also* Doc. 34 p. 4]. He argues that, instead, the affidavit states only that the FBI "made contact with an underage minor victim hereinafter referred to as Victim 2 (V2)" [Doc. 100 p. 32 (quoting Doc. 35-2 ¶23)]. He asserts that this omission is material because the affidavit fails to inform the issuing judge that the information on V2 and her What's App conversations is fruit of the illegal seizure and search of his cellphone in the state and first federal search warrants [*Id.*].

The Court finds that while the specific details of how law enforcement first learned of V2 and the What's App conversations are not included in SA Norris's affidavit, the affidavit details the earlier investigation and the prior searches pursuant to the state and first federal search warrants and states that it is not relying on information gleaned from those searches [Doc. 35-2 ¶¶17–18]. Instead, SA Norris endeavors to show that probable cause exists to search the data extracted from Defendant's cellphone and SD card separate from the information discovered from the execution of the state and first federal search warrants [*Id.* at ¶18]. To that end, SA Norris relates how law enforcement gained the What's App conversations through a separate investigation by conducting a consensual forensic examination and review of V2's cellphone [*Id.* at ¶23]. While V1 was identified through review of Defendant's jail telephone calls,[30] obtaining subscriber information for her cellphone, and conducting online searches, the affidavit states that V2 "was discovered as being in communication with Glatz and V1" [*Id.* at ¶¶19–20, 23]. The affidavit does not state that V1 told law enforcement about the conversations with V2, but the section discussing the involvement of V2 occurs immediately after the section discussing V1 [*Id.* at ¶¶21–23]. Also, law

---

[30]    The Court notes that SA Norris's affidavit states that the FBI reviewed Defendant's correspondence, which he drafted while in custody, and learned that Defendant sent correspondence to V2 through an adult intermediary [*Id.* at ¶¶32–33]. The affidavit does not give a time frame for the review of Defendant's correspondence or state whether law enforcement discovered the letters to V2 before it contacted her on July 18, 2019.

57

enforcement interviewed V1 on January 31, 2019, and contacted V2 and her parents on July 18, 2019 [*Id.* at ¶¶21, 23]. Thus, SA Norris's affidavit permits the reasonable inference that law enforcement learned about V2 through its investigation of V1. Nevertheless, even if law enforcement located V2 exclusively through information on Defendant's cellphone, the Court has found that law enforcement executed the state search warrant in good faith, that the first federal search warrant was validly issued based upon probable cause, and that the identification of V2 and review of her cellphone was attenuated from any illegality in the initial state search. The omission of this information (that law enforcement identified V2 through review of Defendant's cellphone pursuant to a search warrant) is not material to probable cause.

Third, Defendant contends that the affidavit's statement that the FBI learned V1's unique first name from reviewing Defendant's jail telephone calls is false because neither he nor V1 said her name during the jail telephone calls [Doc. 100 pp. 32–33 (citing Doc. 35-2, SA Norris's Affidavit, ¶20]. He also contends that SA Norris's affidavit falsely contends that law enforcement learned V1's parents' names through open-source searches of V1's first name and her two states of residence Alaska and Florida [*Id.* at 32]. Defendant argues this statement is false because a relative of his was not able to duplicate this result with open-source searches using these terms [*Id.* at 33]. The Court finds Defendant's bare assertions do not show the challenged portions of the affidavit to be false.

Fourth, Defendant argues that SA Norris's affidavit falsely states that conversations between V1 and V2 show that he used his "LG cell phone to send and receive pornographic photographs to/from minors" [Doc. 100 p. 33 (quoting Doc. 35-2 ¶28)]. The affidavit relates a conversation between V1 and V2 in which V1 states she deleted photographs and videos from Defendant, changed her password, and "locked" her applications in case the police seized her

cellphone [*Id.* at ¶28(c)]. Defendant denies that this conversation shows that he used his LG cellphone to do anything. However, the following paragraph states that Defendant's telephone number for his LG cellphone was found in V2's contact lists for her cellphone and her What's App application [*Id.* at ¶29]. The affidavit also states that a review of V2's cellphone shows that Defendant was communicating with V1 and V2 on the What's App application [*Id.* at ¶¶23, 25]. Accordingly, Defendant fails to show this statement is false.

Fifth, Defendant argues SA Norris's affidavit falsely states that he has a "lengthy criminal history" [Doc. 100 p. 33 (quoting Doc. 35-2 ¶30)]. Defendant denies that a single felony conviction is a lengthy criminal history. The Court observes that at the time that SA Norris sought the second federal search warrant in November 2019, Defendant had felony convictions for attempted sexual exploitation of a minor and contributing to the delinquency of a minor in addition to his 1995 conviction for child molestation, which is specifically mentioned in the affidavit but with the incorrect date of conviction. *See State v. Glatz*, No. E2019-00431-CCA-R3-CD, 2020 WL 865071, *1 (Tenn. Crim. App. Feb. 21, 2020) (reversing conviction for attempted sexual exploitation). Regardless of whether three criminal convictions involving minors is fairly deemed "lengthy," the Court finds the statement that Defendant has a lengthy criminal history is not necessary to probable cause.

Sixth, Defendant summarily asserts that SA Norris's affidavit falsely states that he communicated with V2 about "sexual matters" and professed his love for her after his arrest [Doc. 100 p. 33 (referencing Doc. 35-2 ¶33); *see also* Doc. 34 p. 4 (arguing none of the correspondence or messages related in the affidavit involve a discussion of "sexual matters")]. The affidavit states that the FBI reviewed Defendant's correspondence that he wrote while in state custody [Doc. 35-2 ¶32]. It relates that "[w]hile detained, [Defendant] has used an adult intermediary who was not

59

in custody to exchange handwritten . . . correspondence with V2 in which [Defendant] has professed his love for V2, and vice-versa and discussed sexual matters" [*Id.* at ¶33]. Defendant fails to demonstrate that this sworn statement by SA Norris is false. Moreover, the Court finds that it is not critical to probable cause.

Seventh, Defendant maintains that SA Norris's statement of her involvement in the investigation in May 2018 is false. The affidavit states that Detective Collins contacted SA Pearson on May 22, 2018, asking for assistance with an investigation [*Id.* at ¶15]. The affidavit then states, "I spoke to Detective Collins who stated that [Defendant] was in custody at their agency for a violation of sex offender registration T.C.A., 40-39-208, and sexual exploitation of a minor, T.C.A., 39-17-1003" [*Id.*]. Defendant argues that the discovery in this case does not show that SA Norris was involved in the investigation on May 22, 2018, and he argues this statement shows that SA Norris merely "cop[ied] and pasted" this paragraph into her affidavit. The Court finds that SA Norris's typographical error in failing to change "I" to "SA Pearson" has no bearing on probable cause.[31] *See Frazier*, 423 F.3d at 538 (holding that a typographical error in an affidavit is not a basis for a *Franks* hearing).

---

[31] Defendant also contends that SA Norris includes several false statements that are also in SA Pearson's affidavit: That his SD card was located inside his cellphone at the time it was seized [Doc. 35-2 ¶12], that Detective Collins asked him to come to the JCSO for a sex offender "compliance check" [*Id.* at ¶16]; that Defendant was arrested at the end of the May 2, 2018 interview [*Id.* at ¶16], and that he was using a "chat application and email address" on DeviantArt website [*Id.*] [Doc. 100 p. 31]. Defendant also argues that SA Norris's affidavit falsely states the wrong date of 2005, rather than 1995, for his child molestation conviction [Doc. 34 p. 4]. Defendant refers the Court to his arguments on these statements in SA Pearson's affidavit and raises no additional grounds [*Id.*; Doc. 100 p. 31]. The Court has analyzed these statements in its discussion of SA Pearson's affidavit above and finds Defendant fails to make a *prima facie* showing for a *Franks* hearing.

In summary, the Court has reviewed all of Defendant's allegations of false statements and material omissions in the affidavits of Detective Taylor, SA Pearson, and SA Norris and finds that Defendant has failed to establish a basis for a *Franks* hearing. Accordingly, the Court recommends that Defendant's Motion for a "*Franks*" Hearing [Doc. 34] should be denied.

### B. Particularity

Defendant also argues that the three search warrants lack particularity in the items to be seized [Doc. 97 pp. 2, 7–8]. He contends that the state search warrant is a general warrant because it authorizes the seizure of all digital evidence and improperly authorizes the search for photographs, which he asserts are not evidence of either a registry violation or solicitation of a minor [*Id.* at 2, 5]. Defendant asserts that the first federal search warrant lacks sufficient particularity because it fails to incorporate the affidavit [*Id.* at 12]. He maintains that the second federal search warrant is also insufficiently particular because it does not state the alleged crimes or list the items to be seized [*Id.* at 4]. Defendant argues that the Court should maintain a "heightened sensitivity to the particularity requirement in the context of digital searches," *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013), and, thus, should suppress the evidence seized pursuant to the three search warrants in this case.

The Fourth Amendment requires that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The particularity requirement forecloses the opportunity for a general search and 'prevents the seizure of one thing under a warrant describing another,' by restricting the discretion of the executing officer." *United States v. Hanson*, 2018 WL 4223320, at * 9 (E.D. Tenn. Sept. 5, 2018) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). In this Circuit, "the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v.*

*Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988). A search warrant is sufficiently particular if the description of items to be seized "is as specific as the circumstances and the nature of the activity under investigation permit." *Id.* (internal quotation omitted). The particularity requirement is satisfied if the text of the warrant limits the search to evidence of a particular crime. *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018).

*(1) State Search Warrant*

The state search warrant authorizes law enforcement to search for evidence of Tennessee Code Annotated § 39-13-528, prohibiting solicitation of a minor and § 40-39-208, prohibiting violation of the sex offender registration requirements [Doc. 20-1 p. 1]. The warrant permits officers to search Defendant's cellphone for

> [a]ny digital and/or electronic evidence including but not limited to stored electronic communications, records, files, directories, address books, call logs, or data in other forms, stored on the device to be searched that constitutes evidence of [s]olicitation of minors, and [v]iolation of sex offender registration laws. Such evidence may include text messaging or photographs depicting illegal activity.

[*Id.*].

Defendant contends the state search warrant is a "general warrant" because it fails to describe the items to be seized with sufficient particularity to guide the executing officers and, instead, is too broad in including items that should not be seized [Doc. 97 p. 5]. *See United States v. Richardson*, 659 F.3d 527, 537 (6th Cir. 2012). Defendant asserts that the authorization to seize photographs is overly broad because photographs are not evidence of either a registry violation or solicitation of a minor [*Id.* at 2–3]. He contends that pursuant to this overly broad language, Detective Michael Stallings seized evidence of child pornography, which was not a crime listed in the search warrant [*Id*. at 5]. Defendant argues that "catch-all terms" like "illegal activity" and

"including but not limited to" turn the state search warrant into a general warrant [*Id.* at 6]. He also maintains that the search of his cellphone should have been limited to a specific time period [*Id.* at 7]. *See United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010) (observing "'the failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad'" (quoting *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999)).

The Court finds the state search warrant is sufficiently particular. First, it limits the items to be seized to communications, photographs, and other digital materials that are evidence of two specific crimes, solicitation of a minor and violation of the sex offender registration requirements. *Castro*, 881 F.3d at 965 (holding a warrant permitting officers to search defendant's cellphones for evidence of aggravated burglary was sufficiently particular because it constrained the officers to evidence of a specific crime). The Court disagrees with Defendant's assertion that that photographs cannot be evidence of solicitation of a minor. Tennessee Code Annotated § 39-13-528 prohibits soliciting a minor for any one of a number of sexual crimes, including aggravated sexual exploitation of a minor, which involves exchanging material (including photographs) depicting a minor engaged in sexual activity or "patently offensive" simulated sexual activity in violation of Tenn. Code Ann § 39-17-1004. Moreover, photographs can be used to identify a minor victim who is the subject of the solicitation. Additionally, screenshots of Defendant's communications on the DeviantArt website could be "photographs" evidencing a registry violation. The Court observes that photographs are but one of a list of examples of evidence that could be seized. The affidavit does include terms like "any" and "including but not limited to" but these catch-all phrases are circumscribed by the specific crimes.

Finally, Defendant challenges the particularity of the state search warrant because it did not limit the seizure of electronic evidence to a specific timeframe. The Court finds the failure to

time limit the seizure of electronic evidence does not turn state search warrant into a general warrant. Instead, "a subject matter limitation," such as the limitation provided by the specific crime can "fulfill[] the same function as a time limitation would have done[.]" *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999). In *United States v. Sullivan*, our appellate court rejected defendant's argument that the search warrant for his laptop computer was not sufficiently particular because it contained no time limitation, holding that the "warrant specified a subject-matter limitation sufficient to limit the warrant to evidence of the crimes described in the affidavit—namely, files related to child pornography." 751 F. App'x 799, 805 (6th Cir. 2018). The same is true here with regard to the specified crimes of solicitation of a minor and registry violation. Accordingly, the Court finds the state search warrant is sufficiently particular.

### (2) First Federal Search Warrant

Defendant argues that the first federal search warrant fails to incorporate the affidavit, which renders it facially defective and invalid [Doc. 97 p. 12]. *See United States v. Blakeney*, 942 F.2d 1001, 1025–26 (6th Cir. 1991). However, the first federal search warrant authorizes the executing officers to search Defendant's cellphone and SD card for the items listed in Attachment B [Doc. 35-1 p. 1]. Attachment B to the search warrant authorizes law enforcement to search Defendant's cellphone and SD card for items that are "contraband, fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 2252A relating to the receipt and possession of visual depictions of minors engaged in sexually explicit conduct, and 18 U.S.C. § 2422(b), enticement of minors to engaged in sexual activity for which any person can be charged with a criminal offense" [*Id.* at 5]. Attachment B contains a list of four categories of items limited by that language: Visual depictions of minors engaged in sexually explicit conduct, child erotica, passwords or security

devices designed to restrict access to data, and evidence of user attribution showing who owned the electronic device at the time the aforementioned items were created, edited, or deleted [*Id.*].

The particularity requirement may be satisfied by the warrant's cross referencing of separate documents that identify the property or items to be seized in sufficient detail. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Defendant argues the warrant is insufficiently particular because it incorporates an attachment, rather than the affidavit. However, Attachment B was a part of the search warrant, attached thereto and expressly incorporated therein. *United States v. Evans Landscaping, Inc.*, 850 F. App'x 942, 948 (6th Cir. 2021) (holding particularity requirement was satisfied by incorporation of an attachment that accompanies the warrant). *But see Baranski v. Fifteen Unknown Agents*, 452 F.3d 433, 444 (6th Cir. 2006) (holding failure to bring incorporated affidavit to execution of the search warrant did not render the search warrantless) (*en banc*). The first federal search warrant incorporates Attachment B, which describes with particularity the items to be seized. Thus, the Court finds the first federal search warrant is sufficiently particular.

### (3) Second Federal Search Warrant

Defendant contends that the second federal search warrant is not sufficiently particular because it fails to state on its face the place to be searched or the evidence to be seized [Doc. 97 p. 4]. He contends that it also fails to state the suspected crimes [*Id.*].

The second federal search warrant authorizes the search of four Blu-ray disks "containing the forensic examination extractions of" Defendant's cellphone and SD card located inside the cellphone, as described in Attachment A [Doc. 102-1 p. 1]. Attachment A describes the location to be searched as the same Blu-ray discs, which are stored in the FBI evidence room in Knoxville, Tennessee [*Id.* at 3]. The second federal search warrant states the "property to be searched,

described above, is believed to conceal:  Please see Attachment B, hereto" [*Id.* at 1].  Attachment

B provides for the concealed items as being "[m]aterial reflecting the following conduct, which

constitute contraband, fruits, instrumentalities, and evidence of crimes to describe [sic.]:"

1. All files or data reflecting the distribution, receipt or possession of visual depictions, including still images, videos, films, or other recordings, of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

2. All files or data reflecting the transfer of obscene material, including still images, videos, films, or other recordings, to any person who had not attained the age of 16 years;

3. All files or data reflecting communications, including emails, chat messages, text/SMS messages, concerning child pornography, sending obscene material to persons under the age of 16 years; the receipt, distribution, or possession of child pornography; or the solicitation of minors for sex;

4. All files or data constituting any child erotica;

5. All files or data relating to possession, use, or ownership of any device used in the commission of any such offenses;

6. Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation or data; [and]

7. Any and all computer data that would reveal the presence of malware, viruses or malicious codes located on the computer storage media.

[*Id.* at 4].

The Court finds the second federal search warrant describes the location to be searched

with particularity.  It authorizes the search of four specific, labeled Blu-ray disks containing the

extracted data from Defendant's cellphone and SD card.  Attachment A gives the location of the

disks at the FBI office in Knoxville.  "The test for determining whether a search warrant describes

the premises to be searched with sufficient particularity 'is not whether the description is

technically accurate in every detail,' [*United States v.* ]*Prout*, 526 F.2d [380,] 387–88[ (5th Cir. 1976)], but rather whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched[,]' *United States v. Gahagan*, 865 F.2d 1490, 1496 (6the Cir. [1989])." *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002). As discussed above, a search warrant may appropriately incorporate an attachment. *Evans Landscaping*, 850 F. App'x at 948. Here, the Court finds that the second federal search warrant and Attachment A describe the items to be searched with sufficient particularity that the executing officer could locate them with reasonable effort. Given the particular labels and location identified, the Court also finds there was no reasonable probability that the wrong disks would be searched.

With regard to the items to be seized, Defendant is correct that the second federal search warrant on its face does not limit the search of the disks to evidence of specific crimes [*See* Doc. 102-1 p. 1]. The warrant, however, incorporates Attachment B. *United States v. Hurwitz*, 459 F.3d 463, 469, 471 (4th Cir. 2006) (determining words "See Attachment to Affidavit" were sufficient to incorporate the attachment describing the items to be seized). The Court finds that Attachment B limited the executing officers' discretion by permitting a search for "contraband, fruits, instrumentalities, and evidence of crimes" described in the subsequent categories, which describe child pornography, transferring obscene materials to minors, and solicitation of minors for sex. *See United States v. Richards*, 659 F.3d 527, 535, 541–42 (6th Cir. 2011) (determining search of entire server for evidence of child pornography, listed in an attachment, was not overly broad). Thus, the Court finds that the second federal search warrant is sufficiently particular both with regard to the location to be searched and the items to be seized.

## C. Execution of Search Warrants

Defendant also challenges the execution of the state and second federal search warrants. He argues that Detective Stallings's search of his SD card exceeded the scope of the state search warrant, which authorized the search of his cellphone and "SIM card," not his SD card [Doc. 20 p. 4, 8–9]. He asserts that the FBI violated his rights by accessing the data on his cellphone and SD card multiple times after obtaining the first federal search warrant [Doc. 97 p. 12]. Finally, Defendant contends that law enforcement "unduly delayed" seeking the second federal search warrant eighteen months after the first federal search warrant [Doc. 20 p. 9; Doc. 97 p. 27].

### *(1) Search of SD Card*

The state search warrant directs the executing officer to search Defendant's LG cellphone and his "16GB sim card" [Doc. 20-1 p. 1]. Detective Collins subsequently testified that Defendant's cellphone and SD card were submitted to Detective Mark Stallings of the Jefferson City Police Department for a forensic examination [Doc. 44, Transcript of April 14, 2021 Hearing, p. 66]. The Court previously determined that the SD card was located inside Defendant's cellphone at the time it was seized by JCSO detectives on May 2, 2018 [Doc. 175 pp. 65–66 & n.32]. Detective Stallings performed a search of Defendant's SD card but was not able to search the cellphone's memory because he could not unlock the passcode [Doc. 35-1 ¶18]. Detective Stallings seized several photographs of a nude minor female from the SD card [*Id.* at 19].

Defendant argues that law enforcement's search of his SD card exceeded the scope of the state search warrant, which only permitted the search of his cellphone and SIM card [Doc. 20 p. 4, 7]. Defendant contends that a SIM card is "a smart card inside a mobile phone, carrying an identification number unique to the owner, storing personal data, and preventing operation if removed [*Id.* at 4]. He asserts that an SD card, on the other hand, "is a storage device" [*Id.*]. He

68

argues that the state search warrant did not authorize the search of his SD card and that all evidence seized from the SD card must be suppressed [*Id.* at 8–9].

The Government responds that Detective Taylor "misidentified" the SD card as a SIM card in her application and that this typographical error was carried over to the search warrant [Doc. 24 p. 2 n.2; Doc. 35 p. 7].  It contends that the SD card was installed in Defendant's cellphone at the time it was seized, and, thus, the state search warrant authorized the search of the SD card as well as the cellphone [Doc. 35 p. 2].  The Government argues that even if the SD card was wrongly described as a "sim card" in the state search warrant, the erroneous description would not have caused the executing officer to search the wrong location, because the SD card was contained within the cellphone [*Id.* at 8].

The Court finds that law enforcement could properly search Defendant's SD card, although it was not listed as a location to be searched in the warrant.  The SD card was contained within the cellphone at the time the JCSO detectives seized it.  The search warrant permits the search of Defendant's cellphone for "digital and/or electronic evidence, including but not limited to stored electronic communications, records, files, directories, address books, call logs, or data in other forms, stored on the device to be searched" that are evidence of solicitation of minors or violation of the sex offender registration laws, and specifies that "[s]uch evidence may include text messaging or photographs depicting illegal activity" [Doc. 20-1 p. 1].  The Court finds that the state search warrant permitted the seizure of evidence of solicitation of a minor and evidence of a registry violation from either the cellphone's internal memory or the SD card, which was a storage device within the cellphone.  "[T]he SD card, which was installed inside the cellphone at the time it was seized, is a component part of the cellphone."  *United States v. Whipple*, No. 3:20-CR-31-KAC-HBG, 2021 WL 9456475, at *16 (E.D. Tenn. Dec. 1, 2021) (holding search of SD card

seized within cellphone was not a separate search from the search of the cellphone authorized by the warrant), *report & recommendation adopted by,* 2022 WL 3684593 (E.D. Tenn. Aug. 25, 2022) (appeal filed Feb. 14, 2023); *see United States v. Wilson*, No. 17-04106-01-CR-C-SRB, 2019 WL 4740509, *4 (W.D. Mo. Sept. 27, 2019) (holding search warrant for cellular telephone included installed micro SD card, because SD card "amounted to a component part of the HTC phone") (Report and Recommendation adopted); *United States v. Archambault*, No. 13–CR–100–A(Sr), 2014 WL 6908884, *4-5 (WDNY Dec. 9, 2014) (holding consent to search cellular telephone extended to SD card installed inside phone) (Report and Recommendation adopted).

The Court finds the authority to search Defendant's cellphone granted by the state search warrant also permitted the search of the SD card, which was located inside the cellphone and a component part thereof. Accordingly, the search of the SD card did not exceed the scope of the state search warrant.

### *(2) Repeated Access Pursuant to First Federal Search Warrant*

Defendant argues that the FBI searched his cellphone and SD card twice after obtaining the first federal search warrant [Doc. 97 p. 12]. He contends that SA McFall extracted data from his cellphone and SD card on June 25, 2018, and again on February 14, 2019 [*Id.*]. He argues that because the February 2019 extraction represents all the evidence on the four Blu-ray disks that are the subject of the second federal search warrant, this Fourth Amendment violation requires the suppression of all the evidence in this case [*Id.*].

Defendant provides as an exhibit to his post-hearing briefs a CART request by SA Pearson dated June 15, 2018, asking SA McFall to search Defendant's cellphone and the SD card previously installed inside the cellphone pursuant to a search warrant [Doc. 98-17; *see also* Doc. 98-18 (electronic communication of CART request on June 20, 2018)]. Defendant also provides

70

a Report of Examination by SA McFall to SA Pearson, dated February 26, 2019, which states that SA McFall performed a physical extraction of the contents of Defendant's cellphone and also a Cellebrite report was generated [98-23 p. 1]. The Report states that both the cellphone and the SD card "contain images consistent with child pornography" [*Id.*]. The Report states that SA McFall "imaged, processed, and made available for Case Agent review" the data from Defendant's SD card, which he also found contained "images consistent with child pornography" [*Id.* at 2]. SA McFall placed two "raw physical extraction[s]" of the cellphone (one encrypted and the other unencrypted), the Cellebrite report, and a forensic image of the SD card on four Blu-ray disks, which were placed in evidence storage [*Id.*]. SA McFall gave a "working copy" of the Cellebrite report to the case agent [*Id.*]. Finally, Defendant provides a single page of an FBI FD-302 entry, dated June 29, 2018, stating SA Pearson received a "cell phone search warrant return from SA Stephen McFall" for Defendant's cellphone and the "return is attached to this FD-302" [Doc. 98-28]. Defendant argues that multiple requests for subpoenas and other FBI reports containing data such as V1 and V2's phone numbers that predate the February 2019 extraction show that law enforcement gained access to his cellphone in June 2018 [Doc. 100 p. 32 (listing exhibits)]. However, the Court finds it is not clear that the FBI performed two extractions because the June 29, 2018 return" could be for SA McFall's receipt of the cellphone and the record is not clear how law enforcement obtained information in the intervening investigation [*See* 98-34, May 14, 2019 Report of SA Pearson (stating SA McFall was able to "bypass the encryption" of Defendant's cellphone on February 19, 2019)].

    In any event, even if SA McFall performed two searches of Defendant's cellphone pursuant to the first federal search warrant, the Court finds this repeated access did not violate the Fourth Amendment. "'A repeated search of an electronic device' that is seized 'and permissibly secured

by the police as evidence of a crime differs in degree and kind' from the search of a home."
*Whipple*, No.: 3:20-CR-31-KAC-JEM, 2022 WL 3684593, *5 (E.D. Tenn. Aug. 25, 2022) (quoting
*Castro*, 991 F.3d at 968) (appeal filed Feb. 14, 2023). The Federal Rules of Criminal Procedure
provide with regard to a search warrant for electronically stored information that law enforcement
are authorized to perform "a later review of the media or information consistent with the warrant."
Fed. R. Crim. P. 41(e)(2)(B); *see also Whipple*, 2022 WL 3684593, *5. "The time for executing
the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure . . ., and not to any later off-site
copying or review." Fed. R. Crim. P. 41(e)(2)(B); *Whipple*, 2022 WL 3684593, *5 (quoting Rule).
Accordingly, the court in *Whipple* concluded that extraction of data from a cellphone and SD card
in November 2020, following an initial extraction in March 2020 under the authority of the same
search warrant did not contravene the Fourth Amendment. *Id.* "To conclude otherwise would be
to allow law enforcement's lawful, permitted access to cellphone data to be undercut in any case
where a password prevents law enforcement from immediately accessing the data it is permitted
to seize. That is not the law." *Id.* Thus, the Court finds that two extractions of data from
Defendant's cellphone and SD card, if such occurred, would not exceed the scope of the first
federal search warrant.[32]

### (3) Timing of Second Federal Search Warrant

Defendant also contends that law enforcement unreasonably delayed seeking the second
federal search warrant for over eighteen months after the execution of the state search warrant and
continued to investigate leads from Defendant's SD card during this time [Doc. 20 p. 9]. The

---

[32] Defendant also argues that it was unreasonable for the FBI to wait eight months after obtaining the first federal search warrant to perform the Cellebrite extraction in February 2019 [Doc. 97 p. 27]. The Court finds no Fourth Amendment violation for this eight-month delay for the same reasons as for the longer delay discussed in section (3).

72

seizure of an item "that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.'" *United States v. Sykes*, 2023 WL 3051733, *5 (6th Cir. Apr. 24, 2023) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). Thus, a seizure of extended duration can violate the Fourth Amendment, if unjustified. *Id.* To determine whether the delay is reasonable, the Court must balance "the individual's possessory interest in the object seized against the law-enforcement interests justifying the seizure and retention." *Id.*

Here, the Court finds Defendant's possessory interest in his cellphone and SD card was low because both items were properly in law enforcement custody as instrumentalities of the state crimes with which he was charged. Defendant was in state custody during this time and could not have possessed his cellphone. Thus, any delay in bringing the second federal search warrant did not interfere with Defendant's possessory interest. *See Sykes*, 2023 WL 3051733, at * 6 (determining that defendant "had a limited possessory interest in the phone because he was not permitted to have the phone while he was in custody). On the other hand, law enforcement had a strong interest in retaining custody of the cellphone and SD card because the SD card contained sexually explicit images of minors and probable cause existed to believe that the internal memory of the cellphone also contained child pornography and potential evidence of solicitation of a minor. *See id.*

While the record before the Court does not provide the reason for the delay in seeking the second federal search warrant, the Court observes that between the execution of the state search warrant in May 2018 and the access to the internal memory of Defendant's cellphone following

the first federal search warrant[33] issued in June 2018 and then the execution of the second federal search warrant in November 19, 2019, law enforcement was identifying and interviewing the minor victims to include a minor female in Bulgaria [*See* 98-22, Letter to Bulgarian General Directorate for Combating Organized Crime (dated September 13, 2018)]. Accordingly, the Court finds that the period between the execution of the state search warrant and the execution of the second federal search warrant was not unreasonable.

The Court has examined the Defendant's allegations of errors in the execution of the three search warrants and finds no basis to exclude evidence.[34]

### D. Irregularities with the Second Federal Search Warrant

Defendant argues that the second federal search warrant was never issued by a judge because it was not signed and contains irregularities in format [Doc. 97 pp. 1–2; Doc. 99 pp. 4–6; Doc. 113 pp. 2–3]. He also alleges irregularities in production of the second federal search warrant

---

[33] Defendant contends that documents provided in discovery suggest that the FBI accessed his cellphone prior to the extraction of data and Cellebrite analysis in February 2019 [Doc. 34 pp. 4–5; Doc. 100 p. 32 (referencing numerous exhibits in Doc. 98)]. However, whether the memory of Defendant's cellphone was accessed in May or June 2018, as suggested by Defendant or February 2019, as related by the FBI Report of Examination [Doc. 98-23], the Court still finds law enforcement's seeking and obtaining the second federal search warrant on November 19, 2019 was reasonable.

[34] Defendant also asserts that an extraction of data from a cellphone using the Cellebrite software is overly broad and the equivalent of a general warrant because it seizes the entire contents of the cellphone [Doc. 97 p. 20]. He argues that a Cellebrite extraction cannot be limited to search certain file types, applications, or time frames [*Id.*]. Relying on "blog" entry, Defendant also contends that the Cellebrite software is capable of being "hacked" and manipulated [*Id.* at 21]. The Court finds Defendant's argument that Cellebrite program could be adulterated is not a basis for finding any improper conduct in this case. Nor has Defendant shown that concerns about the Cellebrite report would require suppression of the evidence in this case. *See United States v. Hawkins*, No. 5:18-CR-063-2-JMH, 2019 WL 542286, at *2 (E.D. Ky. Feb. 11, 2019) (declining to exclude evidence of text messages due to "inconsistencies" with the "Cellbrite report," observing that the inconsistencies to not render the text messages "unreliable or unfairly prejudicial").

in discovery and in docketing [Doc. 97 pp. 1–2; Doc. 99 pp. 4–6; Doc. 113 pp. 2–3]. Defendant asks for a copy of the return and for the undersigned to confirm that she issued the second federal search warrant [Doc. 97 p. 2].

Defendant doubts that the second federal search warrant was ever issued by the undersigned first because the initial copy he received in discovery, along with the copy the Government filed as an attachment to its response to his suppression motion, does not have a signature [Doc. 99 p. 5]. Although the Government subsequently produced a signed copy of the second federal search warrant, Defendant continues to doubt its authenticity due to irregularities in formatting [*See id*. at 5–6]. First, he points out that the issuing judge's signature appears on a second page above the return [*Id.* at 6]. He notes that the spot where the name of the judge to whom the search warrant should be returned is placed is blank on the search warrant [*Id.*]. He also contends that the font in the caption is enlarged, a "white line" has been inserted in the center of the search warrant, some text is "whited out," and the form appears to have been altered from that of an original AO93 form [*Id.*].

The Court finds that the copy of the search warrant appended to the Government's response [Doc. 102-1] is a copy of the search warrant in case number 3:19-MJ-117, and it is signed by the undersigned on the second page above the return. The undersigned issued this search warrant as evidence by the undersigned's signature thereon.

Defendant also argues that he did not receive a signed copy of the second federal search warrant or a copy of the search warrant return in his initial discovery in this case [Doc. 97 p. 1; Doc. 99 p. 5]. Defendant alleges that in February 2020, he received in discovery a twenty-page packet, that purported to contain the second federal search warrant and all related documents [Doc.

99 p. 5].[35]  The copy of the second federal search warrant in this packet is not signed by the issuing judge [Doc. 97 p. 1; Doc. 99 p. 5].  Defendant's elbow counsel sought a signed copy of the search warrant by looking up the case number on the documents, 3:19-MJ-1117, but no documents were filed in that case [Doc. 99 p. 5].  At Defendant's request, elbow counsel asked for a signed copy of the second federal search warrant from the Government, which when produced had a twenty-first page with a blank return and the Judge's signature on the top [*Id.* at 5–6].  Defendant suspects that the signature page provided by the Government is fraudulent because it was not provided in the original discovery, nor was it attached to the Government's response to his motion to suppress [Doc. 97 p. 1 (*see* Doc. 35-2)].  He also contends that none of the documents received in either the original or the later provided discovery packets were stamped as filed [Doc. 99 p. 6].

The Government responds that on August 27, 2021, elbow counsel requested a signed copy of the second federal search warrant, informing Government's counsel that he believed he had received an unsigned copy in discovery [Doc. 102 p. 1].  On August 30, 2021, the Government provide a copy of its "file copy" of the search warrant, application, and affidavit in case number 3:19-MJ-1117 [*Id.*].  The Government alleges that "due to an apparent formatting issue, the Magistrate Judge's signature on the Warrant is on the second page, above the return portion of the warrant" [*Id.* at 2].  The Government relates that its file copy is consistent with the court-filed copy of the original warrant [*Id.*].  The Government notes that the search warrant's return on its copy "is not complete because, due to an oversight, the warrant was returned by the executing agent on September 13, 2021" [*Id.* at 2 n.2].

---

[35]    Defendant contends that the same twenty-page packet appears in the record as an attachment to the Government's response to his Franks motion [Doc. 35-2].

The Court finds that Defendant now has access to a complete, signed copy of the search warrant and that he received access well in time to prepare for trial.

Defendant contends that he asked elbow counsel to obtain a copy of the second federal search warrant and all related documents from case number 3:19-MJ-1117, and counsel responded that no documents were filed under that case number and that the case is closed [Doc. 97 p. 1; Doc. 99 p. 5]. Defendant contends that documents were not filed in case number 3:19-MJ-1117 until September 22, 2021, at which time "back-dated files" were filed in the case [Doc. 111 p. 2; Doc. 113 p. 2]. Defendant asserts that the return lists the four Blu-ray disks as the inventory, rather than what was seized from the disks [Doc. 111 p. 2]. Defendant argues that suppression of all of the evidence gained from the second federal search warrant is the remedy for the Government's attempt to mislead the Court as indicated by the irregularities with the warrant [Doc. 97 pp. 25–26].

The Court observes that the documents in case number 3:19-MJ-1117 were docketed after the Court received the returned search warrant, which is consistent with the Court's procedures for docketing search warrants and related documents at that time.

Defendant also argues that a return was never made for the second federal search warrant [Doc. 97 p. 4]. However, SA Norris returned the second federal search warrant on September 13, 2021 [3:19-CR-1117, Doc. 3]. The return states that the second federal search warrant was executed on November 19, 2019, at 1600 hours [*Id.*]. Delay in returning a valid search warrant is not a basis for suppression of the evidence. *United States v. Lanier*, No. 1:18CR749, 2021 WL 5353932, at *7 (N.D. Ohio Nov. 17, 2021) (holding "any technical violation in failing to return a search warrant does not mean suppression is mandatory absent some additional finding of prejudice"); *see also United States v. Dudek*, 530 F.2d 684, 691 (6th Cir. 1976) (holding "the

77

failure to make a prompt return and to verify the inventory in this case have no relation at all to the command of the Fourth Amendment which bars unreasonable searches and seizures").

In summary, the Court finds that the undersigned issued the second federal search warrant on November 19, 2019, and signed it on the second page above the return. The original search warrant is docketed as document number three in case number 3:19-MJ-1117. The second federal search warrant was returned by SA Norris on September 13, 2021. The Defendant has received a complete copy of the second federal search warrant and related supporting documents. Finally, the Court finds that the delay in returning the second federal search warrant is not a basis to suppress the evidence seized pursuant to that warrant.

### E. Good Faith

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 702 (citations omitted). Here, the Government argues that even if the Court determines the search warrants were invalid, due to the lack of probable cause or faulty execution, suppression of the evidence seized from the searches of Defendant's cellphone and SD card is not the appropriate remedy [Doc. 24 pp. 10–11]. It contends that law enforcement relied in good faith on search warrants issued by state and federal judges. The Government also contends that suppression of the evidence would not deter law enforcement misconduct, because none occurred. Thus, the Government maintains that suppression of the evidence is not warranted in this case.

Defendant argues that barebones affidavits, like the ones in this case after the material misrepresentations are omitted, negate good faith [Doc. 100 p. 3 (citing *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (no good faith when affidavit is so lacking in probable cause that officer's

78

reliance on warrant is unreasonable))].  Defendant also asserts that the good faith exception cannot apply when the executing officers failed to act within the scope and terms of the search warrant and, thus, the illegally obtained evidence from the SD card must be suppressed [Doc. 97 p. 11].

The Supreme Court recognized that "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional," such as breaking into an individual's house without a search warrant or even any basis on which to obtain one, seizing all the papers in an office "without a shadow of authority," or a search accomplished by handcuffing the homeowner and waiving a "false warrant." *Herring*, 555 U.S. at 702 (citations omitted).  As discussed in relation to probable cause above, the Court finds that Detective Stallings acted in good-faith reliance on the state search warrant and finds no Fourth Amendment violations with its execution.  The Court does not find any Fourth Amendment violations with respect to the issuance or execution of the first and second federal search warrants.  The Court finds that, to the extent that the District Judge disagrees with any of the conclusions in this case, the evidence seized from the three search warrants should not be suppressed because law enforcement acted in reasonable reliance on the search warrants issued.  The Court finds that the affidavits in support of the federal search warrants are lengthy and that probable cause to search Defendant's cellphone and SD card is readily apparent from the sexually explicit images seized from his SD card pursuant to the state search warrant and from the information from V1 and V2.  Accordingly, the Court finds that exclusion of evidence in this case would not serve the deterrent purposes of the exclusionary rule and would come at high price for our system of justice.  *See id.*

V.    **CONCLUSION**

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that although Detective Taylor's affidavit failed to provide a nexus between the

alleged criminal activity and Defendant's cellphone and SD card, the good faith exception permits the search of his SD card pursuant to the state search warrant. The Court also finds that law enforcement properly searched Defendant's cellphone and SD card based upon the two valid federal search warrants. Accordingly, the undersigned respectfully **RECOMMENDS** that that Defendant's motion to suppress evidence obtained from the three search warrants [**Doc. 20**], Motion for a *"Franks"* Hearing [**Doc. 34**], and pro se motion relating to irregularities with the November 2019 search warrant [**Doc. 99 pp. 4–6**] be denied.[36]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[36] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

80